1  David B. Shemano (State Bar No. 176020)
   dshemano@shemanolaw.com
2  SHEMANOLAW
   1801 Century Park East, Suite 2500
3  Los Angeles, CA  90067
   Telephone:    (310) 492-5033
4
   Counsel for the Debtor and Debtor in Possession
5

6

7

8              **UNITED STATES BANKRUPTCY COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10                **LOS ANGELES DIVISION**

11

12  In re:                              Case No. 2:24-bk-14877-DS

13  MONARCH BAY FOR SALE                Chapter 11
    RESIDENTIAL, LLC,
14
           Debtor.
15

16                                      **NOTICE OF EXECUTION OF CONTRACT
                                        FOR PURCHASE AND SALE AND
17                                      ESCROW INSTUCTIONS**

18

19

20

21

22

23

24

25

26

27

28

**PLEASE TAKE NOTICE** that Monarch Bay For Sale Residential, LLC, the above-captioned debtor, as "Seller," and The New Home Company of Northern California, LLC, as "Buyer," have each executed the *Contract For Purchase And Sale And Escrow Instructions* dated July 30, 2025 (the "Contract").   A copy of the Contract is attached as Exhibit A.  A condition to the closing of contract is entry of an order of the Bankruptcy Court approving the Contract.


DATED:  August 1, 2025                    **SHEMANOLAW**


By:___/s/ David B. Shemano_____
            David B. Shemano

Counsel for the Debtor and Debtor in Possession

# EXHIBIT A

## CONTRACT FOR PURCHASE AND SALE
## AND ESCROW INSTRUCTIONS

THIS CONTRACT FOR PURCHASE AND SALE AND ESCROW INSTRUCTIONS (the "**Contract**" or "**Agreement**"), dated as of _July 30, 2025, and effective as of the Effective Date (as defined in Section 13(a), below), is entered into by and between MONARCH BAY FOR SALE RESIDENTIAL, LLC a Delaware limited liability company, a debtor-in-possession under Chapter 11 of the United States Bankruptcy Code ("**Seller**") and THE NEW HOME COMPANY OF NORTHERN CALIFORNIA, LLC, a Delaware limited liability company ("**Buyer**"). Seller and Buyer are sometimes individually referred to herein as a "**Party**", and collectively as the "**Parties**."

### R E C I T A L S

A.    Seller is an affiliate of Cal Coast Companies LLC, Inc., a Delaware corporation doing business in California as Cal Coast Companies ("**Cal Coast**").

B.    Cal Coast and the City of San Leandro (the "**City**") entered into that Disposition and Development Agreement dated July 22, 2020 (the "**Original DDA**"), for the development of approximately 75 acres within the City in the Shoreline-Marina area with multiple uses, including, without limitation, hotel, apartment, commercial, park (the "**Project**"); the Project approvals includes 144 single-family detached lots (each, a "**SFD Lot**" and, collectively, the "**SFD Lots**") and 62 attached townhome units (each, a "**Townhome Unit**" and, collectively, the "**Townhome Units**"), which parcel is referred to in the DDA (defined below) as the "**Single Family Element**."

C.    Pursuant to the Original DDA, Cal Coast and the City also entered into that certain Purchase and Sale Agreement dated July 22, 2020, which established the terms and conditions in which Cal Coast had the right to purchase the Single Family Element from the City (the "**Original City Purchase Agreement**").

D.    The DDA and the Original City Purchase Agreement were amended by that certain First Amendment to Purchase and Sale Agreement and Disposition and Development Agreement dated March 17, 2021; that certain Second Amendment to Purchase and Sale Agreement and Disposition and Development Agreement dated June 21, 2022; and that certain Third Amendment to Purchase and Sale Agreement and Disposition and Development Agreement dated December 19, 2022 (such amendments, together with the Original DDA, are collectively referred to as the "**DDA**", and such amendments, together with the Original City Purchase Agreement, are collectively referred to as the "**City Purchase Agreement**").

E.    Cal Coast assigned its right, title and interest in the City Purchase Agreement to Seller, and Seller acquired the Single-Family Element, which is located in the City, County of Alameda (the "**County**"), State of California, as the same is described on **Exhibit A** attached hereto (the "**Land**").

F.    Seller has obtained approval of Vested Tentative Map No. 8643, of which the Land is a portion (the "**Vested Tentative Map**"). Among other things, the Vested Tentative Map includes 144 Single Family Lots and 62 Townhome Units within the boundaries of the Land.

G.    The DDA requires the redevelopment of an existing golf course adjacent to the Single-Family Element (the "**Golf Course Element**"), the development of infrastructure within the Project (the "**Infrastructure Element**") and the development of improvements within Monarch Bay Drive, which runs through the Project and a portion of which is within the Land (the "**Monarch Bay Drive Element**").

1

H.    Cal Coast and City also signed a Development Agreement recorded December 30, 2022, as Instrument No. 2022204137, which covers the Land and other parcels included in the DDA (the "**Development Agreement**").

I.    Seller, Cal Coast and the City have negotiated in connection with the DDA the Inclusionary Housing Agreement, which includes affordable housing requirements for the Town Home Element within the Town Home parcels (the "**Inclusionary Housing Agreement**") (the DDA, the Inclusionary Housing Agreement and the Development Agreement, are collectively referred to as the "**Development Documents**").

J.    On July 11, 2024, Seller filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Central District of California (the "**Bankruptcy Court**") as Case No. 2:24-bk-14877-DS (the "**Bankruptcy Case**").

K.    Subject to the approval of the Bankruptcy Court, Seller desires to sell to Buyer the Land, together with those other rights and interests of Seller collectively defined as the "Property" in <u>Section 1</u> below, and Buyer desires to purchase the Property from Seller, in accordance with the terms and conditions contained in this Agreement.

**A G R E E M E N T**

NOW, THEREFORE, for and in consideration of the mutual covenants and agreements contained in this Agreement, and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged by the parties, Buyer and Seller hereby agree as follows:

1.    **PURCHASE AND SALE.**

a.    <u>Sale of Property</u>. Subject to the terms and conditions set forth herein, Seller hereby agrees to sell and convey the Property to Buyer, and Buyer hereby agrees to acquire and purchase the Property from Seller. As used in this Agreement, the term "**Property**" shall mean and include the Land, as described in Recital E above, together with Seller's rights in and to the following, but solely to the extent related to the Land: (A) all easements, rights, privileges and appurtenances relating thereto; (B) all of Seller's rights, title and interest in and to (i) all entitlements and approvals of or from Governmental Authorities (as defined below), rights and privileges appurtenant, declarant rights and development rights relating to the Land, (ii) all water rights, water and sewer taps and fees, and all permits, deposits, and refunds including, without limitation, all prepaid water, sewer and building fees, utility agreements, deposits, refunds and reimbursements, prepaid fees, fee credits and other credits, system development fees, government and special district fees, deposits and refunds, and hook-ups and connections relating to the Land, (iii) property tax refunds, abatement and protest rights for the current and subsequent years relating to the Land, (iv) all and singular the hereditaments and appurtenances thereto belonging or in anywise appertaining to the Land, and the reversions, remainders, rents and issues and profits therefrom, (v) to the extent assignable, the Existing Documents (as defined below), (vi) all mineral interests and water rights not previously severed from the Land; (vii) all improvements on the Land; and (viii) all of Seller's rights, title and interest in and to adjacent streets, alleys and rights-of-way, and other rights to the extent used in connection with or benefiting or appurtenant thereto; (C) all of Seller's rights, title and interests in or to any community facilities district and assessment district that now exists or that may be created hereinafter that shall or may relate to the Property or include the Property within its service area, including all rights associated therewith, including, without limitation, all rights, privileges and associated or related refunds; and (D) all agreements, contracts, arrangements, commitments, promises, obligations, rights, instruments, documents and other similar understanding, including a leases (collectively, the "**Contracts**") to the extent set forth in <u>Section 1.b</u>. Subject to Buyer's rights under <u>Section 4</u>, below, the legal description of the Land as reflected in the Original Title Commitment and as may be amended in the Closing Commitment (each as hereinafter defined), as approved by Buyer, shall be incorporated herein by reference hereto and shall

*ESM*

become the definitive legal description for the Land hereunder. The Deed (as defined below) to be delivered by Seller to Buyer at the Closing (as defined below) shall contain such legal description of the Land.

b.    <u>Assumption and Assignment of Contracts</u>. Set forth on **Exhibit J** is a list of each Contract that shall be included as part of the Property sold and conveyed (the "**Assigned Contracts**"). Set forth on **Exhibit K** is a list of additional Contracts to which Seller is a party and may be included as part of the Property (the "**Discretionary Contracts**"), which **Exhibit K** may be updated by Seller from time to time to add or remove any Contracts inadvertently included or excluded from such schedule.

i.    The Assigned Contracts shall be assumed and assigned to Buyer. Until the Closing Date, Buyer, in its sole discretion by written notice to Seller, shall designate in writing which Discretionary Contracts that Buyer wishes to include as Assigned Contracts and subject to the right of Buyer, at any time prior to the Closing Date, to determine that any Discretionary Contracts previously designated as a Assigned Contract shall not be an Assigned Contract but instead shall be an Excluded Contract (as defined below). All Discretionary Contracts that Buyer does not designate in writing for assumption and assignment or which otherwise cannot be assumed and assigned to Buyer shall not be considered Assigned Contracts or Property and shall automatically be deemed "**Excluded Contracts.**" Upon Buyer's reasonable request, Seller shall provide additional information as to the liabilities under the Discretionary Contracts sufficient for Buyer to make an informed assessment whether to accept an assignment and assumption of such Discretionary Contract.

ii.    In the event of a dispute as of the Closing Date regarding assumption and assignment of any Contract proposed to be an Assigned Contract, Buyer shall have the right to designate any Assigned Contract as an Excluded Contract at any time following the Closing Date in the event any such dispute is not resolved to Buyer's satisfaction by entry of an order by the Court (or upon the consensual resolution of such dispute as may be agreed by Buyer and such counterparty); provided, however, if the only such dispute is in respect of the proposed claim amounts that must be paid under Section 365(b) of the Bankruptcy Code (a "**Cure Cost**") for such Contract, then the Contract shall be an Assigned Contract on the Closing Date, and Seller shall pay any applicable Cure Cost upon entry of an order by the Court resolving such dispute. Upon an election by Buyer to designate such previously Assigned Contract as an Excluded Contract in accordance with this <u>Section 1.b.ii</u>, Buyer shall have no liability or other obligation whatsoever to the counterparty to such Contract that may arise prior to or after the Closing Date.

iii.    Seller shall use commercially reasonable efforts to assign, or cause to be assigned, the Assigned Contracts to Buyer, including taking all actions required by the Court to obtain an order containing a finding that the proposed assumption and assignment of the Assigned Contracts to Buyer satisfies all applicable requirements of Section 365 of the Bankruptcy Code.

iv.    Except as to Assigned Contracts assigned pursuant to Section 365 of the Bankruptcy Code, this Agreement shall not constitute an agreement to assign any Contract or any right thereunder if an attempted assignment, without the consent of a third party or Governmental Authority (each, a "**Transfer Consent**"), would constitute a breach or in any way adversely affect the rights of Buyer or Seller thereunder. If such Transfer Consent is not obtained or such assignment is not attainable pursuant to Section 365 of the Bankruptcy Code, to the extent permitted and subject to any approval of the Bankruptcy Court that may be required, Seller and Buyer will cooperate in a mutually agreeable arrangement (at Buyer's cost and expense) under which Buyer would obtain the benefits and assume the obligations thereunder in accordance with this Agreement.

v.    Seller shall serve on all counterparties to all Assigned Contracts a notice specifically stating that Seller is or may be seeking the assumption and assignment of such Assigned Contracts and shall notify such counterparties of the deadline for objecting to the Cure Costs.



vi.    At Closing, (i) Seller shall, pursuant to the Confirmation Order (as defined below), assume and assign, or cause to be assigned, to Buyer (the consideration for which is included in the Purchase Price) each of the Assigned Contracts that is capable of being assumed and assigned; (ii) subject to Section 1.b.ii, Seller shall promptly pay all Cure Costs (if any) in connection with such assumption and assignment; and (iii) Buyer shall assume and perform the liabilities (if any) under the Assigned Contracts, pursuant to the Confirmation Order.

2.    **EARNEST MONEY DEPOSIT.**

a.    Within five (5) business days after the Effective Date, Buyer shall deliver to Old Republic Title Company, Attn: Lizeth Villalobos (the "**Title Company**"), the sum of **$100,000.00** as an earnest money deposit (the "**Initial Earnest Money**"), which shall be held in escrow by Title Company pursuant to the terms of this Agreement. The Initial Earnest Money, together with all interest accrued thereon, shall be fully-refundable to Buyer if (A) Buyer terminates this Agreement for any reason prior to the expiration of the Inspection Period (as defined below), (B) this Agreement terminates as a result of the failure of any of the Buyer's Condition Precedent or Seller's Condition Precedent (each as defined below), and Buyer is not in default under this Agreement beyond any applicable notice and cure periods, (C) this Agreement terminates as a result of a Seller default, or (D) otherwise expressly provided in this Agreement. If Buyer timely delivers to Seller a Notice of Continuation (as defined below) prior to the end of the Inspection Period then, within one (1) business day after the expiration of the Inspection Period, Buyer shall deposit additional earnest money with the Title Company in the amount of $10,100,000.00 (the "**Additional Earnest Money**"), which shall be held in escrow by Title Company pursuant to the terms of this Agreement, for a total of $10,200,000.00. Once each is deposited into escrow, the Title Company shall place the Initial Earnest Money and the Additional Earnest Money into a federally-insured, interest-bearing account (the Initial Earnest Money and the Additional Earnest Money, together with all interest earned thereon, are collectively referred to herein as the "**Earnest Money**"). From and after Buyer's timely delivery of a Notice of Continuation, if at all, the Earnest Money shall be non-refundable to Buyer, except that the Earnest Money shall be fully refundable to Buyer (i) if this Agreement is terminated as a result of the failure of any of the Buyer's Condition Precedent or Seller's Condition Precedent, and Buyer is not in default under this Agreement beyond any applicable notice and cure periods, (ii) upon termination of this Agreement as a result of a Seller default, or (iii) as otherwise expressly provided in this Agreement. The Earnest Money shall be credited against the Purchase Price at the Closing.

b.    Notwithstanding anything to the contrary contained herein, so long as the Earnest Money Release Conditions (as defined below) have been and remain satisfied, Seller may draw upon the Earnest Money from time to time (but no more often than once each calendar month (i.e., request in by the 1st out by the 15th)) solely to pay (i) bills and invoices incurred by Seller in connection with its efforts to obtain the Seller Approvals (as defined in Section 6a., below), and/or (ii) interest to the City of San Leandro pursuant to that certain promissory note dated December 22, 2022 in the original principal amount of $24,882,958.00 (the "**City Note**") and secured by that certain Deed of Trust with Assignment of Rents, Security Agreement and Fixture Filing dated December 22, 2022 and recorded on December 20, 2022 in the Official Records of Alameda County, California as Instrument 2022203851 (the "**City Deed of Trust**"), and/or (iii) real property taxes with regard to the Property; provided, however, that no such draws shall be disbursed by Title Company until after Buyer's written approval of a draw request (the "**Draw Request**"); which Draw Request shall be delivered by Seller to Buyer concurrently with its delivery to Title Company. Each Draw Request shall be accompanied by (A) a reasonably detailed list of all costs and expenses for which Seller is seeking funds to pay; (B) copies of invoices and/or other such evidence of such costs to be paid by Seller upon receipt of the Draw Request funds; (C) conditional lien waiver(s) and release(s) from each contractor and subcontractor which has mechanic's lien rights for which payment has been requested, such lien waiver(s) to be conditioned only upon payment of a specific sum (which amounts, in the aggregate, must be equal to or less than the amount of the requested payment); and (D) unconditional lien waivers from each contractor and subcontractor which has mechanic's lien rights who were paid in connection with the immediately previous Draw Request, if any.



Buyer shall approve (which approval shall not be unreasonably withheld or conditioned) or disapprove any such Draw Request, and deliver written notice thereof to Seller and Title Company, within five (5) business days after Buyer's receipt of such Draw Request. Any disapproval of a Draw Request shall be accompanied by a reasonably detailed written explanation for Buyer's disapproval thereof. If Buyer fails to respond to a Draw Request within five (5) business days after Buyer's receipt thereof, then Buyer shall be deemed to have approved such Draw Request. Upon Buyer's approval (or deemed approval) of a Draw Request, the Title Company shall disburse to Seller the amount approved (or deemed approved); provided, however, that no advance shall be made unless (1) Borrower is in compliance with all terms of the Note (as defined below) and the related Loan Documents (as defined in the Note); (2) there exists no Event of Default (as defined in the Note), and (3) all Earnest Money Release Conditions (as defined below) remain satisfied. Notwithstanding such disbursement, the funds so released shall remain an earnest money deposit subject to the terms and conditions of this Agreement.

c.    For purposes of this Agreement, the "**Earnest Money Release Conditions**" shall mean that (i) Buyer has delivered to Seller a Notice of Continuation; (ii) Seller has executed and delivered to Buyer a promissory note in the original principal amount of the Earnest Money in the form attached hereto as **Exhibit H** (the "**Note**"); (iii) a deed of trust in the form attached hereto as **Exhibit I** (the "**Deed of Trust**") has been recorded in the Official Records against the entire Property; (iv) recognition agreements in a form agreed upon by the parties on or before the expiration of the Inspection Period (each a "**Recognition Agreement**") duly executed and acknowledged by Seller and the holder of each monetary lien senior to the Deed of Trust (each a "**Lender**") providing that Buyer's rights hereunder shall be recognized and not disturbed in the event such Lender (or its successors and assigns) forecloses on such senior monetary lien has been recorded in the Official Records; provided, however, that no such Recognition Agreement shall be required from the City with respect to the City Deed of Trust; (v) Title Company shall have caused to be issued to Buyer, at Seller's sole cost and expense, a lender's policy of title insurance assuring Buyer that (1) Seller is the sole owner of the entire Property, (2) that the Deed of Trust is of record with respect to the entire Property, and (3) the Deed of Trust is senior to any and all monetary encumbrances and leases except for (A) the City Deed of Trust, and (B) monetary liens for which a Recognition Agreement has been recorded, and (C) real estate taxes and assessments that are a lien not yet due or payable; and (vi) Seller has obtained a Final Order (as defined below), in form and substance satisfactory to Buyer, approving this Agreement including, without limitation, the Note, the recordation of the Deed of Trust and the disbursement of the Earnest Money.

d.    Notwithstanding anything to the contrary contained in this Agreement, if this Agreement is terminated for any reason that entitles Buyer to the return of the Earnest Money (or any part thereof), then the sum of **$100.00** of the Earnest Money (the "**Independent Consideration**") shall be paid to Seller from the Earnest Money, which amount Seller and Buyer have bargained for and agreed to as independent and sufficient consideration for Seller's execution and delivery of this Agreement. The Independent Consideration is non-refundable and separate consideration from any other payment or deposit required by this Agreement, and Seller shall retain the Independent Consideration upon any termination of this Agreement notwithstanding any other provision of this Agreement to the contrary.

**3.    PURCHASE PRICE.** The purchase price for the Property shall be **$68,259,000.00** (the "**Purchase Price**") calculated as follows: Four Hundred Seven Thousand Five Hundred Dollars ($407,500.00) per SFD Lot (i.e., $58,680,000 for all of the SFD Lots) and One Hundred Fifty-Four Thousand Five Hundred Dollars ($154,500.00) per Townhome Unit (i.e., $9,579,000.00 for all of the Townhome Units). The Purchase Price shall be payable at the Closing in good, immediately available U.S. funds.

**4.    TITLE TO PROPERTY.**

a.    <u>Title Commitment and Title Policy</u>. Within three (3) business days after the Effective Date, Seller shall, at Seller's expense, deliver or ask the Title Company to deliver to Buyer: (i) a title commitment

dated no earlier than thirty (30) days prior to the Effective Date showing the status of record title to the Property and naming Buyer as the proposed insured, in the amount of the Purchase Price and consisting of a Form 2021 (or the Title Company's current form) regarding an ALTA owner's extended title insurance policy (the "**Original Title Commitment**"); (ii) true, correct, and legible copies of any and all instruments referred to in Schedule B of the Original Title Commitment (collectively, the "**Title Instruments**"); and (iii) if in Seller's possession, a current ALTA survey of the Property (the "**Current Survey**") (the Original Title Commitment, Title Instruments, and Current Survey, collectively, the "**Title Documents**"). The Survey shall be certified to Buyer, Seller, and the Title Company. It shall be a condition to the Closing that the Title Company be irrevocably committed to issue to Buyer a Form 2021 extended coverage ALTA owner's title insurance policy dated as of the Closing in the form of the proforma title policy that Buyer obtains prior to the expiration of Inspection Period (as defined below), a copy of which Buyer shall deliver to Seller concurrently with its Notice of Continuation (as defined below), with all pre-printed, standard exceptions that Title Company would typically delete deleted (other than the exception for real property taxes for the year of Closing, a lien not yet due or payable), subject only to the Permitted Exceptions (as defined below), with affirmative coverage against mechanics' liens, an endorsement deleting the arbitration provision and insuring Buyer's title to the Property in the amount of the Purchase Price (the "**Owner's Title Policy**"). Buyer shall be responsible for the cost of any Buyer-requested endorsements.

       b.    <u>Title Review and Objections</u>. Buyer shall have until 10 days prior to expiration of the Inspection Period to review the Title Documents and to deliver written notice to Seller ("**Notice of Defect**") of each matter set forth therein which is objectionable to Buyer (each, a "**Defect**"). If Buyer fails to provide a Notice of Defect, then all of the matters excepted from coverage set forth in the Original Title Commitment shall be deemed disapproved. If a Defect not revealed in the Title Documents and not caused by Buyer is shown in a subsequent update or endorsement to the Original Title Commitment (each a "**New Defect**"), then Buyer shall have until seven (7) business days after Buyer's receipt of such update or endorsement and the applicable underlying document(s) to provide Seller with a Notice of Defect with respect to the New Defect; provided, however, that if Buyer fails to provide a Notice of Defect with respect to a New Defect within such seven (7) business day period, then Buyer shall nevertheless be deemed to have objected to such New Defect. If necessary, the Closing Date and Outside Date (as defined below) shall each be extended to give effect to all applicable time periods set forth in this Section. If a Notice of Defect is timely given or deemed given, Seller may, within seven (7) days of its receipt thereof, notify Buyer in writing of those Defects, if any, contained in Buyer's Notice of Defect which Seller agrees to try to cure ("**Seller's Response**"); provided, however, that regardless of Seller's Response, then Seller shall be required to satisfy and discharge at or before the Closing the following Defects and New Defects (whether or not Buyer objected to the same): (i) all delinquent real estate taxes and assessments, (ii) all deeds of trust, mortgages, and all other monetary liens encumbering the Property arising by, through or under Seller or its predecessors-in-title, (iii) all mechanic's liens arising out of work ordered or performed prior to the Closing caused by the actions of Seller or its affiliates: provided, however, that it is expressly acknowledged and agreed that Seller's failure to pay any amounts as and when due hereunder shall be deemed to be an "action" of Seller for purposes hereof; (iv) all judgment liens, tax liens and any liens arising from or related to Seller's Bankruptcy Case; (v) all leases and other claims to possessory interests in the Property claiming by or through Seller or its affiliates, and (vi) all other exceptions to title arising from and after the Effective Date created by reason of the knowing and intentional act or the default of Seller hereunder and not otherwise expressly approved by Buyer in writing (which approval may be withheld in Buyer's sole and absolute discretion) (collectively, the "**Mandatory Removal Title Defects**").

      If Seller fails to timely provide Seller's Response, Seller shall be deemed to have declined to cure any such Defects other than the Mandatory Removal Title Defects. If Seller does not agree to cure all such Defects contained in Buyer's Notice of Defect, Buyer may elect to terminate this Agreement by written notice delivered to Seller on the later of: (A) the date that is five (5) business days after receipt of Seller's Response; (B) if Seller fails to deliver Seller's Response, then within five (5) business days after the date on which Seller's Response was due under this Section; and (C) the date of expiration of the Inspection Period. Upon such

termination, all of the Earnest Money (less the Independent Consideration) shall be immediately returned to Buyer and, thereafter, the Parties shall have no further rights or obligations under this Agreement, except those that expressly survive termination. If Buyer does not give such notice of termination, Buyer shall be deemed to have waived those Defects noted in its Notice of Defect for which Seller has not agreed to cure (other than the Mandatory Removal Title Defect) and proceed to close as provided in this Agreement in which event such Defects shall be deemed to be "**Permitted Exceptions**". If Seller, however, in a Seller's Response, agrees to cure a Defect but then fails to cure the same by the Closing or is otherwise unable to convey title to the Property to Buyer at the Closing in accordance with the provisions of this Agreement, then Buyer may, at its sole option either (a) waive such Defect(s) in writing and proceed to close as provided in this Agreement (in which event such Defect(s) shall be deemed to be Permitted Exception(s)), or (b) exercise its rights under <u>Section 11</u>. So long as this Agreement remains in full force and effect, Seller shall not knowingly and intentionally (other than as required by a Governmental Authority) cause or permit any additional exceptions to title to be recorded against the Property from and after the Effective Date without Buyer's prior written approval, which approval may be withheld in Buyer's sole and absolute discretion.

c.     <u>Title Conveyed</u>. Seller represents and warrants to Buyer that, at the Closing, Seller will have good and marketable fee simple title to the Property. At the Closing, title to the Property shall be conveyed by Seller to Buyer by grant deed in the Title Company's standard form (the "**Deed**"), free and clear of all exceptions, liens, encumbrances, easements and restrictions except the Permitted Exceptions. Seller further represents and warrants to Buyer that prior to or concurrent with the Closing, that Seller shall satisfy all requirements of the Title Company applicable to Seller as set forth in the Original Title Commitment. Title to any personal property or fixtures shall be conveyed by a general assignment and bill of sale in substantially the same form attached hereto as **Exhibit B** (the "**Assignment**").

## 5.     INSPECTION OF PROPERTY.

a.     <u>Information</u>. Within three (3) business days after the Effective Date, Seller will deliver to Buyer, or make available online, at no cost to Buyer, copies of the following documentary materials to the extent the same are in the possession or control of Seller: (i) real property tax statements for the Property for the past two (2) years; (ii) all existing surveys, plans, studies, reports and permits for the Property including, but not limited to, environmental site assessments and studies, geotechnical, soils, drainage, wetlands and floodplain reports, architectural and as-built plans and specifications for any existing buildings or utilities on the Property, structural engineering, landscaping, development and other improvement plans and other construction documents and building, zoning and other permits (collectively, the "**Existing Reports**"); (iii) evidence of the compliance of the Property with any zoning, local restrictions, building permits, historic designation, historic eligibility and certification of occupancy for the Property; (iv) all leases or licenses or leasing or licensing agreements for the Property; (v) information pertaining to any threatened, pending or current litigation involving any portion of the Property; (vi) all service and maintenance contracts, employment agreements, collective bargaining agreements, private labor agreements, equipment leases, utility agreements, management agreements, will serve letters, correspondence relating to any deficiencies that have been identified at the Property, surface use agreements and parking agreements affecting all or any portion of the Property; (vii) if any insurance claims have been filed within the past two (2) years in any way regarding or involving all or any of the Property, copies of current and operative insurance bills and policies for the past two (2) years; (viii) any other current or pending agreements that will be binding on Buyer after the Closing, if any; (ix) all covenants, conditions, and restriction of any applicable homeowners' or other associations (each, an "**HOA**"), including any bylaws and rules and regulations of each such HOA (collectively, the "**HOA Documents**"); (x) all non-confidential material correspondence related to the Property or the Bankruptcy Case; (xi) the Title Documents; (xii) a complete list of all consultants, contractors and vendors who prepared the Plans and Contracts (as defined below) (collectively, the "**Consultants**"); (xiii) all documents related to the Bankruptcy Case; and (xiv) all other non-confidential documents reasonably requested by Buyer (collectively, "**Existing Documents**"). Seller hereby represents and warrants that to Seller's knowledge (A) the Existing

*ESM*

Documents (including the Existing Reports) delivered by Seller to Buyer hereunder are complete copies of the Existing Documents in Seller's possession or control, and (B) to Seller's knowledge, there are no material defects, deficiencies or inaccuracies contained therein. To the extent of Seller's rights, Seller also hereby grants to Buyer the right to use the Existing Documents at all times from and after the Effective Date until the earlier to occur of the Closing or the prior termination of this Agreement; provided, however, that all of the Existing Documents (to the extent assignable without the need for third party consent) shall become the property of Buyer if the Closing occurs and shall be transferred to Buyer pursuant to the Assignment.

b.    Inspection Period. Buyer shall have until 5:00 p.m. Pacific Time sixty (60) days after the Effective Date (the period of time expiring on such 60th day being referred to herein as the "**Inspection Period**") to review, in Buyer's sole and absolute discretion, the condition and suitability of the Property for Buyer's intended use, including development costs, financial and market feasibility, condition of title, and the physical condition of the Property. Seller agrees that its Consultants, partners and managers will be generally available to answer any questions that Buyer may reasonably ask concerning the Property, at no material cost to Seller. Seller will keep Buyer informed of the proceedings in the Bankruptcy Case.

If Buyer determines in its sole and absolute discretion that the Property is suitable to Buyer, then, prior to the expiration of the Inspection Period, Buyer may send written notice of its approval (the "**Notice of Continuation**") to Seller, in which case this Agreement shall continue in full force and effect, Buyer shall deliver to Title Company the Additional Earnest Money in accordance with Section 2, above, and the Earnest Money shall thereupon become non-refundable (except only as set forth in this Agreement). In the event that Buyer either (A) fails to deliver the Notice of Continuation on or before the expiration of the Inspection Period, or (B) terminates this Agreement by written notice to Seller delivered prior to the expiration of the Inspection Period, then this Agreement shall terminate on the earlier of the date set forth in Buyer's termination notice or upon the expiration of the Inspection Period and, upon such termination, the Title Company shall immediately return the Earnest Money (less the Independent Consideration) to Buyer and, thereafter, the Parties shall have no further rights or obligations under this Agreement, except those that expressly survive the termination hereof.

If the Property is altered or disturbed in any manner in connection with any of Buyer's inspection activities under this Section, Buyer shall promptly return the Property to substantially the same condition existing immediately prior to Buyer's activities; provided, however, such obligation to restore the Property will be limited, as provided below, to only those items of damage or harm caused by Buyer or Buyer's agents. Buyer shall also promptly pay all persons and entities that perform work by or on behalf of Buyer in connection with Buyer's activities related to the Property and shall not permit any liens or other claims to be asserted against the Property as a result thereof, provided, however, if any liens are asserted against the Property (whether or not the same are meritorious), Buyer shall have the same removed or bonded over within no more than twenty (20) calendar days after receiving notice thereof. Buyer shall indemnify and hold harmless Seller and Seller's shareholders, members, and partners, their respective officers, directors, employees, and agents, and all of their respective successors and assigns (collectively, "**Seller Parties**") from and against any and all claims, liabilities, losses, costs, damages or expenses of any kind, including, without limitation, reasonable attorneys' fees, incurred or suffered by the Seller Parties to the extent the same directly result from any of the Buyer's activities with respect to the Property under this Section. Notwithstanding anything herein to the contrary, Buyer's restoration and/or indemnification obligations set forth herein shall not be deemed to apply to changes, claims, liabilities, losses, costs, damages or expenses to the extent arising from or relating to (1) the negligent acts, the omissions, or the willful misconduct of any of the Seller Parties or their invitees, and/or (2) the presence of any latent defects or Hazardous Substance (as defined below) discovered on, under or through the Property not first placed on the Property by Buyer or negligently exacerbated by Buyer, and/or the disclosure of any such latent defects or Hazardous Substances. Further, in no event shall Buyer be liable to Seller for any consequential, incidental, special or punitive damages or damages for lost profits hereunder. Buyer's obligations under this Section shall survive the Closing and/or termination of this Agreement for a

*EJM*

period of one (1) year (which period shall be extended with regard to any action filed during such one (1) year period).

Prior to entering the Property, Buyer or its agents, contractors, subcontractors or employees, Buyer shall deliver to Seller an endorsement to Buyer's commercial general liability insurance policy which evidences that Buyer is carrying a commercial general liability insurance policy with a minimum of $1,000,000.00 of coverage with a financially responsible insurance company, which names Seller as an additional insured, and Buyer shall maintain such insurance in good standing while this Agreement is in effect.

c.    Development Documents.

i.    Development Documents.  Buyer shall have the right to review and approve the Development Documents during the Inspection Period.

ii.    Assignment of Development Documents.  If Buyer acquires the Land pursuant to this Agreement, then, at the Closing, Seller will partially assign to Buyer, and Buyer will partially assume, the Development Documents, by signing a partial assignment agreement as the Development Documents relate to the Land, (the "**Partial Assignment of Development Documents**"), the form of which shall be agreed upon by the parties prior to the expiration of the Inspection Period.  The Partial Assignment of Development Documents must be consented to in writing by the City (the "**City Consent to Partial Assignment of Development Document**").  From and after Buyer's delivery of the Notice of Continuation, Seller will use commercially reasonable efforts to obtain the signed City Consent to Partial Assignment of Development Documents from the City.  In addition, the Parties will work together in good faith to enter into an amendment to this Agreement during the Inspection Period that specifies which rights and obligations under the Development Documents that will be assigned to and assumed by Buyer, and which rights and obligations shall remain with Seller and/or Cal Coast.  The rights and obligations to be assigned to Buyer and retained by Seller and/or Cal Coast Companies shall be attached as an exhibit to the Partial Assignment of Development Documents.

d.    Partial Assignment of DDA.  If Buyer acquires the Land pursuant to this Agreement, the Buyer agrees to assume and complete all of the improvements for the Golf Course Element, as well as a portion of Monarch Bay Drive and infrastructure as more particularly described on **Exhibit C** attached hereto (the "**Buyer Improvements**").  Buyer shall complete the Buyer Improvements in accordance with the time frames, terms and requirements under the DDA.  At the Closing Seller will assign to Buyer, and Buyer will assume, the foregoing obligations under the DDA, by signing a partial assignment agreement as the DDA relates to the Land and the Buyer Improvements (the "**Partial Assignment of DDA**") including, without limitation, an obligation of Buyer to pay Fifty percent (50%) of any improvements related to the Monarch Bay Drive Element.  Buyer, Seller and the City shall agree upon the form of the Partial Assignment of DDA prior to the expiration of the Inspection Period.

e.    Assignment of Plans and Contract.  At the Closing Seller will assign to Buyer, to the extent assignable and on a non-exclusive basis, without warranty, all of Seller's rights in and to certain plans, contracts, warranties and guaranties, intangible property, and other rights to the extent related to the Land (collectively, the "**Plans and Contracts**") pursuant to that certain Assignment and Assumption Agreement attached as **Exhibit D** hereto and hereby incorporated herein (the "**Assignment of Plans**").  Seller will use commercially reasonable efforts to obtain the consent of each Consultant for such assignment prior to expiration of the Inspection Period, in the form attached hereto as **Exhibit E** (each, a "**Consent**").  If Seller is unable to deliver all of the Consents, then Buyer will have the right to terminate this Agreement prior to expiration of the Inspection Period, in which case the Initial Earnest Money (less the Independent Consideration) will be refunded.  If the Closing occurs and despite the delivery of the Consents, if any of the warranties, indemnities, or any other rights or remedies assigned to Buyer are not enforceable by Buyer, or if

*EJM*

Buyer is not named as an additional insured on any policy of insurance for which Seller was added as an additional insured by the Consultant under any of the Plans and Contracts, then Seller shall, at Buyer's request (and Buyer shall promptly on demand reimburse Seller for all reasonable and verifiable out-of-pocket costs and expenses incurred by Seller in connection with same), exercise commercially reasonable efforts to enforce (i) such warranties, indemnities, or other obligations for the benefit of Buyer, or (ii) Seller's rights under such additional insured endorsement for the benefit of Buyer, as the case may be. The intent of the foregoing provision is to put Buyer and Seller in the same position they would have been in whether or not the warranties, indemnities or other obligations become enforceable directly by Buyer or had Buyer been named as an additional insured on any policy of insurance for which Seller was added as an additional insured by the Consultant under any of the Plans and Contracts assigned to it. Nothing contained in this Section shall in any way limit or otherwise affect Seller's obligation to try to deliver the Consents to Buyer as required herein. The obligations of Seller under this Section shall survive the Closing and the delivery and recordation of the Deed.

## 6.    ENTITLEMENTS AND APPROVALS.

a.    <u>Seller Approvals.</u>    Seller will not request, process or consent to any amendment or modification of the Tentative Map or other Development Documents to the extent related to the Land without Buyer's prior written consent, which Buyer may grant or withhold in its sole and absolute discretion. Buyer shall respond promptly to any request for consent. In addition, Seller will not request, process or consent to any amendment or modification of the DDA to the extent it would modify the rights or obligations related to the Land, the Single Family Element or Buyer's intended development of the Property as a residential project without Buyer's prior written consent, which Buyer may grant or withhold in its sole and absolute discretion. Buyer shall respond promptly to any request for consent. Unless expressly waived by Buyer in writing, Buyer's obligation to consummate the purchase of the Property is expressly subject to and contingent upon Seller's having obtained, at Seller's sole cost and expense, the following final and non-appealable approvals from the City, the County and other applicable governmental and quasi-governmental entities and agencies with jurisdiction (collectively, the "**Governmental Authorities**") as may be required by any such Governmental Authorities for the development of the Property into a residential community in accordance with Seller's plans (modified as the Parties may agree in writing), and Seller shall have obtained the approval of the appropriate Governmental Authorities of the following (collectively, the "**Seller Approvals**"): (i) improvement plans related to development of the Land as intended in accordance with the Vested Tentative Map and development of the Golf Course Element in accordance with the DDA for all backbone improvements as required by the City including, without limitation the following to the extent required by the City: street improvements – sections, construction details, plan and profile, etc. (backbone); any required removal plans; water plan (EBMUD); pavement delineation and signing plan; water pollution control; stage construction; traffic handling plan; utility plans; and lighting plans (if street lights are changing) (collectively, the "**Backbone Improvement Plans**"), and, subject to the terms and conditions of Section 7(b)(xviii), below, the EBMUD Plans and the In-tract Plans; (ii) the approved Vested Tentative Map; (iii) written confirmation from the applicable Governmental Authority that a rough grading permit consistent with the Backbone Improvement Plans is ready to be issued to Buyer solely upon Buyer paying the City's regularly scheduled permit fee therefor (the "**Grading Permit**"); and (iv) all necessary environmental and biological permits required for development of the Property, namely, a Regional Water Board 401 Permit, an Army Corps of Engineers 404 Permit, and a California Department of Fish & Wildlife Streambed Alterations Agreement, all in form and content consistent with the usual permits issued by such agencies satisfactory to Buyer in its reasonable discretion (collectively, the "**Environmental Permits**"). For purposes of this Section, the term "non-appealable" means, with respect to each document, instrument, plan, map or other entitlement approved by such Governmental Authorities, that no appeal, reconsideration, initiative, referendum or other challenge (each a "**Challenge**") is filed with respect thereto for during the applicable period of any applicable Governmental Authorities (the "**Appeal Period**") or if a Challenge has been filed, that it has been resolved on terms and conditions acceptable to Buyer in its sole and absolute discretion. Buyer agrees to actively cooperate with Seller on all Seller Approvals and related submittals, and to execute and timely deliver to Seller, no later than five (5) business days after receipt thereof,

*EJM*

all documents reasonably appropriate or necessary in order for Seller to obtain all such Seller Approvals; provided, however, that such cooperation shall be at no out-of-pocket cost or liability to Buyer.

   b.    **Buyer Approvals.** From and after the Effective Date Buyer shall have the right, at its sole cost and in its sole and absolute discretion, to process any other approvals for Buyer's intended development of the Property including, without limitation, (i) architectural plan design review approval by the City (**"Design Approval"**), and (ii) formation of a community facilities district for the Property (which may also include other portions of the Project), for which Buyer would be entitled to all proceeds in consideration for Buyer's construction of the Buyer Improvements (collectively, the **"Buyer Approvals"**); provided, however, no Buyer Approvals will be binding on the Property until the Closing without Seller's prior written consent, which Seller may grant or withhold in its sole discretion. Seller agrees to actively cooperate with Buyer on all Buyer Approvals and related submittals, and to execute and timely deliver to Buyer, no later than five (5) business days after receipt thereof, all documents reasonably appropriate or necessary in order for Buyer to obtain all such Buyer Approvals; provided, however, that Buyer shall reimburse Seller for its reasonable out-of-pocket costs in connection therewith; provided, further, however, that Buyer shall have approved such costs in writing prior to Seller incurring the same.   To the extent Buyer elects to use Seller's consultants to seek any of the Buyer Approvals (which election Buyer may make in its sole and absolute discretion), then Buyer shall either (A) enter into a direct contract with such consultant, or (B) coordinate with Seller so that Buyer either pays such consultant under Seller's contract therewith or reimburses Seller for such costs and expenses.

   c.    <u>AS-IS</u>.

   (i)    BUYER ACKNOWLEDGES AND AGREES THAT EXCEPT FOR THE REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS AND GUARANTIES OF SELLER AS EXPRESSLY SET FORTH IN THIS AGREEMENT OR IN ANY OF THE DOCUMENTS EXECUTED BY SELLER AND DELIVERED TO BUYER AT THE CLOSING (COLLECTIVELY, THE **"SELLER REPRESENTATIONS"**), SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO (I) VALUE; (II) THE INCOME TO BE DERIVED FROM THE PROPERTY; (III) THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH BUYER MAY CONDUCT THEREON, INCLUDING THE POSSIBILITIES FOR FUTURE DEVELOPMENT OF THE PROPERTY; (IV) THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY; (V) THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY; (VI) THE NATURE, QUALITY OR CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL AND GEOLOGY; (VII) THE COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY; (VIII) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE PROPERTY; (IX) COMPLIANCE WITH ANY ENVIRONMENTAL LAWS, OR ANY RULES, REGULATION, ORDERS OR REQUIREMENTS PROMULGATED PURSUANT THERETO; (X) THE PRESENCE OR ABSENCE OF HAZARDOUS SUBSTANCES AT, ON, UNDER, OR ADJACENT TO THE PROPERTY; (XI) THE CONTENT, COMPLETENESS OR ACCURACY OF THE DUE DILIGENCE MATERIALS OR PRELIMINARY REPORT REGARDING TITLE; (XII) THE CONFORMITY OF THE IMPROVEMENTS TO ANY PLANS OR SPECIFICATIONS FOR THE PROPERTY, INCLUDING ANY PLANS AND SPECIFICATIONS THAT MAY HAVE BEEN OR MAY BE PROVIDED TO BUYER; (XIII) THE CONFORMITY OF THE PROPERTY TO PAST, CURRENT OR FUTURE APPLICABLE ZONING OR BUILDING REQUIREMENTS; (XIV) DEFICIENCY OF ANY UNDERSHORING; (XV) DEFICIENCY OF ANY DRAINAGE; (XVI) THE FACT

THAT ALL OR A PORTION OF THE PROPERTY MAY BE LOCATED ON OR NEAR AN EARTHQUAKE FAULT LINE; (XVII) THE EXISTENCE OF VESTED LAND USE, ZONING OR BUILDING ENTITLEMENTS AFFECTING THE PROPERTY, (XVIII) THE PRESENCE OF TENANTS OR OCCUPANTS AT THE PROPERTY; OR (XIX) ANY OTHER MATTER REGARDING THE PROPERTY. FOR THE AVOIDANCE OF DOUBT, NOTHING CONTAINED IN THIS SECTION SHALL LIMIT BUYER'S RIGHT TO RELY ON THE SELLER REPRESENTATIONS.

(ii)    AS PART OF BUYER'S AGREEMENT TO PURCHASE AND ACCEPT THE PROPERTY "AS IS WHERE IS," AND NOT AS A LIMITATION ON SUCH AGREEMENT, EFFECTIVE ON THE CLOSING DATE BUYER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY AND ALL ACTUAL OR POTENTIAL RIGHTS BUYER MIGHT HAVE REGARDING ANY FORM OF WARRANTY, EXPRESS OR IMPLIED, OF ANY END OR TYPE, RELATING TO ANY OF THE MATTERS REFERRED TO ABOVE (COLLECTIVELY, THE "**PROPERTY CONDITION**"), EXCEPT FOR THE SELLER REPRESENTATIONS. SUCH WAIVER IS ABSOLUTE, COMPLETE, TOTAL AND UNLIMITED IN ANY WAY. SUCH WAIVER INCLUDES, BUT IS NOT LIMITED TO, A WAIVER OF EXPRESS WARRANTIES, IMPLIED WARRANTIES, WARRANTIES OF FITNESS FOR A PARTICULAR USE, WARRANTIES OF MERCHANTABILITY, WARRANTIES OF HABITABILITY, STRICT LIABILITY FIGHTS, AND CLAIMS, LIABILITIES, DEMANDS OR CAUSES OF ACTION OF EVERY KIND AND TYPE, WHETHER STATUTORY, CONTRACTUAL OR UNDER TORT PRINCIPLES, AT LAW OR IN EQUITY, INCLUDING, BUT NOT LIMITED TO, CLAIMS REGARDING DEFECTS WHICH MIGHT HAVE BEEN DISCOVERABLE, CLAIMS REGARDING DEFECTS WHICH WERE NOT OR ARE NOT DISCOVERABLE, PRODUCT LIABILITY CLAIMS, PRODUCT LIABILITY TYPE CLAIMS, ALL OTHER EXTANT OR LATER CREATED OR CONCEIVED OF STRICT LIABILITY OR STRICT LIABILITY TYPE CLAIMS AND RIGHTS, AND ANY CLAIMS UNDER CERCLA. EFFECTIVE UPON THE CLOSING DATE, AND TO THE FULLEST EXTENT PERMITTED BY LAW, BUYER HEREBY RELEASES, DISCHARGES AND FOREVER ACQUITS SELLER AND ALL OF THE ENTITIES WHICH COMPRISE SELLER ("**SELLER CONSTITUENT ENTITIES**") AND ALL OF THEIR MANAGERS, MEMBERS, OFFICERS, DIRECTORS, SHAREHOLDERS, AND EMPLOYEES AND THE SUCCESSOR OF EACH AND EVERY ONE OF THEM FROM ALL DEMANDS, CLAIMS, LIABILITIES, OBLIGATIONS, COSTS AND EXPENSES WHICH BUYER MAY SUFFER OR INCUR RELATING TO THE PROPERTY CONDITIONS OR ANY OTHER ASPECT OF THE PROPERTY; PROVIDED, HOWEVER, THAT BUYER'S RELEASE OF SELLER AND THE SELLER CONSTITUENT ENTITIES SHALL NOT APPLY TO PROPERTY CONDITIONS OR ASPECTS; (I) WHICH ARE ACTUALLY KNOWN TO SELLER'S PRINCIPALS AS OF THE DATE OF THIS AGREEMENT; (II) WHICH ARE NOT DISCLOSED TO BUYER BY SELLER PRIOR TO THE CLOSING DATE; AND (III) THE DISCLOSURE OF WHICH BY SELLER TO BUYER WOULD HAVE HAD A MATERIALLY ADVERSE IMPACT UPON BUYER'S DECISION TO PURCHASE THE PROPERTY. THIS PROVISION SHALL SURVIVE THE CLOSING. AS PART OF THE PROVISIONS OF THIS SECTION, BUT NOT AS A LIMITATION THEREON, BUYER HEREBY AGREES, REPRESENTS AND WARRANTS THAT, EXCEPT AS EXPRESSLY PROVIDED IN THE PROVISIONS CONTAINED IN THE IMMEDIATE PRECEDING SENTENCE, THE MATTERS RELEASED HEREIN ARE NOT LIMITED TO MATTERS WHICH ARE KNOWN OR DISCLOSED, AND, EFFECTIVE AS OF THE CLOSING DATE, BUYER HEREBY WAIVES ANY AND ALL RIGHTS AND BENEFITS WHICH IT NOW HAS, OR IN THE FUTURE MAY HAVE CONFERRED UPON IT, BY VIRTUE OF THE PROVISIONS OF FEDERAL, STATE OR LOCAL LAW, RULES OR REGULATIONS, INCLUDING WITHOUT LIMITATION, SECTION 1542 OF THE CIVIL CODE OF THE STATE OF CALIFORNIA, WHICH PROVIDES AS FOLLOWS:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT

*EJM*

THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

(iii)    IN THIS CONNECTION AND TO THE EXTENT PERMITTED BY LAW, BUYER HEREBY AGREES, REPRESENTS AND WARRANTS THAT BUYER REALIZES AND ACKNOWLEDGES THAT FACTUAL MATTERS NOW UNKNOWN TO IT MAY HAVE GIVEN OR MAY HEREAFTER GIVE RISE TO CAUSES OF ACTION, CLAIMS, DEMANDS, DEBTS, CONTROVERSIES, DAMAGES, COSTS, LOSSES AND EXPENSES WHICH ARE PRESENTLY UNKNOWN, UNANTICIPATED AND UNSUSPECTED, AND BUYER FURTHER AGREES, REPRESENTS AND WARRANTS THAT THE WAIVERS AND RELEASES HEREIN HAVE BEEN NEGOTIATED AND AGREED UPON IN LIGHT OF THAT REALIZATION AND THAT BUYER NEVERTHELESS HEREBY INTENDS TO RELEASE, DISCHARGE AND ACQUIT SELLER AND ALL OF THE SELLER CONSTITUENT ENTITIES FROM ANY SUCH UNKNOWN CAUSES OF ACTION, CLAIMS, DEMANDS, DEBTS, CONTROVERSIES, DAMAGES, COSTS, LOSSES AND EXPENSES WHICH MIGHT IN ANY WAY BE INCLUDED IN THE WAIVERS AND MATTERS RELEASED AS SET FORTH IN THIS SECTION.  THE PROVISIONS OF THIS SECTION ARE MATERIAL AND INCLUDED AS A MATERIAL PORTION OF THE CONSIDERATION GIVEN TO SELLER BY BUYER IN EXCHANGE FOR SELLER'S PERFORMANCE HEREUNDER.

(iv)    THE TERMS AND PROVISIONS OF THIS SECTION SHALL SURVIVE THE CLOSING OR THE TERMINATION OF THIS AGREEMENT FOR ANY REASON.  BUYER HAS EACH INITIALED THIS SECTION TO FURTHER INDICATE ITS AWARENESS AND ACCEPTANCE OF EACH AND EVERY PROVISION HEREOF.



BUYER'S INITIALS

(v)    Without limiting anything contained herein, Seller acknowledges and agrees that the foregoing waivers and releases shall not act to release of Seller or any Seller Constituent Entities with respect to (A) any breach of any of the Seller Representations or this Agreement; (B) any acts of Seller or any Seller Constituent Entities that occur after Closing; (C) any release of Hazardous Substances caused by Seller, any Seller Constituent Entity or their respective employees and/or agents or knowingly permitted by Seller during Seller's period of ownership of the Land; (D) any third party claims arising out of the actions of Seller or any Seller Constituent Entities prior to the Closing; or (E) the gross negligence, willful misconduct or fraud of Seller or any Seller Constituent Entities.  In addition, notwithstanding anything in this Section to the contrary, upon Closing, Buyer reserves all its rights and defenses, if any, against any non-parties to this Agreement other than the Seller Constituent Entities, including but not limited to the right to seek cost recovery or contribution under any statute or common law (including those regarding the presence, investigation or cleanup of any Hazardous Substances on, at, under, around or migrating from the Property).  Nothing in this Section 6(c) shall require Buyer to indemnify, defend or hold Seller or any Seller Constituent Entities harmless with respect to the matters released and waived herein.

7.    **CLOSING CONDITIONS.**

a.    <u>Seller's Conditions to Closing</u>.  The following conditions are precedent to Seller's obligation to proceed with the Closing ("**Seller's Conditions Precedent**").  If any of Seller's Conditions Precedent are not satisfied as and when described below then, unless the failure of such condition constitutes a Buyer default, or Buyer is otherwise in default, in which case the provisions of <u>Section 11</u> shall control, Seller may elect, by written notice to Buyer, in Seller's sole and absolute discretion, either to (i) waive that Seller's Condition

*EJM*

Precedent and proceed to Closing, (ii) upon prior written notice to Buyer, extend the Closing Date to allow Seller's Condition Precedent to be satisfied; provided, however, in no event shall Seller have the right to extend the Closing Date beyond the Outside Date, or (iii) terminate this Agreement, whereupon the Title Company shall immediately return to Buyer the Earnest Money (less the Independent Consideration) previously deposited by Buyer and, thereafter, the Parties shall have no further rights or obligations under this Agreement, except for those that expressly survive the termination of this Agreement.

i.    **Buyer Representations**. As of the Closing Date, all of Buyer's representations and warranties set forth in this Agreement shall be true and correct in all material respects.

ii.    **No Buyer Default**. On or prior to the Closing Date, Buyer shall not be in material default of, and shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by Buyer.

iii.    **Bankruptcy Court Order**. The Bankruptcy Court shall have entered the Confirmation Order (as defined below), which shall be in form and content reasonably acceptable to Seller.

b.    **Buyer's Conditions to Closing**. The following conditions are precedent to Buyer's obligation to proceed with the Closing (collectively, the "**Buyer's Conditions Precedent**"). If any of Buyer's Conditions Precedent are not satisfied as and when described below then, unless the failure of such condition constitutes a Seller default, or Seller is otherwise in default, in which case the provisions of <u>Section 11</u> shall control, Buyer may elect, by written notice to Seller, in Buyer's sole and absolute discretion, either to (i) waive that Buyer's Condition Precedent and proceed to Closing, (ii) upon prior notice to Seller, extend the Closing Date to allow Buyer's Condition Precedent to be satisfied; provided, however, in no event shall Buyer have the right to extend the Closing Date beyond the Outside Date, or (iii) terminate this Agreement, whereupon the Title Company shall immediately return to Buyer the Earnest Money (less the Independent Consideration) previously deposited by Buyer and, thereafter, the Parties shall have no further rights or obligations under this Agreement, except for those that expressly survive the termination of this Agreement.

i.    <u>Notice of Continuation</u>. On or prior to the expiration of the Inspection Period, Buyer shall have delivered to Seller a Notice of Continuation.

ii.    <u>Bankruptcy Court Order</u>.

A.    No later than thirty (30) days prior to the Outside Date, the Bankruptcy Court shall have entered an order confirming a chapter 11 plan and approving the sale hereunder (the "**Confirmation Order**"), which shall be in form and content reasonably acceptable to Buyer in its sole and reasonable discretion, and such Confirmation Order shall have become a Final Order no later than ten (10) business days prior to the Outside Date (the "**Bankruptcy Condition**"). As used herein, the "**Final Order**" means an order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Case (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, reargument or rehearing shall then be pending or (ii) if an appeal, writ of certiorari new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure,

or any analogous rule under the Bankruptcy Code, may be filed relating to such order, shall not cause an order not to be a Final Order. For the avoidance of doubt, the Confirmation Order shall approve and authorize the sale, transfer, assignment and conveyance of the Property to Buyer free and clear of all liens (including liens for federal, state or local taxes), encumbrances (including, without limitation, any leasehold interests, licenses or other rights, in favor of any person, to use any portion of the Property), claims, security interests, of whatever kind or nature, mortgages, pledges, restrictions, charges, instruments, licenses, encroachments, options, rights of recovery, judgments, orders and decrees of any court or foreign or domestic governmental authority; in each case of any kind or nature, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown, and including all claims based on any theory that Buyer is a successor, transferee or continuation of Seller or the business, in each case, other than the obligations expressly assumed in the Partial Assignment of the Development Documents and the Partial Assignment of the DDA, whether arising prior to or subsequent to the date of the filing of the Chapter 11 petition of Seller, and in accordance with the terms of the Confirmation Order and Sections 363(f) and 365 of the Bankruptcy Code.

B.    In connection with Seller's efforts to satisfy the Bankruptcy Condition, Seller shall provide Buyer with a reasonable opportunity to review and comment upon all motions, applications and supporting papers prepared by the Seller relating to this Agreement prior to the filing thereof in the Bankruptcy Case, and such filings shall be in form and substance satisfactory to Buyer.

C.    It is expressly acknowledged and agreed that Seller and the bankruptcy estate of Seller is directly benefited by Buyer's submission of and agreement to the terms of this Agreement. As a protection to Buyer in connection with certain costs, time and effort expended, the Parties agree that it is reasonable to reimburse Buyer's expenses in the event that any party other than Buyer becomes lawfully entitled to the purchase of the Property, including as a result of, or in connection with, competitive bidding allowed by the Bankruptcy Court (regardless of whether such other party is entitled to purchase (i) solely the Property or (ii) the Property in combination with any other assets or properties held by Seller). In such event, Buyer shall be entitled to receive (in addition to the return of the Earnest Money (less the Independent Consideration)) an amount equal to the reasonable, documented, out-of-pocket costs and expenses of Buyer (including the reasonable, documented expenses of outside counsel, and other outside advisors) related to negotiating this Agreement and investigating the Property, up to a maximum amount of $600,000.00 (the "**Expense Reimbursement**"). Such Expense Reimbursement shall be approved in any bidding procedures (if applicable) and order approving the sale of the Property, and paid in cash no later than the closing of sale of the Property. Seller's obligation to pay the Expense Reimbursement shall expressly survive the termination of this Agreement.

iii.    Seller Approvals. On or prior to the Closing Date, Seller shall have delivered to Buyer written confirmation from all applicable Governmental Authorities that, subject to Subsection 7(b)(xviii), below, all Seller Approvals have been obtained as provided in Section 6 above.

iv.    City Consent to Partial Assignment of DDA. The City shall have executed and delivered the City Consent to Partial Assignment of DDA.

v.    City Consent to Partial Assignment of Development Documents. The City shall have executed and delivered the City Consent to Partial Assignment of Development Documents.

vi.    Seller Representations. As of the Closing Date, all of Seller's representations and warranties set forth in this Agreement shall be true and correct in all material respects.

EJM

vii. <u>No Seller Default</u>. On or prior to the Closing Date, Seller shall not be in material default of, and shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by Seller.

viii. <u>No Casualty</u>. No casualty or other change in the Property has occurred and no condemnation action have been commenced or completed, which in either case (A) negatively impacts the value of the Property by more than three percent (3%) of the Purchase Price, (B) results in a loss of more than two percent (2%) of the SFD Lot or two percent (2%) of the Townhome Unit, or (C) results in the loss of all reasonably necessary access to the Land unless the same has been waived by Buyer as a Buyer's Condition Precedent as provided therein.

ix. <u>Title Policy</u>. On or prior to the Closing Date, (i) Seller shall be able to convey to Buyer, good and marketable title to the Property, subject only to the Permitted Exceptions, as more specifically provided in <u>Section 4</u> above, and (ii) the Title Company shall be irrevocably committed to issue to Buyer the Owner's Title Policy for the Property to be conveyed at Closing as required under this Agreement.

x. <u>Moratoriums</u>. There shall be no enacted building or utility hook-up moratoria, ordinances, laws or regulations that were not existing and enforced as of the last day of the Inspection Period, and that would prohibit or materially delay or hinder the issuance of building permits or certificates of occupancy for residences within the Land.

xi. <u>Affordable Housing Requirements</u>. There shall be no obligation to build affordable housing, inclusionary housing, or below-market rate housing in connection with the development of the Property consistent with the Vested Tentative Map other than as set forth in the Inclusionary Housing Agreement.

xii. <u>Hazardous Substances</u>. The Property shall be free of Hazardous Substances that did not exist as of the last day of the Inspection Period which will materially and adversely impact Buyer's project, except as shall have been remediated to residential standards by Seller at no cost to Buyer, such that residential development may proceed without any further environmental restrictions, soil vapor mitigation measures, clean-up, remediation, testing or monitoring (in the case of such remediation, all Governmental Authorities asserting jurisdiction over the development or remediation of the Property shall have issued final and unqualified "no further action" letters, site closure letters, and/or similar written determination, in a form and substance satisfactory to Buyer in Buyer's sole and absolute discretion).

xiii. <u>PLAs</u>. There shall be no proposed, threatened, or enacted union labor agreement or prevailing wage agreement applicable to the development of the Property other than that certain private labor agreement Seller is currently negotiating with respect to the Townhome Units (the "Townhome Unit PLA"). From and after the Effective Date of this Agreement, Seller shall (a) keep Buyer fully appraised of the negotiation of the Townhome Unit PLA and allow Buyer to participate therein; and (b) not execute the Townhome Unit PLA without Buyer's prior written approval, which approval shall not be unreasonably withheld prior to the expiration of the Inspection Period but which may be withheld in Buyer's sole and absolute discretion after the expiration of the Inspection Period. Once executed, Seller shall not amend the Townhome Unit PLA without Buyer's prior written consent, which consent Buyer may withhold in its sole and absolute discretion.

xiv. <u>Leases, etc</u>. All leases and tenancies affecting the Property shall have been terminated, all tenants and other parties shall have vacated the Property, and all personal property shall have been removed from the Property. Further, Seller shall have terminated (or caused the termination of) all licenses and other agreements affecting the Golf Course Element, all tenants and other parties of the Golf Course Element shall have vacated the Golf Course Element, and all personal property on the Golf Course Element shall have been removed therefrom.

xv. <u>Subdivision Map Act</u>. The Property shall be one or more legally subdivided parcels.

xvi. <u>Estoppels</u>. Seller shall have delivered to Buyer estoppel or similar certificates, dated no earlier than thirty (30) days before the Closing, certified to Buyer and its successors and/or assigns, on the form prescribed by the DDA and the Development Agreement or if no such form shall be prescribed then on a form reasonably required by Buyer, stating (A) that no default by any party exists under the DDA or Development Agreement, which impacts the Property, as applicable, (B) that the DDA or the Development Agreement shall be in full force and effect, (C) that the copy of the DDA or the Development Agreement, as applicable, attached to the estoppel is true, correct and complete; and (D) such other information as may be reasonably requested by Buyer (each, an "**Estoppel**"); provided, however, that no Estoppel delivered hereunder shall be acceptable if it (1) discloses adverse terms of the applicable instrument that were not expressly contained in the applicable instrument; (2) alleges a default of Seller under the DDA or the Development Agreement, as applicable; or (3) discloses a dispute between the Seller and such certifying party in connection with the DDA or the Development Agreement, as applicable, which dispute the certifying party does not unconditionally waive in the Estoppel.

xvii. <u>Flood Matters</u>. Seller shall have delivered to Buyer written confirmation in a form and with content acceptable to Buyer in its sole and absolute discretion from the City indicating that, notwithstanding anything to the contrary contained in the DDA, upon construction of single-family detached homes on each SFD Lot and an attached townhome unit on each Townhome Unit in accordance with all applicable plans, the City will issue Buyer certificates of occupancies for each such residence based solely on the purchase of flood insurance.

xviii. <u>In-tract Plans & EBMUD Approvals</u>. Seller, at its sole cost and expense, shall have obtained Approval of the East Bay Municipal Utility District utility plans for the Property (the "**EBMUD Plans**") and all In-tract Plans (as defined below) for the Property (the "**Plan Approval Condition**"). If Buyer delivers a Notice of Continuation, then, from and thereafter and for so long as this Agreement remains in full force and effect, Seller shall use commercially reasonable and diligent efforts to satisfy the Plan Approval Condition by the Outside Closing Date. In furtherance of the foregoing, Seller shall keep Buyer reasonably appraised of the status of its satisfaction of the Plan Approval Condition including promptly responding to Buyer's requests for updates. Notwithstanding anything to the contrary in this Agreement, in the event that the Plan Approval Condition is not satisfied as of the Outside Closing Date, then, so long as all of the other Buyer's Conditions Precedent have been satisfied and/or waived by Buyer, then Buyer shall on such satisfaction or waiver complete the purchase of the Property, and on the Closing Seller shall deposit into an escrow account (the "**Holdback Escrow**") an amount equal to Buyer's Carrying Costs for the Property for a period of time reasonably estimated by Buyer for Seller to satisfy the Plan Approval Condition (the "**Holdback Amount**"), to be held and disbursed by Title Company pursuant to the terms of this Agreement and an escrow agreement reasonably acceptable to Buyer, Seller and Title Company (the "**Holdback Agreement**"). The Holdback Amount shall be released from the Holdback Escrow as follows: beginning on the first (1st) day of the calendar month following the Closing, and on the first (1st) day of each calendar month thereafter, Title Company shall disburse to Buyer an amount equal to a fraction with one (1) being the numerator and the number of months estimated by Buyer above as the denominator (each, a "**Monthly Disbursement**"), until the satisfaction or waiver in writing by Buyer of the Plan Approval Condition, it being agreed that if there are insufficient funds in the Holdback Amount to make a Monthly Disbursement, then Seller shall immediately deposit such additional funds into the Holdback Escrow such that the Monthly Disbursement can be made in a timely manner. If Seller fails to deposit such additional funds in a timely manner, then the amount past due shall bear interest at the highest interest rate of interest permitted by applicable law until paid in full and, in addition, Buyer shall have the right to pursue all other rights or remedies under this Agreement or at law or in equity arising from Seller's failure to satisfy the EBMUD Condition and/or funding the Holdback Escrow in a timely manner. For purposes hereof, the term "In-tract Plans" shall mean all improvement plans related to development of the Land as intended in accordance with the Vested Tentative Map and development of the

EJM

Golf Course Element in accordance with the DDA for all in-tract improvements as required by the City including, without limitation, a project control plan; typical sections; grading; storm drain; joint trench; onsite utility plan (dry utilities / sewer); curb detail; demolition plan; street improvements - sections and details (in-tract); erosion control plan; signage/striping plan; fence plan; street light plan; and golf course design/improvement plans; and **"Carrying Costs"** shall mean all costs and expenses incurred by Buyer in connection with owning, maintaining, and carrying the Property from and after the Closing, including, without limitation: (i) interest on any purchase money financing or other loans secured by the Property; (ii) real property taxes and assessments; (iii) insurance premiums (including property, liability, and any other customary coverages); (iv) utilities and other operating expenses; (v) maintenance, repair, and security costs; (vi) homeowner association or similar fees, if applicable; and (vii) any other out-of-pocket costs customarily associated with the ownership and operation of similar real property. For purposes hereof, Buyer's Carrying Costs shall be deemed to equal twelve percent (12%) of the Purchase Price per month (i.e., $682,000.00 per month).

## 8.    CLOSING.

a.    <u>Close of Escrow</u>. The Closing shall occur **THIRTY (30) days** after the satisfaction of the Buyer's Condition Precedent and the Seller's Condition Precedent (the **"Closing Date"**), provided that if any such condition has not been satisfied or waived by February 17, 2026 (the **"Outside Date"**), then either Party who is not then in default beyond any applicable notice and cure periods shall have the right to terminate this Agreement by written notice to the other Party anytime prior to the occurrence of the Closing.

b.    <u>Closing</u>. The closing of the transactions contemplated in this Agreement (the **"Closing"**) shall occur on the Closing Date. The Closing shall occur at a time mutually acceptable to Seller and Buyer, on the Closing Date. The following shall occur at Closing:

i.    <u>Deed</u>. Seller shall execute, acknowledge and deliver to the Title Company the Deed, conveying to Buyer fee simple absolute title to the Property, subject only to the Permitted Exceptions, which Deed shall be recorded in the official records of the County (the **"Records"**).

ii.    <u>Payment of Purchase Price</u>. Buyer shall deliver to the Title Company the Purchase Price for the Property (as adjusted pursuant to this Agreement, including a credit for the Earnest Money, and as further adjusted under <u>Section 8.c.</u> below).

iii.    <u>General Assignment</u>. Seller and Buyer shall execute and deliver to the Title Company the Assignment, conveying and assigning to Buyer all of Seller's rights, title and interests in and to the Property that is not conveyed under the Deed.

iv.    <u>Assignment of Plans and Consents</u>. Seller shall execute and deliver to the Title Company an Assignment of Plans and Contracts.

v.    <u>Partial Assignment of DDA</u>. Seller and Buyer shall execute, acknowledge and deliver to the Title Company the Partial Assignment of DDA, which shall be recorded in the Records.

vi.    <u>Partial Assignment of Development Documents</u>. Seller and Buyer shall execute, acknowledge and deliver to the Title Company the Partial Assignment of Development Documents, which shall be recorded in the Records.

vii.    <u>Non-foreign Affidavit</u>. Seller shall execute and deliver to the Title Company an affidavit prepared by the Title Company stating that Seller is not a "foreign person" within the meaning of

*EJ M*

Section 1445 of the Internal Revenue Code of 1986, and a California Franchise Tax Board Form 593 to satisfy the requirements of California Revenue and Taxation Code Sections 18662(e) and 18668.

      viii.    Holdback Agreement. Seller, Buyer and Title Company shall execute and deliver the Holdback Agreement, if applicable.

      ix.    Authorization Documents. Seller and Buyer each shall deliver to the Title Company evidence reasonably satisfactory to the other party authorizing the execution, delivery and performance by it of this Agreement and the documents required to be delivered under this Agreement.

      x.    Other Documents. Seller and Buyer shall each deliver to the other and/or to the Title Company each of the following items prepared by the Title Company: a settlement statement, affidavits and indemnities as to mechanic's liens, a gap indemnity (if required), a transfer declaration and such other documents, agreements and certificates, either required by or otherwise not inconsistent with the provisions of this Agreement, as may be reasonably required or requested by the Title Company or the Parties pursuant to this Agreement or as may be necessary or customary to consummate the transactions contemplated in this Agreement and to issue the Owner's Title Policy.

      xi.    Owner's Title Policy. The Title Company shall be irrevocably committed to deliver to Buyer the Owner's Title Policy as provided for in Section 4 above.

      xi.    Possession. Seller shall deliver to Buyer exclusive possession of the Property, subject only to the Permitted Exceptions and other applicable provisions of this Agreement.

    c.    Closing Costs and Adjustments. At Closing, the Parties, at their sole cost and expense, shall deliver to the Title Company the sums provided as follows, in immediately available funds:

      i.    Seller Costs. Seller shall pay: (A) the recording fees due in connection with recordation of any of the documents described in Section 8.b above and documents required for the release of any instruments or documents required to release or remove any encumbrances to title to the Property as required for Seller to convey title in the condition required in Section 4 above, (B) 50% of any city and county documentary transfer taxes; (C) any personal property, sales and use tax with respect to the transaction contemplated by this Agreement, (D) all taxes and assessments, assessment district fees and charges, HOA fees and assessments and all similar fees, assessments and charges levied against the Property for years prior to the year of the Closing, including any penalties, fees, interest, redemption amounts, and similar amounts, and a pro-rata portion of the same for the year of the Closing, and (E) the premium for the basic standard coverage element of the Owner's Title Policy for the Property.

      ii.    Buyer Costs. Buyer shall pay (A) the premium for the extended coverage element of the Owner's Title Policy for the Property (and any lender's policy) and the cost of any premiums for any endorsements except to the extent that Seller agrees to pay for such endorsements to cure any Title Defects; provided, however, that such endorsements shall be acceptable to Buyer in its sole and absolute discretion, (B) a pro-rata portion of all taxes and assessments, assessment district fees and charges, HOA fees and assessments and all similar fees, assessments and charges levied against the Property for the year of the Closing, and (C) 50% of any city and county documentary transfer taxes.

      iii.    Current Taxes and Assessments. Taxes and assessments, assessment district fees and charges, HOA fees and assessment and all similar fees, assessments and charges levied against the Property for the year of the Closing shall be prorated and apportioned between Seller and Buyer as of 11:59 p.m. on the day before Closing, based upon the most recent assessment and mill levy and such prorations and assessments shall be deemed final, as between Seller and Buyer, as of the Closing. As a covenant that expressly survives

*EJM*

Closing, Seller agrees to be responsible for and to pay all taxes assessed or becoming due and payable by virtue of any change in land use or ownership applicable or allocable to any period of time prior to or at Closing regardless of whether such taxes become due after the Closing Date. Seller's covenants set forth in this Subsection (iii) shall survive the Closing and the recordation of the Deed.

    iv. <u>Other Costs</u>. All other Closing costs not expressly provided for in this Agreement shall be paid by the Parties in accordance with normal local practices for bulk vacant land sales. Except as otherwise expressly provided in this Agreement, Seller and Buyer shall each pay its own fees and expenses incurred in the preparation and performance of this Agreement, including, without limitation, the performance by Seller and Buyer of their respective Closing obligations.

**9. REPRESENTATIONS AND WARRANTIES.**

    a. <u>Seller</u>. Seller hereby represents and warrants to Buyer that the following are true and correct as of the Effective Date and shall, as a Buyer's Condition Precedent, be materially true and correct at the time of Closing:

    i. Seller is a limited liability company duly organized and validly existing under the laws of the State of California, is in good standing and authorized to transact business in the State of California, and Delaware the requisite power and authority to enter into this Agreement and perform its obligations hereunder;

    ii. Subject to any necessary approval of the Bankruptcy Court, the execution and delivery of this Agreement by Seller and the performance by Seller of its obligations under this Agreement have been duly and validly authorized by all necessary action on the part of Seller, the person signing below on behalf of Seller is duly authorized to execute this Agreement and to bind the Seller; and this Agreement constitutes a legal, valid and binding obligation of Seller enforceable against Seller in accordance with its terms;

    iii. To Seller's knowledge, other than the Bankruptcy Case, there are no currently ongoing or, to Seller's knowledge, pending or threatened condemnation or similar proceedings affecting the Property, or any part thereof, and there are no currently ongoing or, to Seller's knowledge, pending litigation or other legal or administrative claims affecting the Property, and Seller has not received notice of any of the foregoing;

    iv. Except as disclosed to Buyer in the Existing Documents, (A) There are no parties in possession of any portion of the Property including, but not limited to, as lessees, tenants at sufferance, or trespassers pursuant to an agreement made by Seller; (B) No party has been granted or obtained any license, lease, easement or other right relating to use or possession of the Property pursuant to an agreement made by Seller; (C) Other than Buyer hereunder, Seller has not granted any option, contract, or other agreement with respect to the purchase of, sale of, or any interest in or to the Property or any portion thereof or any interest therein; and (D) Other than under the Development Documents, the Existing Documents and other documents made available to Buyer prior to the end of the Inspection Period, there are no other restrictions or burdens on the Property created by or under any agreement, instrument, judicial decree, court order or otherwise that will be binding on Buyer or the Property after the Closing;

    v. Except as set forth in the Existing Documents, (A) Seller has not received written notice of any special assessments, levies or taxes imposed or to be imposed affecting the Property and is not aware of any action regarding the potential formation of any district or authority impugned to so assess a tax or levy; and (B) to Seller's knowledge, the Property has not been, and is not being, taxed under any agricultural or special use valuation;

    vi. Seller has not received any written notice of any violation of any ordinance, regulation, law, or statute of any Governmental Authorities, for which such violation has not been corrected in

EJM

accordance with all applicable ordinances, regulations, laws and statutes, and to Seller's knowledge neither Seller nor the Property is in violation of any ordinance, regulation, law, or statute of any Governmental Authorities;

       vii.     The execution and delivery of this Agreement, the consummation of the transaction herein contemplated, and the compliance with terms of this Agreement will not conflict with or, with or without notice or the passage of time or both, result in a breach of any of the terms or provisions of, or constitute a default under, any agreement, indenture, mortgage, loan agreement, or instrument to which Seller is a party or by which Seller or Seller's property is bound, any applicable regulation or any judgment, order, or decree of any court having jurisdiction over Seller or Seller's property (excluding provisions of loan documents which would be terminated on Closing);

       viii.    To Seller's knowledge, the Property does not contain (A) any endangered species or endangered or protected habitats as defined by applicable state and federal laws; (B) any wetlands, whether or not delineated or designated as such by any Governmental Authority; and (C) any graves, cemeteries or burial grounds, or any buildings, foundations or other material or contents of archeological or historical significance; which in each case would have a material and adverse effect on Buyer's ability to proceed with its proposed project;

       ix.     Except for Seller, and parties with rights expressly disclosed to Buyer and/or set forth in (1) the Original Title Commitment or disclosed in the Existing Documents (as of the Effective Date) or (2) the Permitted Exceptions (as of the Closing Date), there are no parties with any interest whatsoever in the Property (marital, homestead, prescriptive or otherwise), and no other signatures are required to make this Agreement fully enforceable by Buyer against Seller; and

       x.     Except as the same may be disclosed in the Existing Documents or in any environmental site assessment report obtained by Buyer during the Inspection Period in connection with its due diligence inspections of the Property, Seller has never knowingly used, generated, processed, stored, disposed of released, or discharged any Hazardous Substance on, under, about or in the vicinity of the Property or transported it to or from the Property; and no use by Seller or, to Seller's knowledge, others has occurred which violates or has been alleged by any party to violate any applicable Environmental Law, and the Property is not on any "Superfund" list under any applicable Environmental Law, nor is it subject to any lien related to any environmental matter. As used in this Agreement, **"Hazardous Substance"** shall mean, without limitation, any material or substance which is (A) defined as a "hazardous waste," "extremely hazardous waste," "restricted hazardous waste," "hazardous substance," or "hazardous material" under the laws or regulations of the State of California, (B) petroleum, (C) asbestos, (D) designated as a hazardous waste pursuant to Section 311 of the Federal Water Pollution Control Act (33 U.S.C. § 1317), (E) defined as hazardous waste pursuant to Section 1004 of the Federal Resource Conservation Recovery Act (42 U.S.C. § 1601 et seq.) (42 U.S.C. § 6903), (F) defined as a hazardous substance pursuant to Section 101 of the Comprehensive Environmental Response Compensation Liability Act (42 U.S.C. § 9601 et seq.), (G) anything listed by the State of California as a chemical known by the State to cause cancer or reproductive toxicity pursuant to Section 25249.8 (a) of the California Health and Safety Code, (H) any material the presence of which would require remediation pursuant to the guidelines set forth in the State of California Leaking Underground Fuel Tank Field Manual, whether or not the presence of such material resulted from a leaking underground fuel tank, (I) lead based paint, and polychlorinated biphenyls, per and polyfluoroalkyl substances (including PFAs, PFOA, PFOS, Gen X, and PFBs), and (J) any other chemical, material or substance, the use or presence of which, or exposure to the use or presence of which, is prohibited, limited or regulated by, or could give rise to liability under, any federal, state, or local law, ordinance or regulation, or any order, demand or guidance document of any Governmental Agency, relating to Hazardous Substances (collectively, **"Environmental Laws"**).



xi.    The Existing Documents are all of the reports, records and documents in Seller's possession or control concerning the physical (including environmental) condition and use of the Property.

xii.    The Vested Tentative Map was approved by the City on December 24, 2024. A true, correct and complete copy of the Vested Tentative Map conditions of approval is included among the Existing Documents.

xiii.    Neither Seller, nor any of its directors, officers, agents, or other authorized persons acting on its behalf (A) is directly or indirectly 10% or more owned, individually or in the aggregate, by, or (B) is acting on behalf of, one or more individuals or entities that are currently on any of the lists of sanctioned, prohibited, or restricted parties maintained by (1) the U.S. Department of the Treasury, Office of Foreign Assets Control; or (2) the U.S. Department of Commerce, Bureau of Industry and Security, or the U.S. State Department, or any similar list of restricted parties maintained by the U.S. government.

xiv.    Seller is the sole owner of the Plans and Contracts and Seller has not heretofore transferred any interests therein. All Contracts are in full force. Without limiting the foregoing, all amounts due under the Plans and Contracts have been or will be paid current.

xv.    Seller proceeding with the Closing will constitute Seller's representation and warranty that, as of the Closing, all of Seller's Representations remain true and correct, and that all of Buyer's Conditions Precedents and Seller's Conditions Precedent have been satisfied; provided, however, the foregoing representation and warranty shall not apply to any Condition Precedent that Buyer has waived in writing in accordance with Section 7.b.

If any of the Seller's representations or warranties contained herein are untrue or incorrect, Seller shall at all times before the Closing use Seller's reasonable efforts to take such necessary action to make such representations or warranties true and correct but excluding the payment of money. The obligations of Buyer under this Agreement are contingent on the representations and warranties of Seller contained herein being true and correct as of the Effective Date and as of the Closing Date. If any of the Seller's representations or warranties contained herein are untrue or incorrect on the Closing Date, subject to the cure provisions in Section 11.a below, Buyer shall be entitled, in addition to its other remedies in Section 11, to terminate this Agreement by written notice to Seller on the Closing Date, upon which termination the Earnest Money (less the Independent Consideration) previously deposited by Buyer shall be immediately returned to Buyer, and thereafter the Parties shall have no further rights or obligations under this Agreement, except to the extent the same survive termination hereof. Seller understands and acknowledges that Buyer is relying on the accuracy and completeness of the Seller Representations. In the event Seller has knowingly and intentionally breached any of the Seller Representations arising from and/or related to this Agreement, Seller shall indemnify, defend and hold Buyer, its successors and assigns harmless for, from and against all fines, penalties, losses, damages and liabilities, and other damages, costs and losses, including reasonable attorney's fees, whether direct or indirect and in whole or in part arising out of or in any way attributable to such breach. Notwithstanding anything to the contrary contained herein, the Seller Representations arising from or related to this Agreement, shall survive the Closing for a period of one (1) year and shall not be merged therein. Representations made to "Seller's knowledge" shall mean the knowledge of Ed Miller as chief executive of Seller, with requirement of reasonable inquiry. Seller represents that Mr. Miller is the person most knowledgeable about the subject matters of the Seller Representations.

b.    Buyer. Buyer hereby represents and warrants to Seller that the following are true and correct as of the Effective Date and shall be true and correct at the time of Closing:

EJM

i.    Buyer is a limited liability company duly organized and validly existing under the laws of the State of Delaware, is in good standing and authorized to transact business in the State of California, and has the requisite power and authority to enter into this Agreement and perform its obligations hereunder;

ii.    The execution and delivery of this Agreement by Buyer and the performance by Buyer of its obligations under this Agreement have been duly and validly authorized by all necessary action on the part of Buyer; the person signing below on behalf of Buyer is duly authorized to execute this Agreement and to bind the Buyer; and this Agreement constitutes a legal, valid and binding obligation of Buyer enforceable against Seller in accordance with its terms; and

iii.    There are no attachments, executions, or assignments for the benefit of creditors, or voluntary or involuntary proceedings in bankruptcy or under any other applicable debtor relief laws pending or nor has Buyer received written notice threatening any of the foregoing against Buyer, and Buyer has not filed, voluntarily or involuntarily, for bankruptcy relief within the last year under the Bankruptcy Code, nor has any petition for bankruptcy or receivership been filed against Buyer within the last year.

If any of the Buyer's representations or warranties contained herein are untrue or incorrect, Buyer shall at all times before the Closing use reasonable efforts to take such necessary action to make such representations or warranties true and correct but excluding the payment of money. The obligations of Seller under this Agreement are contingent on the representations and warranties of Buyer contained herein being true and correct. If any of the Buyer's representations or warranties contained herein are untrue or incorrect on the Closing Date, subject to the cure provisions in Section 11.a below, Seller shall be entitled to terminate this Agreement by written notice to Buyer on the Closing Date, upon which termination the Earnest Money previously deposited by Buyer shall be disbursed to Seller, and thereafter the Parties shall have no further rights or obligations under this Agreement, except to the extent the same survive termination hereof. Notwithstanding anything to the contrary contained herein, the representations and warranties of Buyer made hereunder shall be deemed remade as of the Closing, and such representations and warranties shall survive the Closing for a period of one (1) year and shall not be merged therein.

10.    **ADDITIONAL COVENANTS.**

a.    Seller Actions. During the period between the Effective Date and the Closing Date, Seller covenants as follows:

i.    Agreements. Seller shall not (a) sell, convey, encumber or otherwise dispose of the Property or any interest therein, in a manner which would impact Buyer after the Closing Date, (b) enter into or modify or amend any contracts, leases or other agreements of any nature relating to any of the Property that will be binding on Buyer or any of the Property after the Closing, including, but not limited to, the HOA Documents, (c) create, or vote in favor of the creation of, a community facilities district or assessment district which would serve the Property, and (d) agree in writing to any changes in the entitlements affecting any of the Property including, without limitation, the DDA, the Development Agreement, the Inclusionary Housing Agreement, the Environmental Permits and the Vested Tentative Map.

ii.    Legal Requirements. Seller shall continue to operate its business and the Property in accordance with requirements of law.

iii.    Waste. Seller shall use reasonable efforts to maintain the Property, or cause the Property to be maintained, in substantially in the same condition it was in as of the expiration of the Inspection Period, and shall use reasonable efforts to not commit or suffer to be committed any waste in or upon the Property.

*EJM*

iv.     Marketing.  While this Agreement is in full force and effect, neither Seller nor any of its employees, agents or representatives shall engage in an active marketing for the sale of the Property or any interest in Seller to any person other than Buyer, or deal or negotiate with, accept offers or backup offers from, any persons or entities for the purchase or lease of the Property (or any part thereof).

v.     Notices.  Seller shall provide to Buyer, after the receipt thereof, (A) all written notices relating to the Property received by Seller from any Governmental Authority, insurance company or Consultant, relating to the operation and development of the Property, which notices are of a type not normally received in the ordinary course of Seller's business, or that are notices with respect to taxes or that may have a material effect upon the Property or result in a change in the Seller Representation, and (B) notice of the occurrence after the date of Buyer's inspection of the Property of a casualty event or other damage affecting the Property.

vi.     Knowledge of Events.  Seller shall notify Buyer reasonably promptly after Seller obtains knowledge of any fact or event that renders any of the Seller Representations hereunder untrue or incomplete.

vii.     Hazardous Substances.  Seller shall not use, generate, manufacture, produce, store, release, discharge or dispose of on, under, above or about the Property, or transport to or from the Property, any Hazardous Substances or authorize any other person or entity to do so, except for normal quantities of Hazardous Substances used in the ordinary course of operating or maintaining the Property, so long as they are used in accordance with all Laws including, without limitation, all Environmental Laws.

viii.     No Improvements; No Dumping.  Seller shall not construct or allow the placement of additional buildings or improvements on the Property.  Seller shall not dump or dispose of soils or other materials on the Property.

ix.     Normal Course of Business.  Seller shall use commercially reasonable efforts to continue to operate, manage and maintain the Property in such condition so that the Property shall be in substantially the same condition as of the Closing Date as it is as of the Effective Date, reasonable wear and tear, casualty, condemnation, excepted.  Seller shall use reasonable efforts to maintain all existing insurance policies (or replacement policies) in connection with the Property; provided, however, that if Seller shall fail to maintain all such policies (or replacements thereof), then, as a covenant that survives the Closing and is not subject to the terms and conditions of Section 6, above, Seller shall indemnify, defend and hold harmless Buyer and Buyer's shareholders, members, and partners, their respective officers, directors, employees, and agents, and all of their respective successors and assigns from and against any and all claims, liabilities, losses, costs, damages or expenses of any kind, including, without limitation, reasonable attorneys' fees, incurred or suffered by any of them if the same would have been covered by the insurance Seller was otherwise obligated to maintain hereunder.

b.     Condemnation.  If prior to the Closing, any portion of the Property is taken by any entity by condemnation or with the power of eminent domain which negatively impacts the value of the Property by more than three percent (3%) of the Purchase Price, if the access thereto is reduced or restricted thereby, or will result in the loss of one (1) or more SFD Lots or Townhome Units (or is the subject of a pending taking which has not yet been consummated), Seller, upon receiving notice thereof, shall immediately notify Buyer of such fact.  In such event, Buyer shall have the right, in Buyer's sole and absolute discretion, to terminate this Agreement upon written notice to Seller and Title Company not later than seven (7) days after receipt of Seller's notice thereof.  If this Agreement is so terminated, the Earnest Money (less the Independent Consideration) shall be immediately returned to Buyer, and thereafter the Parties shall have no further rights or obligations under this Agreement, except for any that expressly survive the termination hereof.  Alternatively, Buyer, in its sole and absolute discretion, may proceed to consummate the transaction, in which

E.TM

event, at the sole option of Buyer, either (a) Seller shall assign and turn over, and Buyer shall be entitled to receive and keep, any and all awards made or to be made in connection with such condemnation or eminent domain, and the Parties shall proceed to the Closing pursuant to the terms hereof, or (b) the Purchase Price shall be proportionately reduced in an amount equal to the portion of the Property taken as compared to the whole, with Seller being entitled to the entire award. In the event Buyer elects to proceed to consummate this transaction, Buyer will be deemed to have waived the occurrence of such condemnation as a Buyer's Conditions Precedent under Section 7.b above.

c.      Profit Participation. Buyer and Seller will engage in a profit share plan with revenue sharing of 50% to Buyer and 50% to Seller on the sale of the SFD Lots and Townhome Units after Buyer has received a 12% net margin, if any. The 12% net margin shall be determined by assuming an 18% soft cost allowance. The terms and conditions of this profit share plan are set forth on **Exhibit F** attached hereto is incorporated herein by this reference; provided, however, in the event of a conflict between the terms and conditions of this Section 10.c and the terms and conditions of **Exhibit F**, the terms and conditions of **Exhibit F** shall govern and control. This Section 10.c shall survive the Closing.

## 11.      DEFAULT/TERMINATION.

a.      Notice and Right to Cure. Except as otherwise expressly provided herein, each Party shall be entitled to written notice of any default and prior to the exercise of any remedy provided herein, such defaulting Party shall have five (5) business days from receipt of such notice to cure any failure to timely complete the Closing, thirty (30) days from receipt of such notice to cure any other non-monetary default, and ten (10) days from receipt of such notice to cure any other monetary default. Both Parties agree to cooperate with the other in any and all reasonable attempts by the defaulting Party to cure any default within the default cure period.

b.      Seller's Failure to Close. Subject to the notice and cure provisions in Section 11.a. above, if Seller defaults in the performance of its obligation to close on the terms and conditions contained herein at or before Closing (each, a "**Seller Closing Default**"), Buyer shall have the right to elect, as its sole and exclusive remedy, to either: (i) terminate this Agreement and receive immediate return of the Earnest Money (less the Independent Consideration) previously deposited by Buyer and, in addition, Buyer shall be entitled to receive and Seller shall immediately pay to Buyer actual damages in an amount equal to all of Buyer's out-of-pocket costs incurred in connection with Buyer in connection with this Agreement and the Property, which shall be due and payable with fifteen (15) days after Seller's receipt of a written demand therefore, and thereupon when fully performed neither Party shall have any further rights or obligations hereunder except those that expressly survive termination; or (ii) maintain an action for specific performance provided, however, that if Buyer elects to pursue specific performance but such remedy is or becomes unavailable as a result of any action or inaction of Seller or any other Seller Parties occurring from and after the Effective Date and at any time thereafter during the effective period of this Agreement, then Buyer shall have the right to pursue a claim at law for actual damages. Buyer expressly waives all other rights or remedies for any Seller Closing Defaults. Upon termination of this Agreement pursuant to this paragraph, and the payment of all sums due hereunder, the Parties shall have no further rights or obligations under this Agreement, except those that expressly survive termination.

c.      Buyer's Failure to Close. SUBJECT TO THE NOTICE AND CURE PROVISIONS IN SECTION 11.a. ABOVE, IF BUYER DEFAULTS IN THE PERFORMANCE OF ITS OBLIGATIONS TO CLOSE HEREUNDER ON THE TERMS AND CONDITIONS CONTAINED HEREIN AT OR BEFORE CLOSING (EACH, A "**BUYER CLOSING DEFAULT**"), SELLER SHALL HAVE THE RIGHT, AS ITS SOLE AND EXCLUSIVE REMEDY, TO TERMINATE THIS AGREEMENT AND IMMEDIATELY RECEIVE THE EARNEST MONEY PREVIOUSLY DEPOSITED BY BUYER AS LIQUIDATED DAMAGES AND IN LIEU OF ALL OTHER REMEDIES FOR SAID DEFAULT BY BUYER. BUYER AND SELLER EACH AGREE THAT IN THE EVENT OF A BUYER CLOSING DEFAULT, THE

DAMAGES TO SELLER WOULD BE EXTREMELY DIFFICULT AND IMPRACTICABLE TO ASCERTAIN, AND THAT THEREFORE, IN THE EVENT OF SUCH A BUYER CLOSING DEFAULT, THE EARNEST MONEY PREVIOUSLY DEPOSITED BY BUYER SHALL SERVE AS LIQUIDATED DAMAGES FOR SUCH DEFAULT BY BUYER, AS A REASONABLE ESTIMATE OF THE DAMAGES TO SELLER, INCLUDING COSTS OF NEGOTIATING AND DRAFTING THIS AGREEMENT, COSTS OF COOPERATING IN SATISFYING CONDITIONS TO CLOSING, COSTS OF SEEKING ANOTHER BUYER, OPPORTUNITY COSTS IN KEEPING THE PROPERTY OUT OF THE MARKETPLACE, AND OTHER COSTS INCURRED IN CONNECTION HEREWITH. DELIVERY TO AND RETENTION BY SELLER OF THE EARNEST MONEY PREVIOUSLY DEPOSITED BY BUYER SHALL BE SELLER'S SOLE AND EXCLUSIVE REMEDY AGAINST BUYER IN THE EVENT OF SUCH A MATERIAL DEFAULT BY BUYER, AND SELLER WAIVES ANY AND ALL RIGHT TO SEEK OTHER RIGHTS OR REMEDIES AGAINST BUYER, INCLUDING WITHOUT LIMITATION, SPECIFIC PERFORMANCE. THE PAYMENT AND RETENTION OF SUCH AMOUNT AS LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR PENALTY WITHIN THE MEANING OF CALIFORNIA CIVIL CODE SECTIONS 3275 OR 3369, BUT IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO SELLER PURSUANT TO CALIFORNIA CIVIL CODE SECTIONS 1671, 1676 AND 1677. SELLER HEREBY WAIVES THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 3389.    UPON TERMINATION OF THIS AGREEMENT PURSUANT TO THIS PARAGRAPH, AND RELEASE OF THE SUMS HEREUNDER, THE PARTIES SHALL HAVE NO FURTHER RIGHTS OR OBLIGATIONS UNDER THIS AGREEMENT, EXCEPT FOR THOSE THAT EXPRESSLY SURVIVE TERMINATION. NOTWITHSTANDING THE FOREGOING, SELLER'S RIGHTS UNDER THE INDEMNITY AND ATTORNEYS' FEES PROVISIONS OF THIS AGREEMENT SHALL NOT BE SUBJECT TO THE PROVISIONS OF THIS PARAGRAPH.

      d.     <u>All Other Defaults</u>.  Subject to the provisions in <u>Section 11</u> above, in no event shall either Party recover damages other than actual damages for such default (including, without limitation, reasonable attorneys' fees and costs), and each Party expressly waives its rights to receive consequential, incidental or punitive damages or damages for lost profits under this Agreement.

      e.     <u>No Limit on Indemnities</u>.  The provisions of this Section shall not limit either Party's express obligations to indemnify the other as set forth in other Sections of this Agreement, provided, however, that in the event a Party seeks damages, it shall recover only actual damages (but not any consequential, incidental or punitive damages or damages for lost profits), and each Party expressly waives its rights to receive consequential, incidental or punitive damages or damages for lost profits under this Agreement.

      f.     <u>Attorneys' Fees</u>.  Should any legal action be brought in relation to this Agreement, including, without limitation, actions based on contract, tort or statute, the prevailing Party in such action shall be awarded all of the reasonable costs and expenses (including reasonable attorneys' fees) incurred by such Party in connection with such action, including without limitation, any mediation, arbitration, appeal or other proceedings.

      g.     <u>Survival</u>.  The provisions of this <u>Section 11</u> shall survive the Closing, expiration, and termination of this Agreement.

**12.**    **COMMISSION.**  Seller and Buyer each represents and warrants to the other that it has not dealt with or been represented by any brokers or finders in connection with the purchase and sale of the Property, other than Tellus Land and Capital, Inc. (the "**Broker**"), who represents Seller. Seller will pay Broker a commission under separate agreement.  Buyer and Seller each represent and warrant to each other that no other fees, commissions, or other similar fees shall be due or shall arise in connection with the entering into of this Agreement, the sale and purchase of the Property, or the consummation of transactions contemplated herein as a result of its acts or omissions. Seller and Buyer each hereby agree to indemnify, defend and hold the other

*PJM*

Docusign Envelope ID: 460D5A12-0515-4DBC-8821-DBFE7A09AE79

harmless for, from and against all liability, loss, cost, damage, or expense (including, but not limited to, reasonable attorneys' fees and costs of litigation) which the other Party shall suffer or incur because of any claim by a broker, agent, or finder claiming by, through or under the other Party hereto, whether or not such claim is meritorious, for any compensation with respect to the entering into of this Agreement, the sale and purchase of the Property, or the consummation of the transactions contemplated herein. Notwithstanding anything to the contrary contained in this Agreement, the representations, warranties, indemnities, and agreements contained in this Section 12 shall survive the Closing or earlier termination of this Agreement.

## 13.    MISCELLANEOUS PROVISIONS.

a.    Effective Date. This Agreement shall be deemed effective as of the date the Title Company executes the Acknowledgment attached to this Agreement, indicating its receipt of a fully-executed copy of this Agreement, and its agreement to disburse the Earnest Money deposited by Buyer in accordance with this Agreement (such date, the "**Effective Date**").

b.    Notices. All notices required to be given hereunder shall be in writing and shall be addressed as follows, or as either Party may subsequently designate by written notice to the other. All notices shall be delivered by electronic mail (e-mail), recognized overnight delivery service, or hand-delivery and shall be deemed effective: (i) if sent by email, when sent, provided, however that (A) if such email is sent after 5:00 p.m. on a business day, then it will be deemed to have been sent on the following business day, and (B) the sender addressed the email correctly and does not receive a message of non-delivery; (ii) upon receipt if sent by recognized overnight delivery service; or (iii) upon receipt by hand-delivery:

|  |  |
|---|---|
| to Seller: | Monarch Bay For Sale Residential, LLC<br>12301 Wilshire Blvd Suite 520<br>Los Angeles CA 90025<br>Attention: Edward Miller<br>Email:  emiller@cal-coast.com |
| With a copy to: | Nicholas F. Klein, Esq<br>12301 Wilshire Blvd Suite 520<br>Los Angeles CA 90025<br>Attention: Nick Klein<br>Email:  nick@nfkrelaw.com |
| to Buyer: | The New Home Company of Northern California LLC<br>1508 Eureka Road, Ste. 290<br>Roseville, CA 95661<br>Attention: Kevin Carson & Samantha Higbee<br>Email: kcarson@NewHomeCo.com & shigbee@NewHomeCo.com |
| With a copies to: | New Home Co.<br>15231 Laguna Canyon Rd., Ste. 250<br>Irvine, CA 92618<br>Attention: Miek Harbur, Esq.<br>Email: mharbur@NewHomeCo.com |
| And to: | Miller Starr Regalia<br>1331 N. California Blvd., Ste. 600<br>Walnut Creek, CA 94597<br>Attention: Hans Lapping, Esq. |

*KSM*

Email: hans.lapping@msrlegal.com

to Title Company:    Old Republic Title Company
101 N. Brand Blvd., Suite 14th Fl.
Glendale, CA 91203
Attention: Lizeth Villalobos
Email: lvillalobos@oldrepublictitle.com

If any addressee rejects or otherwise refuses to accept the notice, or if the notice cannot be delivered because of a change in address for which no notice was given in accordance herewith, then upon the rejection, refusal, or inability to deliver the notice such notice shall nevertheless be deemed to have been delivered in accordance herewith. Any notice given by counsel to a Party shall have the same effect as if given by such Party. Notwithstanding anything to the contrary, notices of default hereunder may not be sent by email and no such notice shall be valid, it being expressly agreed that notices of default shall be sent only by one of the other approved methods hereunder.

c.    Interpretation.    The Parties hereto acknowledge and agree that each has been given the opportunity to independently review this Agreement with legal counsel, and/or has the requisite experience and sophistication to understand, interpret, and agree to the particular language of the provisions hereof. The Parties have equal bargaining power, and intend the plain meaning of the provisions herein. In the event of an ambiguity in, or dispute regarding, the interpretation of same, the interpretation of this Agreement shall not be resolved by any rule of interpretation providing for interpretation against the Party who causes the uncertainty to exist or against the draftsman. This Agreement shall be governed by the law of the State of California in all respects including, but not limited to, validity, interpretation, construction, effect and jurisdiction.

d.    Severability.    If any of the terms, covenants, conditions, obligations, or options created by this Agreement shall be unlawful or void for violation of the rule against perpetuities or any analogous statutory provision, or any other statutory or common law rules imposing like or similar time limits, then such provision shall continue only for the period of the life or lives of the current Chief Executive Officer of Buyer, plus twenty-one years.

e.    Integration.    This Agreement, together with the exhibits attached hereto (which are incorporated herein by this reference) constitutes the entire agreement between the Parties with respect to the Property and other subject matter of this Agreement. In entering into this Agreement, all prior discussions, agreements or understandings of the Parties are merged into this Agreement. The terms of this Agreement cannot be modified, except by the written agreement of the Parties.

f.    Counterparts; Electronic Signatures.    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. An electronic signature shall have the same effect as an original signature. Any electronic signature to this Agreement or to any notice, certificate, agreement or document related to this transaction (other than those that will be recorded in the Records), shall have the same legal validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the federal Electronic Signatures in Global and National Commerce Act, any state electronic signatures and/or records act, or any similar state law based on the Uniform Electronic Transactions Act. The Parties hereto waive any objection to the contrary. "Electronic signature" as used herein includes (i) any electronic symbol or process attached to, or associated with, a contract or other record and adopted by a person with the intent to sign, authenticate or accept such contract or record (including any signature affixed by DocuSign or Adobe Sign), and (ii) any facsimile or .pdf signature.

g.    Headings for Convenience Only; Interpretation.    The headings, captions and titles contained in this Agreement are intended for convenience of reference only and are of no meaning in the interpretation

*EJM*

or effect of this Agreement. All references to "Sections" or "paragraphs" without reference to a document other than this Agreement, designate sections of this Agreement. The words "herein," "hereof," "hereunder," and other words of similar import refer to this Agreement as a whole and not to any particular Section, unless specifically designated otherwise. The use of the term "including" shall mean "including but not limited to." No rules of construction against the drafter of this Agreement shall apply in any interpretation or enforcement of this Agreement or any documents or certificates executed pursuant hereto.

h.    **Binding Effect.** This Agreement shall inure to the benefit of and bind the Parties hereto and, subject to Section 13.i below, their respective representatives, successors, and assigns.

i.    **Assignment.** Buyer will have the right to assign this Agreement and its rights and obligations hereunder to any entity (i) directly or indirectly owned or controlled by Buyer, (ii) directly or indirectly controlling Buyer, or (iii) directly or indirectly controlling, controlled by, or under common control with Buyer or Buyer's members, upon delivery of notice to Seller, but without obtaining Seller's prior consent. Without limiting the foregoing, Buyer shall also have the right, without Seller's prior consent but upon delivery of notice to Seller, to nominate and/or assign this Agreement and its right and obligations hereunder to a third party (a "**Land Banker**") who has entered into an agreement with Buyer pursuant to which Buyer has the right to develop the Property and an option to purchase the Property. Seller shall not have the right to assign this Agreement without Buyer's prior written consent, which consent may be withheld in Buyer's sole and absolute discretion.

j.    **No Third-Party Beneficiaries.** The agreements contained herein are solely for the benefit of the Parties hereto (and their permitted assignees) and no other person or entity shall be a third party beneficiary thereof.

k.    **Relationship of Parties.** Nothing in this Agreement (including **Exhibit F** hereto) shall be construed or deemed to make Seller and Buyer partners, joint venturers or any other form of joint participants in the acquisition and development of the Property, and Seller and Buyer agree that the sole and exclusive nature of their relationship is as seller and purchaser.

l.    **Time.** Time is of the essence of this Agreement. In computing any period of time herein, the date of the act or event from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included unless it is a Saturday, Sunday or federal legal holiday, in which case the period of time shall run until the end of the next day which is not a Saturday, Sunday or federal legal holiday. As used herein, the term "business day" shall mean Monday through Friday, but excluding any state or federal legal or bank holiday. All time periods hereunder shall expire at 5:00 p.m. Pacific Time.

m.    **No Implied Waiver.** No failure by a Party hereto to insist upon the strict performance of any term, covenant or provision contained in this Agreement, no failure by a Party hereto to exercise any right or remedy under this Agreement, and no acceptance of full or partial payment owed to a Party hereto during the continuance of any default by the other Party, shall constitute a waiver of any such term, covenant or provision, or a waiver of any such right or remedy, or a waiver of any such default unless such waiver is made in writing by the Party to be bound thereby. Any waiver of a breach of a term or a condition of this Agreement shall not prevent a subsequent act, which would have originally constituted a default under this Agreement, from having all the force and effect of a default.

n.    **Exhibits.** All exhibits referenced herein and attached hereto are incorporated herein as if set forth in full.

o.    **Attorneys' Fees.** If any legal action or other proceeding is brought for the enforcement of this Agreement (including, without limitation, enforcement of any obligation to indemnify, defend or hold

harmless), or because of an alleged dispute, default or misrepresentation in connection with any of the provisions of this Agreement, the substantially prevailing Party shall be entitled to recover the reasonable attorneys' fees (including those in any bankruptcy or insolvency proceeding), accountants' and other experts' fees and all other fees, expenses and costs incurred in connection with that action or proceeding, in addition to any other relief to which it may be entitled.

p.    Press Releases.  Neither Seller nor any of Seller's employees or agents shall issue any press release or disclosures, whether "on the record" or "off the record," to any member of the press, any newsletter publisher, any real estate brokers or any trade publication, or otherwise publicize in any manner the transactions contemplated by this Agreement before or after the Closing without Buyer's prior written consent in its sole and absolute discretion.

q.    Further Assurances.  The Parties hereto agree to execute and deliver all such further assignments, endorsements and other documents and take all such further action as any Party hereto may reasonably request from time to time in order to effectuate the terms, purposes and intent of this Agreement.

r.    Dispute Resolution.  If the Bankruptcy Case is not dismissed, then each of the Parties irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court in any controversy arising out of or relating to this Agreement, which relief may be sought by motion to the Bankruptcy Court.  If the Bankruptcy Case is dismissed, then any controversy arising out of this Agreement or the other documents executed in connection with the transaction contemplated hereby shall be heard in Alameda County, California, by judicial reference pursuant to the provisions of the California Code of Civil Procedure Sections 638 to 645.2, inclusive.  The Parties shall agree upon a single referee, who shall be a JAMS (or its successor) referee having significant experience with similar real estate disputes.  The referee shall try all issues of fact and law and, subject to the terms and conditions of this Agreement, is authorized to provide all remedies available in law or equity (including, but not limited to, specific enforcement of any provision of this Agreement, declaratory relief or injunctive relief) appropriate under the circumstances of the controversy. The referee shall not have the power to award punitive damages nor any other damages which are not permitted by the express provisions of this Agreement, and the Parties waive any right to recover such damages.  If the Parties are unable to agree upon a referee, then either Party may thereafter seek to have a similarly qualified one appointed pursuant to the California Code of Civil Procedure Sections 638 and 640.  The cost of the judicial reference proceeding shall initially be borne equally by the Parties to the dispute.  However, the prevailing Party in such proceeding shall be entitled, in addition to all other costs, to recover its contribution for the cost of the reference as an item of damage and/or recoverable cost.  All discovery methods (and sanctions and other remedies for noncompliance with same) available to litigants under the Civil Discovery Act (California Code of Civil Procedure Section 2016.010 et seq.) and means of production permitted under California Code of Civil Procedure Section 1985 et seq. shall be available to the Parties in such reference.  The referee shall issue a written statement of decision within twenty (20) days of the date on which the case has been submitted for decision, which statement of decision shall contain findings of fact and conclusions of law to the extent available.  The Parties shall use commercially reasonable efforts to complete any judicial reference proceeding within ninety (90) days after such proceeding is initiated by any Party.  The statement of decision shall be reported to the Court in accordance with California Code of Civil Procedure Section 644 and mailed promptly to the Parties.  Judgment shall be entered on the decision of the referee in accordance with California Code of Civil Procedure Section 644; and the decision may be excepted to, challenged and appealed according to law. The Parties acknowledge and accept that, to the fullest extent permitted by law, they are waiving their right to a jury trial and the Parties agree that judicial reference shall be the sole forum in which to resolve any dispute arising out of or related to this Agreement or the other documents executed in connection with the transaction contemplated hereby. Notwithstanding the above provisions, unless and until a referee has been appointed and without the need to first apply for such relief through judicial reference above, any Party may seek emergency equitable relief in a court with jurisdiction to restrain or prohibit any breach or threatened breach of any covenant of the Parties set forth in this Agreement, without the need to post a bond.

*ESM*

*[Remainder of this page intentionally left blank.  Signature page follows.]*

IN WITNESS WHEREOF, the Parties hereto have executed this Contract for Purchase and Sale and Escrow Instructions, effective as of the Effective Date.

**SELLER:**

MONARCH BAY FOR SALE RESIDENTIAL, LLC, a Delaware limited liability company

By: _____

Name: _EDWARD J MILLER_

Title: _MANAGING MEMBER_

**BUYER:**

THE NEW HOME COMPANY OF NORTHERN CALIFORNIA LLC, a Delaware limited liability company

By: _____
Name: Tom Baine
Title: Division President

By: _____
Name: Samantha Higbee
Title: VP, Land Acquisition & Entitlement

EJM

## ACKNOWLEDGEMENT OF THE TITLE COMPANY

The undersigned Title Company hereby acknowledges receipt of counterparts of this Agreement duly executed by Seller and Buyer as of this _____ day of _____, 2025 and that such date shall serve as the Effective Date of the Agreement.  In addition, the undersigned Title Company has read and agrees to be bound by the provisions of this Agreement with respect to the disbursement of the Earnest Money.

**OLD REPUBLIC TITLE INSURANCE COMPANY**

By: _____

Name: _____

Title: _____

NWHM-60131\3043983.20

## Exhibit A

Land

*EJM*

Docusign Envelope ID: 460B5A12-0515-4DBC-8821-DBFF7A09AE79





EJM

Docusign Envelope ID: 460B5A12-0515-4DBC-8821-DB5F7A09AE79



3

EJM

Docusign Envelope ID: 460B5A12-0515-4DBC-8821-DB5E7A09AE79



NWHM-60131\3043983.20

EJM

Docusign Envelope ID: 460D5A12-0515-4DBC-8821-DBEF7A09AE79



NWHM-60131\3043983.20

## Exhibit B

### GENERAL ASSIGNMENT AND BILL OF SALE

THIS GENERAL ASSIGNMENT AND BILL OF SALE (the "**Assignment**") is made this _____, 20__, by and among _____ a _____ ( "**Assignor**") and _____, a _____ ("**Assignee**").

#### Recitals

A.    Assignor owns certain real property more particularly described in **Exhibit A** attached hereto and incorporated herein by this reference (the "**Property**").

B.    Assignor and Assignee, entered into that certain Contract for Purchase and Sale and Joint Escrow Instructions dated as of _____, 20__ (as the same may thereafter be amended, the "**Purchase Agreement**"), pursuant to which Assignee agreed to purchase the Property from Seller and Seller agreed to sell, among other things, the Property to Assignee on the terms and conditions contained therein.

C.    Assignor desires to assign to Assignee all of its right, title and interest in and to certain documents, rights, privileges, plans and instruments pertaining to the Property as the same are more specifically described herein, and Assignee desires to accept the assignment thereof.

#### Agreement

NOW, THEREFORE, for the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.    <u>Assignment</u>.  Assignor hereby assigns, sells and transfers to Assignee all of Assignor's right, title and interest, if any, in and to the following to the extent they exist and are assignable (collectively, the "**Assigned Interests**"):

(a)    the Seller Approvals and all rights and privileges, declarant's rights and development rights relating to the Property;

(b)    all water rights, water and sewer taps and fees, utility agreements, permits, deposits, refunds and reimbursements, prepaid fees, fee credits and other credits, system development fees, and utility hook-ups and connections relating to the Property;

(c)    all of Assignor's right to use any studies and reports, including, but not limited to, environment(e) all of Assignor's right to use any studies and reports, including, but not limited to, environmental site assessments and studies, and geotechnical, soils and drainage reports, obtained by Assignor and relating to the Property; and

(d)    any fixtures, equipment and tangible personal property located on the Property, if any.

Assignee hereby accepts the foregoing assignment and hereby assumes all obligations and duties with regard to the Assigned Interests that first accrue or arise after the date of this Assignment.

2.    <u>Relinquishment</u>.  Assignor hereby assigns and relinquishes to Assignee all rights and privileges of Assignor to hold any ownership interest in, to create, manage or operate, any community facilities district and assessment district that now exists or that may be created hereinafter that shall or may relate to the Property or include the Property within its service boundary, or any right or privilege to receive any benefit therefrom,

*EJM*

including, without limitation any right or privilege to receive from any such community facilities or assessment district, any refunds, credits or reimbursements arising from or related to the Property (the "**Relinquished Rights**").

3.    <u>No Prior Assignment</u>.  Assignor hereby represents and warrants to Assignee that Assignor has not previously assigned to any other party all or any of the Assigned Interests and/or Relinquished Rights being assigned to Assignee hereunder.

4.    <u>No Liens</u>.  Assignor also hereby represents and warrants that the Assigned Interests and Relinquished Rights are free and clear of liens and monetary encumbrances.

5.    <u>Assignment Binding</u>.  This Assignment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

6.    <u>Governing Law</u>.  This Assignment shall be governed and construed in accordance with the laws of the State of California.

7.    <u>Miscellaneous</u>.  This Assignment may be executed in any number of counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.  The parties may execute this Assignment and deliver executed copies hereof via email.  Such email copies hereof shall be enforceable as original instruments.  All exhibits attached hereto are incorporated herein by this reference.

*[Remainder of this page intentionally left blank.  Signature page follows.]*



TO HAVE AND TO HOLD the same unto Assignee, its successors and assigns, forever.

IN WITNESS WHEREOF, Assignor and Assignee have executed this Assignment as of the _____ day of _____, 20__.

**ASSIGNOR:**

_____,

a _____

By: _____
Name: _____
Title: _____

**ASSIGNEE:**

_____,

a _____

By: _____
Name: _____
Title: _____

8

*EJM*

## EXHIBIT C

## BUYER IMPROVEMENTS

(to be attached)

E.JM

## EXHIBIT D

## ASSIGNMENT OF PLANS, CONTRACTS, WARRANTIES AND GUARANTIES
## AND OTHER INTANGIBLE PROPERTY

This ASSIGNMENT OF PLANS, CONTRACTS, WARRANTIES AND GUARANTIES AND OTHER INTANGIBLE PROPERTY (this "**Assignment**") is made as of _____, 202_ by _____, a _____ ("**Assignor**") in favor of _____ ("**Assignee**").

### R E C I T A L S

A.     Assignee and Assignor are the parties to that certain Contract for Purchase and Sale and Escrow Instructions dated as of _____ ("**Agreement**"), pursuant to which Assignor agreed to assign to Assignee, to the extent assignable and on a non-exclusive basis without warranty (provided that Assignor shall if requested by Assignee request any required consents), all of Assignor's rights in and to certain plans, contracts, warranties and guaranties, intangible property, and other rights, documents and instruments relating to the development of those portions of the Property described on **Exhibit 1** attached hereto (the "**Property**"). Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Agreement.

NOW THEREFORE, in consideration of the foregoing recitals, which are incorporated herein by reference, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Assignor hereby covenants and agrees as follows:

1.     Assignor hereby assigns and transfers to Assignee, and Assignee hereby accepts and assumes from Assignor, to the extent assignable and on a non-exclusive basis without warranty (provided that Assignor shall if requested by Assignee request any required consents to such assignment), and subject to Section 5 below, all of Assignor's right, title, claim and interest (if any) in and under:

(a)     All plans and specifications with respect to the Property prepared by or at the direction of Seller (the "**Plans**");

(b)     All of the contracts and agreements executed by Seller with respect to the Property (the "**Contracts**");

(c)     All warranties and guaranties in favor of Seller made by or received from any third party with respect to any goods, materials, supplies, chattels, fixtures, equipment, machinery, building materials and work attached to or placed in or on any part of the Property, or used in connection with any construction on the Property (the "**Warranties and Guaranties**"); and

(d)     Any development entitlements or other intangible property now owned or hereafter acquired by Assignor which arises from or relates to the Property or to the ownership, use or operation of the Property, including without limitation, any current or future reimbursement or cost sharing agreement providing payment to Assignor or its affiliates defined in the Agreement, indemnifications, the right to use any governmental permits or licenses, agreements, utility contracts, other contract rights including those rights applicable to the Property arising from or under the Agreement.

2.     Should any litigation be commenced between the parties hereto or their representatives or should any party institute any proceeding in a bankruptcy or similar court (excluding the Bankruptcy Case) which has jurisdiction over any other party hereto or any or all of such party's or parties' property or assets concerning any provision of this Assignment or the rights and duties of any person or entity in relation thereto, the party or parties prevailing in such litigation shall be entitled, in addition to such other relief as may be granted, to a reasonable sum as and for such party's or parties' actual, third-party attorneys' fees and court costs in such litigation which

*E-SM*

Docusign Envelope ID: 460D5A12-0515-4DBC-8821-DB5F7A09AE79

shall be determined by the court in such litigation or in a separate action brought for that purpose. Any such attorneys' fees and other expenses incurred by either party in enforcing a judgment in its favor under this Assignment shall be recoverable separately from and in addition to any other amount included in such judgment, and such attorneys' fees obligation is intended to be severable from the other provisions of this Assignment and to survive and not be merged into any such judgment.

      3.      This Assignment shall be binding on and inure to the benefit of the parties hereto, their successors in interest and permitted assigns.

      4.      Assignor agrees that Assignor will, at the written request of Assignee and at no material cost, expense or liability to Assignor, execute and deliver to Assignee any and all other and further instruments which may be necessary to vest in Assignee any of Assignor's right, title and interest in or to any of the property and/or rights transferred hereunder. This Assignment may be executed in counterparts.

[Signature page follows]

IN WITNESS WHEREOF, Assignor and Assignee have executed this Assignment the day and year first above written.

ASSIGNOR:

_____, a _____

By:_____
Name:_____
Its:_____

ASSIGNEE:

_____, a _____

By:_____
Name:_____
Its:_____

LJM

## Exhibit 1

TO ASSIGNMENT OF PLANS, CONTRACTS, WARRANTIES AND GUARANTIES AND OTHER
INTANGIBLE PROPERTY

Legal Description of Property

E-SM

## EXHIBIT E

## CONSENT TO ASSIGNMENT OF WORK PRODUCT AND CONSENT

**THIS CONSENT TO ASSIGNMENT OF WORK PRODUCT AND CONSENT** ("**Assignment**") is made and entered into as of _____, 202_ by and between or its assignee ("**Assignee**") and _____ ("**Contractor**").

### RECITALS

A.    Assignee and _____ ("Assignor") entered into that certain Contract for Purchase and Sale and Escrow Instructions dated as _____ (as amended the "Agreement"), for the purchase and sale of land located in _____ (the "**Property**").

B.    Pursuant to the Agreement, concurrent with transferring fee title of the Property (the "**Closing**"), Assignor will also assign to Assignee, to the extent assignable, all plans, contracts, warranties and guaranties other documents related to the Property.

C.    Contractor has entered into the contract attached hereto as **Exhibit 1** with Assignor (the "**Contract**").

D.    The    Contract    is    for    the    following    scope    of    work    (the "**Work**"):_____

E.    Contractor has performed or is performing the Work in compliance with the following plans (the "**Plans**"): _____

F.    Assignee desires that Contractor confirm the Contract will be assigned to Assignee at the Closing.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree to the following.

1.    <u>Consent</u>.  If and only if Assignee acquires fee title to the Property, then effective as of Closing Contractor consents to and acknowledges the assignment of the Contract (including, without limitation all warranties and guaranties thereunder) to Assignee.  From and after the Closing, Assignee shall have the right to use all of the Work and Plans and all other materials previously or hereafter prepared by Contractor for use in connection with the Property.

2.    <u>Payment for Work and Plans</u>.  Assignor will be responsible for paying for all Work and Plans conducted up to the Closing, and Assignee shall not be responsible for paying the cost for any such Work.  In the event that the Work and Plans are incomplete or require additional work, if Assignee desires to continue to use Consultant, then Consultant agrees to work in good faith to enter into a new Consultant Agreement for completion of the Work and Plans on Assignee's standard form agreement.  Consultant will not perform any additional work unless and until authorized by Assignee.

3.    <u>Additional Insured</u>.  Contractor hereby agrees to add Assignee its affiliates as additional insured under all general liability, automobile liability insurance and umbrella excess that Contractor has obtained for its work on the Property.  Within ten (10) days after execution of this Consent, Contractor shall deliver to an additional insured endorsement reflecting such additional insured status, which shall (a) provide coverage for both premises/ongoing operations and products-completed operations to the benefit of the additional insured; and (b) provide coverage to the full extent of the actual limits of Contractor's coverage even if such actual limits exceed the minimum limits required by this Agreement.

EJM

4.    <u>Certifications</u>.  Contractor represents and warrants to Assignee as follows: (a) the Contract is in full force and effect as of the date of this Consent, (b) the Agreement represents the entire agreement between Assignor and Contractor relating to the services described in the Contract, (c) the Contract has not been modified or amended except as set forth in <u>Exhibit 1</u>, and (d) neither Assignor nor Contractor are in default of the Contract and in no event shall Assignee have any responsibility for any breach by Assignor or for the performance of any of Assignor's obligations under the Contract that arise prior to the Closing.

5.    <u>Counterparts</u>.  This Assignment may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

6.    <u>Further Assurances</u>.  Assignor and Assignee agree to execute any additional instruments as may be requested by each other or Escrow to evidence and effectuate the terms of this Assignment.

[signatures on next page]

EJM

IN WITNESS WHEREOF, Contractor and Assignee have executed this Assignment as of the day and year first written.

**CONTRACTOR:**                                    **ASSIGNEE:**

_____

By:_____          By:_____
Name:_____          Name:_____
Title:_____          Title:_____

EJM

## EXHIBIT F
## PARTICIPATION PAYMENTS

In addition to the Purchase Price, Buyer shall pay to Seller 50% of all Net Profit (as defined below), if any, generated from the construction and or sale of residential homes (a "Residence") constructed on the SFD Lots (the "Profit Participation") as provided in this Exhibit F. As clarification, no Profit Participation payments ("Participation Payments") shall be due for the sale of Residences on the Townhome Units or any Exempt Transfer (as defined below). Seller acknowledges and agrees that (a) it shall have no right to determine, challenge or request changes to sales price, sales pace, incentives, options, upgrades, marketing or any other aspects of the residential development upon which the Participation Payments are determined, (b) Buyer makes no representation or warranty to Seller that it will achieve any particular sales price or sales pace and Buyer shall have the right to determine the sales price and sales pace for each Residence in its sole and absolute discretion, (c) Buyer shall have no obligation to consider the Participation Payments when determining the sales price or sales pace (including any decision to cease sales at any time and for any reason whatsoever), and (d) Buyer makes no representations or warranties the there will be any Net Profit from the sale of Residences. In the event of a conflict between the terms and conditions of this Exhibit F and the terms and conditions of the purchase agreement to which this Exhibit F is attached, (the "Agreement"), the terms and conditions of this Exhibit F shall govern and control. The provisions of this Exhibit F shall survive the closing under the Agreement.

A.    Profit Participation.

1.    In General. Buyer shall pay to Seller Profit Participation as provided in this Exhibit F. Certain capitalized terms used herein are defined in Section A.3 below. Any capitalized term not herein defined shall have the meaning set forth in the Agreement.

2.    Payments and Reconciliations.

a.    Generally. From and after the sale of the first Residence constructed on a SFD Lot, Buyer shall make payments to Seller of estimated amounts of Profit Participation on each subsequent Payment and Reporting Date. After the final Residence Closing for the Buyer Project, there shall be a reconciliation of such estimated payments against the actual amount payable by Buyer as Profit Participation which Seller shall have the right to audit pursuant to Section B.2, below. Buyer shall promptly pay Seller any shortfall revealed by such audit as set forth in Section B.2, below.

b.    Estimates and Reserves.

(i)    Use of Estimates. The parties acknowledge that until the Buyer has completed the development, construction and sale of all SFD Lots Project, certain calculations contemplated hereunder can only be made using estimated numbers in certain instances. Interim payments for Profit Participation shall be based on such estimates as provided in subsection (c) below, subject to final reconciliation as set forth in subsection (d) below. All such estimates shall be made by Buyer in accordance with generally accepted accounting principles consistently applied.

EXHIBIT B
-1-

(ii)    <u>Reserves</u>. Development costs incurred by Buyer after the Final Project Reconciliation shall not be considered an Allowed Cost except to the extent reasonable reserves are established to cover costs to complete specifically identified items, all as proposed by Buyer and approved by Seller at the time of the Final Project Reconciliation.

(iii)    <u>Calculation and Payment of Reserves</u>. As to any such reserve, Seller shall accept Profit Participation calculated as if the reserved amount was an actual cost, in which event Buyer shall promptly pay to Seller the underpaid Profit Participation as the identified items are completed with an expenditure of money in an amount less than the amount reserved for such item (provided, however, in no event shall any payment be due from Seller to Buyer in the event the costs to complete such item exceed the amount reserved for such item). Buyer to provide a list of its typical project reserves, such as warranty reserves, etc.

(iv)    <u>Time Limit</u>. Seller shall have the right to require Buyer to pay Profit Participation as if such reserve did not exist in the event the item for which such reserve is established is not fully completed within six (6) months after the close of the sale for the last Residence.

c.    <u>Interim Reporting and Payments</u>.

(i)    <u>Delivery of Profitability Reports</u>. No later than each Payment and Reporting Date, Buyer shall deliver to Seller a Profitability Report covering all Residences which have been the subject of a Residence Closing on or before the Cutoff Date, which pertains to such Payment and Reporting Date.

(ii)    <u>Estimated Profit Participation Payments</u>. The following provisions shall apply with respect to estimated Participation Payments to be made on each Payment and Reporting Date:

(A)    If there is no Estimated Net Profit as of the applicable Cutoff Date or if there is an Estimated Net Loss as of such Cutoff Date, then no payment shall be due Seller on account of Profit Participation at such time.

(B)    If there is an Estimated Net Profit as of the applicable Cutoff Date, then Buyer shall pay to Seller on the Payment and Reporting Date an amount equal to the difference between (1) the product of (A) the Profit Participation Percentage, multiplied by (B) such Estimated Net Profit, minus (2) all amounts previously paid to Seller on account of Profit Participation pursuant to this Section 2(c)(ii)(B). If, however, such calculation results in a negative number, then no payment shall be due to Seller on account of Profit Participation at such time.

d.    <u>Final Buyer Project Reconciliation</u>.

(i)    No later than the Final Reconciliation Reporting Date (as defined below), Buyer shall submit to Seller a Profitability Report using the final Buyer Project information, including without limitation final Allowed Costs. Upon the approval of such Profitability Report by Seller, there shall be a reconciliation of amounts previously paid on account of Profit Participation hereunder against amounts actually due for Profit Participation for the entire Buyer Project. If there is a Project Net Profit, then (i) if the total of any amounts previously paid

EXHIBIT F
-2-

EJM

to Seller on account of interim Profit Participation under Section 2(c)(ii)(B) above exceed the Project Participation Amount, Seller shall refund such excess to Buyer, and (ii) if the Project Participation Amount exceeds the total of any amounts previously paid to Seller on account of interim Profit Participation under Section 2(c)(ii)(B) above, then Buyer shall pay such excess to Seller. If there is a Project Net Loss, then Seller shall refund to Buyer the total of any amounts previously paid to Seller on account of interim Profit Participation under Section 2(c)(ii)(B) above. In no event shall Seller have any obligation to reimburse or pay to Buyer any portion of any Project Net Loss incurred by Buyer. Any reconciling payment or payments due under the provisions of this Section shall be made within thirty (30) days of the final Project reconciliation. Any amount that is due hereunder shall accrue interest at a rate equal to the prime rate of interest as published in the Wall Street Journal or, failing such publication, such other interest rate as may replace or supersede the same (the "**Prime Rate**") plus two percent (2%).

(ii)     The "**Final Reconciliation Reporting Date**" shall mean the date that is ninety (90) days following the final Residence Closing for the Buyer Project.

3.     <u>Definitions</u>.  The following terms shall have the following meanings for purposes of this <u>Exhibit B</u> only:

a.     "**Actual Purchase Price**" for a Residence shall mean the total amount actually charged by Buyer for the Sale of a Residence, including without limitation the amounts of any Premiums, rebates or reimbursements, all amounts charged for options, Upgrades, and modifications, any adjustments made for prorations, and the face value of any note and the fair market value of any property accepted by Buyer, but deducting therefrom any Incentives to the buyer of such Residence.

b.     Intentionally deleted.

c.     " **Affiliate**" shall mean any person or entity in which Buyer or its parent company or any of its principals or members, or principals of its members or, if Buyer is a partnership, any of its partners or principals of its partners has, individually or in the aggregate, directly or indirectly, a greater than fifty percent (50%) voting or financial interest. The term "Affiliate" shall include any principal or partner of Buyer and any family member of Buyer or any of Buyer's principals or, if Buyer is a partnership, any family member of any of its partners or the principals of its partners. As used in the foregoing, a "principal" shall be any person or entity who owns or controls, directly or indirectly, a greater than fifty percent (50%) voting or financial interest in Buyer or the entity at issue. "Financial interest" shall mean any interest in the profits and/or losses of, and/or equity in, such entity.

d.     "**Allocable Hard Costs**" shall mean all Hard Costs for the Buyer Project other than Direct Hard Costs. Without limiting the foregoing, Allocable Hard Costs shall include such Hard Costs as grading, street improvements (other than curb cuts and drive aprons for each Residence) and in-street utilities. Allocable Hard Costs shall be allocated among the Residences built and to be built in the Buyer Project in accordance with the Cost Allocation Method.

EJM

    e.    **"Allowed Costs"** for the Buyer Project shall mean the sum of the Hard Costs and the Soft Costs for the Buyer Project. Notwithstanding anything herein to the contrary, the following provisions shall also apply to the determination of Allowed Costs:

    (i)    If Buyer purchases any goods or services from an Affiliate, then Buyer shall be allowed to deduct as an Allowed Cost only an amount equal to the price charged by other independent third party providers of the same goods and services.

    (ii)    The Purchase Price set forth in the Agreement shall be a Hard Cost that is an Allowed Cost. The Purchase Price shall be allocable to each Residence on an equal pro rata basis.

    f.    **"Buyer Project"** shall mean the single-family residential development project to be built on the Single Family Element and, in no event shall the Buyer Project include any Townhome Unit.

    g.    **"Cost Allocation Method"** shall mean the method or methods employed by Buyer for allocating Allocable Hard Costs to specific Residences in the Buyer Project. The Cost Allocation Method selected by Buyer must comply with generally accepted accounting principles and must be consistently applied by Buyer in allocating Allocable Hard Costs throughout the Buyer Project and cannot be changed after the same is selected by Buyer.

    h.    **"Cutoff Date"** shall mean (i) December 31 with respect to each February 15 Payment and Reporting Date, (ii) March 31 with respect to each May 15 Payment and Reporting Date, (iii) June 30 with respect to each August 15 Payment and Reporting Date, and (iv) September 30 with respect to each November 15 Payment and Reporting Date.

    i.    **"Direct Hard Costs"** with respect to a Residence shall mean all Hard Costs directly attributable to the development and construction of such Residence.

    j.    **"Estimated Hard Costs"** shall mean, as of any date of determination thereof, the sum of (i) all Direct Hard Costs for all Residences which have been the subject of a Residence Closing as of such date, plus (ii) the Allocable Hard Costs allocated to all Residences which have been the subject of a Residence Closing as of such date.

    k.    **"Estimated Net Loss"** shall have the meaning given such term under the definition of "Estimated Net Profit".

    l.    **"Estimated Net Profit"** shall mean, as of any date of determination thereof, the difference between (i) the Project Revenues as of such date, minus (ii) the Estimated Hard Costs as of such date, minus (iii) the Soft Costs as of such date, minus (iv) the Profit Margin as of such date. If such calculation results in a negative number, such negative amount shall be an "Estimated Net Loss".

    m.    **"Hard Costs"** for the Buyer Project shall mean Buyer's total out-of-pocket expenses for each of the following separate items: (i) plan check and permit fees paid to the City or other Governing Agency for the Buyer Project, (ii) the Basic Purchase Price paid by Buyer to Seller, (iii) library, fire, transit, and similar fees paid by Buyer to the City or other Governing

ESM

Agency for the Buyer Project, (iv) utility connection fees paid by Buyer for the Buyer Project, except to the extent that such fees refunded or reimbursed to Buyer, (v) amounts paid by Buyer to contractors and subcontractors under construction contracts for grading, construction of streets, installation of utilities and related improvements, (vi) amounts paid by Buyer to contractors and subcontractors under construction contracts for construction of Residences and related improvements (with the cost of home-buyer options broken out as a sub-component), and (vii) engineering and consultant fees incurred in connection with the grading, street improvements and in street utilities for the Land (but not the Residences). In all events only out-of-pocket costs and expenses directly related to construction on the Single Family Element will qualify as Hard Costs. All such costs shall be determined in accordance with generally acceptable accounting principles consistently applied.

n.    "**Incentives**" as used herein means, and subject to the provisions of Section A.4 below, the amount of payments to the buyer, or to a third party, for the benefit of the buyer of a Residence to induce the buyer to complete the purchase of such Residence, and which amount is shown on the closing statement for the escrow for the Sale of that Residence, and not otherwise. Any reduction in the sales price of a Residence or other Incentive offered to the employees of Buyer or Buyer's Affiliates which is not also offered to the public shall not be an allowable deduction from the Actual Purchase Price (and instead, the Actual Purchase Price shall be adjusted upward to offset any such reduction). If an Incentive provided by Buyer consists of any payment to a third party which is an Affiliate of Buyer, Buyer shall be allowed to include in the calculation of Incentives only an amount equal to the price charged in an arm's length transaction by other independent third party providers of the same goods and services. Incentives offered to Homebuyers for the use of any Affiliate of Buyer shall be permitted deductions subject to the following limitations for each Residence that is Sold where an incentive with an Affiliate Incentive is provided to the Homebuyer of that Residence, the Deduction for the Affiliate Incentive, subject to a limitation equal to 70% of the total amount of the Affiliate Incentive provided for the Sale of that Residence.

o.    "**Payment and Reporting Date**" shall mean (i) following the Close of Escrow and prior to the first Residence Closing, each February 15 and August 15, and (ii) following the first Residence Closing and until the Residence Closing for the last Residence in the Buyer Project, each February 15, May 15, August 15, and November 15. Additionally, a "Payment and Reporting Date" shall occur thirty (30) days following the occurrence of the Residence Closings for ninety percent (90%) of all Residences to be built in the Project.

p.    "**Premium**" for a Residence, if any, shall mean the sum of any lot, view, location or other premium or premiums for a Residence. The Premium for a Residence may be either a positive or negative amount.

q.    "**Principal**" shall mean, with respect to any entity, any person or entity who owns or controls, directly or indirectly, a ten percent (10%) or greater Financial Interest in such entity.

r.    "**Profit Margin**" shall mean an amount equal to twelve percent (12%) of the Project Revenues.

ESM

s.    "**Profit Participation**" shall mean the total of the amounts payable by Buyer to Seller under this Section A.

t.    "**Profit Participation Percentage**" shall mean fifty percent (50%).

u.    "**Profitability Report**" shall mean and refer collectively to the reports prepared by Buyer in a form approved by Seller, which approval shall not be unreasonably withheld, conditioned or delayed. Buyer shall submit the proposed form of the Profitability Report to Seller for Seller's review and approval no more than sixty (60) days after the date of this Agreement. The Profitability Report shall include (i) Buyer Project inception to date financial statements for the entire Buyer Project showing Project Revenues, Estimated Hard Costs, Estimated Profit Margin and Estimated Net Profit or Estimated Net Loss as of the Cutoff Date for such report, (ii) Buyer's estimate of total future Project Revenues and Allowed Costs to be realized and incurred in connection with the entire Buyer Project, (iii) an allocation worksheet reconciling the items set forth in the foregoing items (i) and (ii), and (iv) such other information as Seller shall reasonably request that is set forth in the approved form of Profitability Report. In the event of any conflict or inconsistency between the format of or the express or implied calculations set forth in the form of Profitability Report and the provisions of this Exhibit F, the provisions of this Exhibit F shall prevail.

v.    "**Project Net Loss**" shall have the meaning given such term in the definition of Project Net Profit.

w.    "**Project Net Profit**" shall mean the difference between (i) the Project Revenues, minus (ii) the Allowed Costs for the Buyer Project, and minus (iii) the Profit Margin. If such calculation results in a negative number, then such negative amount shall be the "Project Net Loss".

x.    "**Project Participation Amount**" shall mean (i) if there is a Project Net Loss, the amount of zero ($0); and (ii) in all other instances, an amount equal to the product of (A) the Profit Participation Percentage, multiplied by (B) the Project Net Profit.

y.    "**Project Revenues**" shall mean, as of any date of determination thereof, the sum of the Actual Purchase Prices for all Residences that have been the subject of a Residence Closing as of such date.

z.    "**Residence Closing**" or "**Sale**" shall mean, with respect to a Residence, the close of escrow and the recordation of a deed conveying such Residence to a member of the homebuying public.

aa.    "**Sales Commission Incentive**" shall mean the payment of a sales commission to an outside real estate broker.

bb.    "**Soft Cost Allowance**" shall mean a fixed amount equal to eighteen percent (18%) of the Project Revenues.

cc.    "**Soft Costs**"-shall include the following categories of costs set forth below:

NWHM-60131\3043983.20

(i)      All "**Overhead Costs**" of Buyer of every type and nature, including without limitation (A) salaries and payroll additives of Buyer's home and branch office executives, officers, department heads and staff on directing, administering and supervising development of the Land; (B) the services of the purchasing department, sales manager and marketing support staff in Buyer's home and branch offices, (C) all employee bonuses of Buyer's home and branch offices, (D) general legal and accounting fees, and (E) the operating expenses of Buyer's home and branch offices, including without limitation rent, utilities, insurance, stationary, office machines and other office related expenses;

(ii)      "**Warranty Costs**" which shall include out of pocket warranty and complaint costs incurred by Buyer for all Residences on the Land, for each Residence which escrow closes within the 12-month period immediately prior to the Final Audit for the Land, the amount deductible for warranty and complaint costs for such Residence shall be the reasonable warranty and complaint costs anticipated by Buyer (and approved by Seller) to be experienced in the remaining warranty period for such Residence after the Final Audit. For purposes of calculating hereunder, the warranty period for Residences shall not exceed 12 months. If there are excess funds after the expiration of the 12-month warranty period for each house, such funds shall be distributed.

(iii)      "**Sales and Marketing Costs**" means the actual salaries and other compensation for Buyer's sales staff, and merchandising, advertising and model costs net of all Upgrade cost recoveries (exclusive of Model building and site improvement costs).

(iv)      "**Insurance Costs**" shall mean the actual premiums paid by Buyer for the insurance that Buyer is required to carry pursuant to the terms of this Agreement and reasonably allocated to the Land, with such allocation subject to Seller's approval.—Insurance Costs exclude costs associated with deductibles, self-insurance retentions and self-insurance, such as costs of establishing reserves for same;

(v)      The cost of Sales Commission Incentives;

(vi)      Finance Costs;

(vii)      Depreciation, amortization and other non-cash charges and expenses for the Buyer Project;

(viii)      The costs of any model sale/lease back program;

(ix)      All architectural, engineering, design and consultant fees and costs incurred in connection with the Residences.

(x)      All real estate taxes and assessments;

(xi)      All indirect construction costs in the field or on the job site including, but not limited to, field labor, field supervision, bonuses paid to field superintendents, auto and payroll additives related to field labor or supervision, field office expenses, equipment or tool rentals, guard services, trash disposal, maintenance expenses and vandalism.

EXHIBIT F

-7-

dd.    "**Upgrades**" for a Residence (including the Models) shall mean all items not included in the base Residence, whether provided by Buyer or a third party, and shall include without limitation all extras and options for such Residence such as room additions, room conversions, special amenities and upgrades of standard features.

4.    <u>Incentives</u>.

a.    Not less than ten (10) days prior to the release for sale to the homebuying public of or the taking of reservations for a sales phase ("**Sales Phase**"), for which Buyer has obtained a Final Subdivision Public Report from the California Department of Real Estate ("DRE"), Buyer shall submit to Seller, for Seller's use in internal financial forecasting and modeling, a schedule ("**Price Schedule**") specifying (i) the base purchase price established by Buyer for each Residence in such Sales Phase, and (ii) the Premiums for each Residence in such Sales Phase. Thereafter, Buyer shall give prior written notice (each a "**Price Update**") to Seller of any change in the information contained in a previously delivered Price Schedule. The base purchase prices for Residences specified by Buyer in a Price Schedule, as the same may be modified by Buyer from time to time through delivery of Price Updates, are herein referred to as the "**Scheduled Base Residence Prices**". Notwithstanding the foregoing provisions, Buyer shall be free to sell Residences to the public at whatever purchase prices Buyer chooses and such purchase prices are not subject to review or approval by Seller.

b.    Concurrently with the delivery of the Price Schedule for a Sales Phase to Seller, Buyer shall also deliver to Seller a schedule ("**Incentive Schedule**") specifying the Incentives which Buyer may wish to offer to the future purchasers of Residences in such Sales Phase ("Approved Incentives"). Any other Incentives approved in writing by Seller shall also constitute Approved Incentives. If for any new Sales Phase Buyer does not submit an Incentive Schedule to Seller in accordance with the foregoing provisions, the Incentive Schedule for the immediately prior Sales Phase shall be deemed to be the Incentive Schedule for such new Sales Phase. For the avoidance of doubt, Buyer shall be free offer any Approved Incentives Buyer chooses to offer and such Approved Incentives are not subject to review or approval by Seller.

5.    <u>Interest</u>.    In the event Buyer understates amounts due to Seller for Profit Participation at any Payment and Reporting Date, the amount so understated shall bear interest from the date such amount should have been paid to the date actually paid to Seller at the greater of (i) the Prime Rate plus two percent (2%), or (ii) the maximum allowable non-usurious rate under then existing law (the applicable of such rates herein referred to as the "**Applicable Rate**"). If in any event Buyer has underpaid Seller on any Payment and Reporting Date by an amount exceeding the greater of (i) ten percent (10%) of the Profit Participation due as of such Payment and Reporting Date or (ii) One Hundred Thousand Dollars ($100,000.00), then Buyer shall also reimburse Seller for the reasonable out-of-pocket cost of any audit in connection therewith; provided, however, in no event shall such reimbursement obligation exceed Twenty-Five Thousand Dollars ($25,000.00).

6.    <u>Books and Records</u>.    Buyer shall keep and maintain materially accurate financial books, records, and documentation (all such items herein collectively referred to as the "**Buyer Project Information**") with respect to all items which are taken into consideration in calculating

*EJM*

the Profit Participation, including, without limitation, those items specified on Buyer's Profitability Reports.

    B.    <u>General</u>.

    1.    <u>Calculation of Information</u>. Intentionally Deleted.

    2.    <u>Audit Rights; Adjustments</u>. Seller shall have the right to audit and review all Buyer Project Information at Buyer's offices during normal business hours on thirty (30) business days prior written notice given no later than one hundred and eighty days (180) days after receipt of a Profitability Report (the "<u>Audit Period</u>"). Buyer shall make all Buyer Project Information available to Seller's auditor on demand. Any such audit shall be completed by an independent certified public accountant licensed in the State of California that is not paid on a contingency fee basis (the "<u>Auditor</u>") for the purpose of verifying the calculation of the Profit Participation, if any, due Seller pursuant to the terms of this Agreement (the "<u>Audit</u>"). The Audit shall be completed within five (5) business days during normal business hours (subject to extension for actual delay caused by Buyer). Seller's failure to complete the Audit within the Audit Period shall be deemed to be Seller's approval of the applicable Profitability Report and Seller, thereafter, waives the right or ability to complete an Audit with respect thereto. Unless Buyer disputes the Audit, any deficiency in amounts due to Seller, or any overpayment by Buyer, as determined by the Audit, shall be paid by Buyer or reimbursed by Seller, as the case may be, within thirty (30) days after delivery of the Audit. Subject to reimbursement by Buyer as provided in <u>Section A.5</u>, above, Seller shall pay the costs of the Audit. Seller and any party performing any such Audit must agree that all information provided pursuant to this <u>Exhibit F</u> is confidential and Seller and such party must agree in writing not to disclose any such information to any party other than Seller's attorneys and accountants involved in any Audit (who must also agree in writing to maintain the confidentiality of such information) or as required by court order or otherwise by law. Notwithstanding any provision to the contrary in this <u>Exhibit F</u>, including in any Schedule hereto, Seller shall not be entitled to a copy of homebuyer's HUD-1 settlement statement or any other information if and to the extent Buyer or the escrow agent for the sale of Residences is prohibited by law from disclosing the same to Seller. However, in such event, Buyer agrees to provide a written statement prepared by the escrow agent for the sale of the Residences ("**Escrow Statement**") identifying the homebuyer, the property address, the date of the closing of the Residence and the Actual Purchase Price of the Residence as reflected on the HUD-1 settlement statement, for the purpose of Seller verifying compliance with Buyer's obligation to pay Profit Participation. The making or acceptance of any payment or the taking of any other action by Seller shall not waive any right of Seller to later audit, review, verify, object to or challenge any Profitability Report or other Buyer Project Information. In the event of an objection or challenge by Seller to any such item, the parties shall promptly meet and reasonably cooperate in an attempt to resolve such objection or challenge. In the event any adjusting payment is due as a result of the resolution of any objection or challenge by Seller, the same shall be made within thirty (30) days of such resolution.

    3.    <u>Sales Information</u>. To the extent permitted by applicable law, Buyer shall deliver sales agreements and closing statements in connection with the sale of each Residence. Seller shall have the right to use such information solely for verifying the amount to be paid to Seller hereunder, if any.

EXHIBIT F
-9-

4.    <u>Successors & Assigns</u>.  If Buyer assigns its right to purchase all or any part of the Single Family Element to another party, or if all or any portion of the Single family Element is sold or otherwise transferred to a third party (other than to a member of the homebuying public), then the provisions of this <u>Exhibit F</u> requiring the payment of the Profit Participation shall survive and shall be binding on any such third party which becomes a seller or transferee, in whole or in part, of the Single Family Element (or portion thereof), it being the intent of Buyer and Seller that the obligation to pay the Profit Participation shall burden each SFD Lot comprising the Single Family Element until such time as a Residence has been constructed on each such Lot, such Residence has been sold, and the Profit Payment has been paid to Seller.  If only a portion of the Single Family Element is transferred to a third party, then the amount of the Profit Participation to be paid by such third party shall be calculated based on the number of SFD Lots acquired by such third party.

5.    <u>Exempt Transactions</u>.  Notwithstanding anything to the contrary contained herein, the requirement that Buyer pay Seller a Profit Participation shall not apply in the event that Buyer transfers the SFD Lots (or any portion thereof including, without limitation, in connection with the bulk sale thereof or the sale of one or more Residences) to (i) an Affiliate, (ii) to a merchant builder pursuant to a land banking Transaction, (iii) a foreclosing lender, or (iv) a bulk sale to a merchant builder or investor (each, an "Exempt Transaction"), provided that any party that acquires title to any of the SFD Lots pursuant to an Exempt Transaction shall be obligated to pay the Profit Participation, if any, to Seller in accordance with the terms of this Exhibit F if such party subsequently sells, conveys or transfers any of the SFD Lots its acquired pursuant to the Exempt Transaction to a member of the homebuying public.

EXHIBIT F

-10-

**SCHEDULE 1 TO EXHIBIT F**

**REQUIRED BOOKS, RECORDS AND DOCUMENTATION**

The following books, records and documentation are required to be maintained by the Buyer in connection with the sales and costs associated with Buyer's Profitability Report:

**SALES**

<u>Escrow Files</u>

a)   Initial purchase application for all buyers making a deposit on the specific lot reflecting how the purchase price is calculated.

b)   Escrow cancellation contracts reflecting the amount of any refund returned to the potential buyers and the amount retained by Buyer.

c)   All extras and options (E&O) purchase price (or cancellations) contracts. Each contract to reflect the accumulated purchase price of the Residence (base price plus E&O).

d)   All escrow and legal documents required by the Buyer and/or the DRE and signed by the buyer.

e)   Notice of Completion and Certificate of Occupancy for the Residence.

f)   Final and revised final (if appropriate) escrow closing statement and HUD settlement statement reflecting gross selling price and all costs, loan payments and Buyer distributions.

g)   Sales journal entry for each lot that records escrow statement sales, costs and refunds, loan payments and Buyer distributions.

h)   Price approval documents submitted to and approved by Seller as required by this Agreement.

i)   Valuation and inventory of the furniture and fixtures sold with each Model Home.  If the furniture and fixtures are not sold with the Model Home, Buyer shall retain an inventory of items retained by Buyer and current value.

EXHIBIT F

-11-

NWHM-60131\3043983.20

*E JM*

## SCHEDULE 1 TO EXHIBIT F

## COSTS AND EXPENSES

### Subcontractors

Buyer will maintain contracts from subcontractors as well as subcontractor's and materialman's change orders, amendments and modifications that document the costs to be paid. Additionally, each invoice or payment application related to a subcontractor or materialman, lien release and contract reconciliation will be maintained in the vendor's payment documentation file.

### Other Vendors & Suppliers

For all vendors and suppliers other than materialman or other entities having a direct contract with Seller, used in conjunction with the acquisition, construction, marketing and sales of the Buyer Project, Buyer will maintain all contracts, agreements and purchase orders documenting the purchase price as well as all invoices related to the amounts paid. Buyer will pay particular attention to attach third party documentation, invoices and permits to each check written.

### Wire Transfers

Buyer will maintain closing statements, invoices and other third party documentation for purchases and other expenses paid via wire transfer.

### Estimates to Complete

Buyer will document all estimates to complete and validate the estimate with specific invoices and contracts. Specific documentation is required to validate that the cost will be allowed.

EXHIBIT F

-12-

Docusign Envelope ID: 460B5A12-0515-4DBC-8821-DB5F7A09AE79

**EXHIBIT G**

**INTENTIONALLY DELETED**



EXHIBIT H

FORM OF NOTE

SECURED PROMISSORY NOTE

$10,100,000.00
Los Angeles, California
Dated: _____, 2025

　　　FOR VALUE RECEIVED, the undersigned, MONARCH BAY FOR SALE RESIDENTIAL, LLC, a Delaware limited liability company, a debtor and debtor-in-possession ("**Borrower**") in Case No. 2:24-bk-14877-DS pending before the United States Bankruptcy Court for the Central District of California (the "**Bankruptcy Court**") under Chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Case**"), hereby promises to pay to the order of THE NEW HOME COMPANY OF NORTHERN CALIFORNIA, LLC, a Delaware limited liability company ("**Lender**"), the principal sum of Ten Million One Hundred Thousand Dollars ($10,100,000.00) (the "**Maximum Amount**"), or if the Maximum Amount has not been funded, such lesser amount as may be advanced by Lender from time to time in accordance with this Note and the DIP Loan Documents (as defined below), together with interest thereon, as provided herein.

　　　1.　　Draws and Disbursement Procedure.

　　　　1.1.　　Monthly Advances.　This Note evidences a loan facility (the "**DIP Loan**") pursuant to which Borrower may request monthly draws, subject to the total commitment amount of the Maximum Amount.　This Note is a non-revolving promissory note and, accordingly, once the aggregate sum of advances hereunder reaches the Maximum Amount, Borrower shall not be entitled to any further advances hereunder notwithstanding the repayment by Borrower of any prior advances.

　　　　1.2.　　Draw Requests.　Each advance shall be made only upon submission by Borrower of a written request (a "**Draw Request**") to Lender and Title Company (as defined in that certain Contract for Purchase and Sale And Escrow Instructions dated _____, 2025 by and between Lender, as buyer, and Borrower, as seller (the "**PSA**")), accompanied by the following: (a) a reasonably detailed list of all costs and expenses for which Borrower is seeking funds to pay; (b) copies of invoices and/or other such evidence of such costs to be paid by Borrower upon receipt of the Draw Request funds; (c) conditional lien waiver(s) and release(s) from each contractor and subcontractor which has mechanic's lien rights for labor and/or materials for which payment has been requested in such Draw Request, such lien waiver(s) to be conditioned only upon payment of a specific sum (which amounts, in the aggregate, must be equal to or less than the amount of the requested payment); and (d) unconditional lien waivers from each contractor and subcontractor who were paid in connection with the immediately previous Draw Request, if any. Each Draw Request shall be submitted no later than the first (1st) calendar day of the month; provided, however, that if such day is a non-business day, then on the first (1st) business day thereafter.

14

*EJM*

     1.3.    <u>Lender Approval</u>.  Lender shall approve (which approval shall not be unreasonably withheld or conditioned) or disapprove any such Draw Request, and deliver written notice thereof to Borrower and the Title Company, within five (5) business days after Lender's receipt of such Draw Request.  Any disapproval of a Draw Request shall be accompanied by a reasonably detailed written explanation for Lender's disapproval thereof.  If Lender fails to respond to a Draw Request within five (5) business days after Lender's receipt thereof, then Lender shall be deemed to have approved such Draw Request.  Upon Lender's approval (or deemed approval) of a Draw Request, the Title Company shall disburse to Borrower the amount approved (or deemed approved); provided, however, that no advance shall be made unless (a) Borrower is in compliance with all terms of this Note and the related DIP Loan Documents, (b) there exists no Event of Default (as defined below), and (c) all Earnest Money Release Conditions (as defined in the PSA) have been and remain satisfied.  Notwithstanding such disbursement, the funds so released shall remain an earnest money deposit subject to the terms and conditions of the PSA.

     1.4.    <u>Additional Conditions Precedent</u>.  Notwithstanding anything else herein, the effectiveness of this Note and the Lender's obligation to fund the DIP Loan shall be subject to the prior or concurrent satisfaction of the following conditions: (a) the Bankruptcy Court shall have entered a Final Order (as defined in the PSA), in form and substance satisfactory to Lender, approving the DIP Loan (the "**DIP Order**"); and (b) no termination event shall have occurred under that certain Plan Support Agreement dated as of _____, 2025, by and among Lender and Borrower (as may be amended, restated, supplemented, waived, or otherwise modified from time to time in accordance with the terms thereof, the "**Plan Support Agreement**").

    2.    <u>Interest Rate and Payments</u>.

     2.1.    <u>Interest Rate</u>. Interest shall accrue on the unpaid principal balance of the DIP Loan at a rate equal to the lowest applicable federal rate for short term loans in effect on the date of this Note, computed on the basis of a 360-day year and actual days elapsed.

     2.2.    <u>Default Rate</u>. Upon the occurrence and during the continuance of any Event of Default, or if the Borrower fails to repay the DIP Loan at maturity, interest shall accrue on the unpaid principal at the maximum rate permitted by applicable California law ("**Default Rate**"), until the indebtedness is paid in full.

     2.3.    <u>Payment Dates</u>. There will be no periodic payments under this Note.  All principal and interest shall be due and payable on the thirtieth (30th) day after the termination of the PSA for any reason other than a termination thereof as a result of a "Buyer" default (the "**Maturity Date**").  The entire outstanding principal balance hereunder, together with accrued interest on this Note, shall be due and payable in full in one "lump-sum" payment in cash on the Maturity Date. All amounts due on this Note shall be payable without set-off, counterclaim or any other deduction whatsoever.  Notwithstanding anything to the contrary contained herein, (a) if the PSA terminates solely as a result of a "Buyer" default thereunder, then the amounts advanced hereunder and the balance of the Maximum Amount shall be retained by and/or paid to

*EJM*

Borrower as liquidated damages pursuant to the PSA and credited in full towards the amounts due hereunder, and (b) if the Closing (as defined in the PSA) occurs, then the Maximum Amount (or if less, the amounts actually funded under this Note) shall be credited in full against the payment of the Purchase Price (as defined in the PSA) whereupon this Note shall be deemed paid in full.

3.    Use of Proceeds.  Proceeds of the DIP Loan shall be used exclusively for the payment of (a) interest due to the City of San Leandro, California pursuant to that certain promissory note dated December 22, 2022 in the original principal amount of $24,882,958.00 and secured by that certain Deed of Trust with Assignment of Rents, Security Agreement and Fixture Filing dated December 22, 2022 and recorded on December 20, 2022 in the Official Records of Alameda County, California as Instrument 2022203851, (b) the payment of costs and fees incurred directly in connection with Borrower seeking final approval of the Seller Approvals (as defined in the PSA) in accordance with the terms of the PSA, and/or (c) the payment of real property taxes, and shall not be used for any purpose in contravention of this Note, the DIP Loan Documents, the Bankruptcy Code, or the order of the Bankruptcy Court.

4.    Security.  This Note is secured by, and entitled to the benefits of, that certain Deed of Trust, Assignment of Rents, and Security Agreement, dated of even date herewith, executed by Borrower in favor of Lender, encumbering certain real property located in the City of San Leandro, County of Alameda, State of California (the "**Deed of Trust**").

5.    Events of Default.  The following shall constitute "**Events of Default**":

5.1.    Conversion or Dismissal.  The conversion of the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code, or the dismissal of the Bankruptcy Case.

5.2.    Appointment of Trustee.  The appointment of a Chapter 11 trustee or an examiner with expanded powers.

5.3.    Unauthorized Use.  Use of DIP Loan proceeds for any purpose not authorized by the DIP Loan Documents or Bankruptcy Court order.

5.4.    Failure to Pay.  Failure to pay any interest, principal, or other amounts due under this Note within five (5) business days after written notice.

5.5.    Violation of Covenants.  Material default by Borrower under this Note or any DIP Loan Document including, without limitation, the PSA.

5.6.    Lien Challenge.  Any lien purported to be created under any DIP Loan Document on any material portion of the Collateral (as defined in the Deed of Trust) shall cease to be, or shall be asserted by Borrower not to be, a valid and perfected, lien.

5.7.    Loan Challenge.  Any material provision of any DIP Loan Document shall for any reason be asserted by Borrower not to be a legal, valid and binding obligation of Borrower.

*ESM*

Docusign Envelope ID: 460B5A12-0515-4DBC-8821-DB5F7A09AE79

5.8.  Relief from Stay. The entry of an order granting relief from the automatic stay with respect to any material assets of Borrower.

5.9.  Plan Impairment. Filing or support by Borrower of any plan of reorganization that does not provide for full payment of this Note in cash on the effective date, without Lender's consent.

5.10.  Loss of Exclusivity. The termination of Borrower's exclusive right to file a plan of reorganization.

5.11.  Unauthorized Adequate Protection Payments. Without Lender's prior written consent (which consent may be giving or withheld in its sole and absolute discretion), the filing of any motion by Borrower seeking approval of (or the entry of an order by the Bankruptcy Court approving) adequate protection to any Prepetition Secured Party (as defined in the DIP Order) that is inconsistent with the DIP Order.

5.12.  Unauthorized Loans. Without Lender's consent (which may be given or withheld in its sole and absolute discretion), the entry of any order by the Bankruptcy Court granting, or the filing by Borrower of any motion or other request with the Bankruptcy Court (in each case, other than the DIP Order and motions seeking entry thereof or permitted amendments or modifications thereto) seeking, authority to (a) use any cash proceeds of any of the Collateral without Lender's consent, (b) obtain any financing under Section 364 of the Bankruptcy Code other than pursuant to DIP Loan Documents or (c) modify or affect any of the rights of the Lender under the DIP Order, the DIP Loan Documents, and related documents.

5.13.  Improper Action. Borrower shall take any action in support of any matter set forth in Section 5.1 through Section 5.12, or any other person shall do so and such application is not contested in good faith by Borrower and the relief requested is granted in an order that is not stayed pending appeal.

5.14.  Plan Support Agreement Termination. Any termination event occurs under the Plan Support Agreement.

6.  Remedies Upon Default. Upon the occurrence of an Event of Default, Lender may (a) declare the entire unpaid balance of this Note, together with all accrued interest and other charges, immediately due and payable; (b) charge interest at the Default Rate; (c) exercise all rights and remedies available under the DIP Order and DIP Loan Documents, at law or in equity; and (d) seek additional relief from the Bankruptcy Court.

7.  Prepayment. Borrower may prepay this Note, in whole or in part, at any time without premium or penalty. All prepayments shall be applied first to accrued and unpaid interest, then to principal.

8.  Waivers. To the maximum extent permitted by law, Borrower for itself and for its successors, personal representatives, heirs and assigns, all guarantors, endorsers and signers, and

their respective successors, personal representatives, heirs and assigns, hereby waives all valuation and appraisement privileges, presentment and demand for payment, protest, notice of protest and nonpayment, dishonor and notice of dishonor, bringing of suit, lack of diligence or delays in collection or enforcement of this Note and notice of the intention to accelerate, notice of acceleration, the release of any party liable, the release of any security for debt, the taking of any additional security and any other indulgence or forbearance, and all said parties agree that this Note and any or all payments coming due hereunder may be extended or renewed from time-to-time without in any way affecting or diminishing their liability hereunder.  No waiver by Lender shall be effective unless in writing, and no waiver shall operate as a waiver of any other default.

9.      Governing Law; Jurisdiction.  This Note shall be governed by and construed in accordance with the laws of the State of California. Any action to enforce this Note shall be brought in the Bankruptcy Court or, if such court lacks jurisdiction, in a court of competent jurisdiction in California.

10.     Miscellaneous.

10.1.    DIP Loan Documents.  This Note, the Deed of Trust, the PSA and any related agreements, orders, and documents executed in connection herewith are collectively referred to as the "**DIP Loan Documents.**"

10.2.    Binding Effect.  This Note shall be binding upon Borrower and its successors and shall inure to the benefit of Lender and its assigns.

10.3.    Assignment.  Lender may assign this Note, in whole or in part, without the consent of Borrower.  Borrower may not assign or transfer its obligations hereunder without Lender's prior written consent.

10.4.    Time of the Essence.  Time is of the essence with respect to all of Borrower's obligations under this Note.  Unless otherwise expressly stated to be "business days", all references to "days" herein shall mean calendar days; provided, however, that if the last date or the deadline for the giving of notice or performance of any other act or fulfillment or satisfaction of any condition set forth in this Note shall fall on a day which is not a business day, then the time for the giving of such notice or performance of such act or fulfillment or satisfaction of such condition shall be extended to the next business day.  As used herein, the term "business days" shall mean all days other than Saturdays, Sundays or state or federal holidays.

10.5.    Severability.  Every provision of this Note is intended to be severable.  In the event any term or provision hereof is declared to be illegal or invalid for any reason whatsoever by a court of competent jurisdiction, such illegality or invalidity shall not affect the validity or enforceability of the remaining terms and provisions hereinabove set forth.

10.6.    Amendments.  Any contract, promise, undertaking, or offer to forebear repayment of money or to make any other financial accommodation in connection with this loan

EJM

of money or grant or extension of credit, or any amendment of, cancellation of, waiver of, or substitution for any or all of the terms or provisions of any instrument or document executed in connection with this loan of money or grant or extension of credit, must be in writing to be effective.

10.7.    <u>Attorneys' Fees</u>.  In the event suit be brought because of any matter set forth in or arising out of this Note, the prevailing party shall be entitled to recover all expenses incurred therefor, including, without limitation, attorneys' fees and costs, including, without limitation, any such fees and costs incurred in connection with any appeal.

10.8.    <u>Jury Waiver</u>.  TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IF AT ALL, BORROWER HEREBY WAIVES THE RIGHT TO REQUEST A JURY TRIAL IN ANY ACTION OR PROCEEDING INVOLVING THIS NOTE.

IN WITNESS WHEREOF, Borrower has executed this Secured Promissory Note as of the date first written above.

MONARCH BAY FOR SALE RESIDENTIAL, LLC,
a Delaware limited liability company,
a debtor and debtor-in-possession

By:      _____
Name:   _____
Title:     _____

EXHIBIT I

**FORM OF DEED OF TRUST**

RECORDING REQUESTED BY AND
WHEN RECORDED RETURN TO:

The New Home Co.
15231 Laguna Canyon Rd., Ste. 250
Irvine, CA 92618
Attention: General Counsel

---

SPACE ABOVE THIS LINE FOR RECORDER'S USE
APN: _____

**ATTENTION: COUNTY RECORDER -- THIS DEED OF TRUST SERVES AS A FINANCING STATEMENT FILED AS A FIXTURE FILING UNDER SECTION 9502 OF THE CALIFORNIA UNIFORM COMMERCIAL CODE AND COVERS GOODS THAT ARE OR ARE TO BECOME FIXTURES ON THE LAND DESCRIBED HEREIN AND IS TO BE FILED FOR RECORD IN THE RECORDS WHERE DEEDS OF TRUST ON REAL ESTATE ARE RECORDED. ADDITIONALLY, THIS DEED OF TRUST IS TO BE FILED IN THE INDEX OF FINANCING STATEMENTS UNDER THE NAMES OF THE GRANTOR, AS "DEBTOR", AND THE LENDER, AS "SECURED PARTY". THE GRANTOR IS A RECORD OWNER OF AN INTEREST IN THE LAND DESCRIBED HEREIN. THE MAILING ADDRESSES OF THE GRANTOR (DEBTOR) AND THE LENDER (SECURED PARTY) ARE SET FORTH BELOW.**

DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS,
SECURITY AGREEMENT AND FIXTURE FILING

THIS DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING (this "Security Instrument") is made and entered into as of _____, 2025, by and among MONARCH BAY FOR SALE RESIDENTIAL, LLC, a Delaware limited liability company, with an address of 12301 Wilshire Blvd., Ste. 520, Los Angeles, CA 90025 Attn: Edward Miller (the "Grantor"), in favor of OLD REPUBLIC TITLE COMPANY, in its capacity as trustee (together with its successors and assigns in such capacity, the "Trustee"), with an address of 101 N. Brand Blvd., 14th Floor, Glendale, CA 91203 Attn: Lizeth Villalobos, for the benefit of THE NEW HOME COMPANY OF NORTHERN CALIFORNIA, LLC, a Delaware limited liability company (the "Lender") identified as the Noteholder in the Promissory Note defined below, with an address of 1508 Eureka Road, Ste. 290, Roseville, CA 95661 Attn: Kevin Carson & Samantha Higbee, as beneficiary hereunder.

*ESM*

## RECITALS

Lender agreed to make a loan to Grantor in the maximum principal sum of Three Million Four Hundred Twelve Thousand Nine Hundred Fifty Dollars ($3,412,950.00) pursuant to the terms of that certain Secured Promissory Note ("Promissory Note") of even date herewith. All terms used but not otherwise defined herein shall have the meanings provided in the Promissory Note. Grantor is the fee owner of the real property described below and is required by the Promissory Note to execute and deliver this Security Instrument as security for the Secured Indebtedness, which the Grantor is willing to do in consideration of the agreement of the Lender to make the loan pursuant to the terms of the Promissory Note.

## W I T N E S S E T H:

In consideration of the foregoing recitals and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Grantor irrevocably grants, mortgages, warrants, bargains, sells, pledges, remises, aliens, assigns, conveys, transfers and sets over to the Trustee, in trust, for the benefit of the Lender, WITH POWER OF SALE, and with all other statutory rights and covenants and subject to the further terms of this Security Instrument, all of the Grantor's right, title and interest in and to the following:

(a)    All those tracts or parcels of land and other real property interests in the City of San Leandro, Alameda County, California as more particularly described on Exhibit A attached hereto and incorporated herein (the "Land"), and all of Grantor's right, title and interest in and to rights appurtenant thereto, including easement rights, to the extent relating solely to the Land; and

(b)    All buildings and improvements owned by Grantor of every kind and description now or hereafter erected or placed on the Land (the "Improvements") and all materials intended for construction, reconstruction, alteration and repair of such Improvements now or hereafter erected thereon owned by Grantor, all of which materials shall be deemed to be included within the premises hereby conveyed immediately upon the delivery thereof to the aforesaid Land, and all fixtures now or hereafter owned by Grantor and located on or attached to or contained in and used in connection with the aforesaid Land and Improvements (collectively, the "Fixtures"), and all articles of personal property now or hereafter owned by Grantor and attached to or contained in and used in connection with the aforesaid Land and Improvements (including, but not limited to, all furniture, furnishings, apparatus, machinery, equipment, motors, elevators, fittings, radiators, ranges, refrigerators, awnings, shades, screens, blinds, carpeting, office equipment and other furnishings and all plumbing, heating, lighting, cooking, laundry, ventilating, refrigerating, incinerating, air conditioning and sprinkler equipment and fixtures and appurtenances thereto), and all renewals or replacements thereof or articles in substitution thereof, whether or not the same are or shall be attached to the Land and Improvements in any manner (the "Tangible Personalty") and all proceeds of the Tangible Personalty, and all appurtenances to the Land (the "Appurtenances") and all proceeds and products of the Land, including casualty and condemnation proceeds (collectively, the "Proceeds")

*EM*

(hereinafter, the Land, the Improvements, the Fixtures, the Tangible Personalty, the Appurtenances and the Proceeds may be collectively referred to as the "Collateral").

TO HAVE AND HOLD the same, together with all privileges, hereditaments, easements and appurtenances thereunto belonging, to the Trustee, for the benefit of the Lender, as security for the Secured Indebtedness.

As additional security for the Secured Indebtedness, the Grantor hereby transfers and assigns to the Lender and grants to the Lender a security interest under the Uniform Commercial Code (as defined herein) in all right, title and interest of the Grantor in and to all of the following:

(1) All security deposits, rents, issues, profits and revenues of the Collateral from time to time accruing (the Grantor's right, title and interest in and to the foregoing, the "Rents and Profits") and all existing and future leases, subleases, licenses and other agreements for the use and occupancy of all or part of the Collateral, together with all guarantees of the lessee's obligations thereunder (collectively, the "Leases"), whether oral or written, for a definite term or month-to-month. This assignment shall extend to and cover any and all extensions and renewals and future Leases and to any and all present and future rights against guarantor(s) of any such obligations and to any and all Rents and Profits collected under the Leases or derived from the Collateral. In pursuance of this assignment, and not in lieu hereof, the Grantor shall, upon request from the Lender, execute and deliver to the Lender separate specific assignments of rents and leases covering some or all of the Leases, the terms of such assignments being incorporated herein by reference. This assignment is absolute and effective immediately and without possession; however, the Grantor shall have a revocable license to receive, collect and enjoy the Rents and Profits accruing from the Collateral until an Event of Default has occurred. Upon the occurrence and during the continuance of any Event of Default, the license shall be revoked automatically, without need of notice, possession, foreclosure or any other act or procedure, and all Rents and Profits assigned hereby shall, during the continuance of such Event of Default, be payable to the Lender for application to the Secured Indebtedness.

(2) All proceeds (including, without limitation, all "proceeds" as defined in the Uniform Commercial Code and any and all insurance proceeds, and any and all awards, including interest, previously or hereafter made to the Grantor for taking by eminent domain or in lieu thereof, in each case, relating to the Collateral), products, offspring, rents and profits from any of the foregoing, including, without limitation, those from sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

All the Tangible Personalty which comprises a part of the Collateral shall, as far as permitted by law be deemed to be "fixtures" affixed to the aforesaid Collateral and conveyed therewith. As to the balance of the Tangible Personalty, this Security Instrument shall be considered to be a security agreement which creates a security interest in such items for the benefit of the Lender. In that regard, the Grantor grants to the Lender all of the rights and remedies of a secured party under the Uniform Commercial Code and grants to the Lender a security interest in all of the Tangible Personalty.

The Grantor, the Trustee and the Lender covenant, represent and agree as follows:

ESM

## ARTICLE I

### Secured Indebtedness

This Security Instrument secures the prompt payment, performance and observance of all obligations of the Promissory Note, whether now existing or hereafter arising or incurred, due or to become due, direct or indirect, absolute or contingent, and howsoever evidenced, held or acquired (the "Secured Indebtedness").

## ARTICLE II

### Grantor's Covenants, Representations and Agreements

2.1    Title to Collateral.  Grantor represents and warrants to Lender (a) that it is seized of the Land and the Improvements and has indefeasible fee simple title to the Land and the Improvements and has the right to encumber and convey the same, and title to such Land and Improvements is free and clear of all liens and encumbrances, other than matters of record as of the date hereof, (b) that it is the owner of the Tangible Personalty free and clear of all liens and encumbrances and (c) that it will warrant and defend the title to such property against the claims of all Persons.

2.2    Taxes and Other Charges.  Grantor will pay all taxes, general and special assessments, insurance premiums, permit fees, inspection fees, license fees, water and sewer charges, franchise fees and equipment rents and any other charges or fees against it or the Collateral.

2.3    Reimbursement.  The Grantor agrees that if it shall fail to pay on or before the date that the same become delinquent any of the taxes and other charges described in Section 2.2, or if it shall fail to procure the insurance coverage and the delivery of the insurance certificates required hereunder, or if it shall fail to pay any other charge or fee required to be paid by the Grantor described herein, within five (5) business days after written notice from the Lender, then the Lender, at its option, may pay or procure the same and will give the Grantor prompt notice of any such expenditures. The Grantor will reimburse the Lender upon demand for any sums of money paid by the Lender pursuant to this Section, together with interest on each such payment at the applicable default rate of interest set forth in the Promissory Note, and all such sums and interest thereon shall be secured hereby.

2.4    Additional Documents; Further Assurances; After-Acquired Property.  At any time, and from time to time, upon request by the Lender, the Grantor will make, execute and deliver or cause to be made, executed and delivered, to the Lender and, where appropriate, to cause to be recorded and/or filed and from time to time thereafter to be rerecorded and/or refiled at such time and in such offices and places as shall reasonably be deemed desirable by the Lender any and all such other and further reasonable trust deeds, mortgages, instruments of further assurance, certificates and other documents as may, in the reasonable opinion of the Lender, be necessary or desirable in order to effectuate, complete, maintain or perfect, or to continue and preserve the

NWHM-60131\3043983.20                                        23

*ESM*

obligations of the Grantor under the Promissory Note and this Security Instrument, and the liens and security interests of this Security Instrument as a second lien upon all of the Collateral, whether now owned or hereafter acquired by the Grantor, provided that Grantor's obligations and duties under such instruments shall not be greater than those set forth in this Security Instrument. The lien hereof will automatically attach, without further act, to all after acquired property comprising a part of the Collateral. The Grantor hereby authorizes the Lender to prepare and file such financing statements, fixture filings, renewals or continuations thereof, amendments and supplements thereto and other instruments as the Lender may from time to time deem necessary or appropriate in order to perfect and maintain the security interests granted in this Security Instrument and the documents executed in connection therewith in accordance with the Uniform Commercial Code.

2.5   Sale, Transfer or Encumbrance. Except as set forth in any matters of record as of the date hereof, the Grantor shall not sell, transfer, convey, mortgage, encumber or otherwise dispose of the Collateral or the Rents and Profits or any part thereof or any interest therein or engage in subordinate financing with respect thereto during the term of this Security Instrument without the prior written consent of the Lender, and the Grantor shall not sell, transfer, convey, mortgage, encumber or otherwise dispose of any of the Tangible Personalty. In the event the Grantor sells or otherwise disposes of any of the Tangible Personalty in contravention of the foregoing sentence, the Lender's security interest in the proceeds of the Tangible Personalty shall continue pursuant to this Security Instrument.

2.6   Fees and Expenses. The Grantor will promptly pay upon demand any and all reasonable costs and expenses of the Lender and the Trustee, (a) as required under the Promissory Note and (b) in the case of an Event of Default that has occurred and is continuing, as necessary to protect the Collateral or the Rents and Profits or to exercise any rights or remedies under this Security Instrument or with respect to the Collateral or Rents and Profits. All of the foregoing costs and expenses shall be Secured Indebtedness.

2.7   Leases and Other Agreements. Grantor shall faithfully keep and perform, or cause to be kept and performed, in all material respects, all of its covenants, conditions, and agreements contained in each of the Leases, if any, and other agreements or contracts affecting all or any portion of the Collateral, now or hereafter existing, on the part of the Grantor to be kept and performed by the Grantor and shall at all times use commercially reasonable efforts to enforce, with respect to each other party thereto, all obligations, covenants and agreements by such other party to be performed thereunder.

2.8   Maintenance of Collateral. Grantor will abstain from and will not permit the commission of waste in or about the Collateral and will maintain, or cause to be maintained (subject to permitted reconstruction periods), the Collateral in substantially the same condition and repair as on the date of this Security Instrument, reasonable wear and tear and casualty excepted.

2.9   Insurance; Casualty. Grantor, at its sole expense, shall maintain the following policies of insurance:

*EJM*

(a) Insurance against loss or damage to the improvements on the Collateral by fire and any of the risks covered by insurance of the type known as "fire and extended coverage", including flood (if in at least a 100-year flood plain), in the amount of one hundred percent (100%) of the full replacement cost of the Collateral, including the cost of debris removal (exclusive of the cost of excavations, foundations, and footings below the lowest basement floor), but in no event less than the outstanding principal balance of the Promissory Note, subject to applicable law. The policies of insurance maintained in accordance with this subparagraph (a) shall contain a Replacement Cost Endorsement.

(b) Business interruption insurance and/or loss of rental value insurance in an amount equal to at least twelve (12) months' aggregate gross scheduled rents from the Collateral, if any, in a form satisfactory to Lender.

(c) Commercial general liability insurance on an occurrence basis against claims for personal injury, including without limitation bodily injury, death, or property damage occurring on, in, or about the Collateral and the adjoining streets, sidewalks, and passageways, in form, substance and amounts reasonably approved by Lender.

(d) During the course of any construction or repair of any improvements encompassed within the Collateral, workmen's compensation insurance (including employer's liability insurance, if requested by Lender) for all employees of Grantor engaged on or with respect to the Collateral in such amount as is satisfactory to Lender, or, if such limits are established by law, in such amounts.

(e) During the course of any construction or repair by Grantor of any improvements encompassed within the Collateral, builder's completed value risk insurance against all risks of physical loss, including collapse and transit coverage, during construction of such improvements, in nonreporting form, covering the total value of work performed and equipment, supplies, and materials furnished. This insurance shall contain the permission to occupy upon completion of work or occupancy endorsement.

(f)    Insurance against loss or damage to the Personal Property by fire and other risks covered by insurance of the type now known as fire and extended coverage.

(g) Such other insurance, and in such amounts, as may from time to time be reasonably required by Lender against the same or other hazards.

(h)    All policies of insurance required by the terms of this Security Instrument shall contain an endorsement or agreement by the insurer that any loss shall be payable in accordance with the terms of such policy notwithstanding Lender's failure to comply with the provisions of such policies or any act or negligence of Grantor which might otherwise result in forfeiture of insurance and the further agreement of the insurer waiving all rights of setoff, counterclaim, or deductions against Grantor. Grantor may obtain for its own account any insurance not required under this section, but any such insurance obtained by Grantor on the Collateral, whether or not so required, shall be for the mutual benefit of Grantor and Lender and shall be subject to the other provisions of this Security Instrument.

(i)    Any deductible for any of the insurance coverages required hereunder shall be subject to Lender's prior review and reasonable approval, provided that Lender has approved the policies and deductibles maintained by Grantor prior to the date of this Security Instrument. In no event shall Grantor become a co-insurer under any of the insurance policies required herein.

(j)    All policies of insurance shall be issued by companies (rated at least Best's A and a financial category rating of IX) and in amounts in each company satisfactory to Lender, provided that Lender has approved the policies maintained by Grantor prior to the date of this Security Instrument. All policies of insurance shall have attached thereto a lender's loss payable endorsement for the benefit of Lender in form satisfactory to Lender. Grantor shall furnish Lender with a copy of all policies of required insurance. If Lender consents to Grantor providing any of the required insurance through blanket policies carried by Grantor and covering more than one location, then Grantor shall furnish Lender with a certificate of insurance for each such policy setting forth the coverage, the limits of liability as to the Collateral, the name of the carrier, the policy number, and the expiration date. At least thirty (30) days prior to the expiration of each such policy, Grantor shall furnish Lender with evidence satisfactory to Lender of the payment of premium and the reissuance of a policy continuing insurance in force as required by this Security Instrument. All such policies shall contain a provision that such policies will not be cancelled or materially amended (which shall include any reduction in the scope or limits of coverage), without at least thirty (30) days' prior written notice to Lender. The insurance carrier shall send a copy of any material amendments to existing policies to Lender. Grantor shall not materially amend any existing policies, which amendments shall be deemed to include any reduction in the scope or limits of coverage under existing policies, without having first obtained the prior written approval of Lender. In the event Grantor fails to provide, maintain, keep in force, or deliver and furnish to Lender the policies of insurance required by this Security Instrument, Lender may procure such insurance or single-interest insurance for such risks covering Lender's interest, and Grantor will pay all premiums thereon promptly upon demand by Lender, and until such payment is made by Grantor the amount of all such premiums together with interest thereon at the default rate provided in the Promissory Note shall be secured by this Security Instrument.

(k) Upon any casualty to the Collateral or any part thereof, Grantor shall give prompt written notice thereof to Lender.

(l) In the event of any damage or destruction which is thirty percent (30%) or less than the value of the Collateral, all of the insurance proceeds shall be used for reconstruction.

(m) In the event of any damage or destruction which is greater than thirty percent (30%) of the value of the Collateral, all insurance proceeds shall be used for reconstruction provided: (i) there are no defaults under hereunder, (ii) in Lender's determination, after reconstruction, the Collateral will be economically viable, and (iii) if the insurance proceeds are insufficient to complete reconstruction of all improvements on the Collateral, Grantor has supplied assurances to Lender, which are satisfactory to Lender in its discretion, that Grantor will supply all additional funds necessary for complete reconstruction in a timely manner. Should any of the conditions in the immediately prior sentence not be satisfied, then Lender shall have the option, in its sole discretion, of either applying all or part of the insurance proceeds to the repayment of all sums due under the Promissory Note or using such proceeds for reconstruction.

(n) In the event of such loss or damage as described in subsection (n) above, all proceeds of insurance shall be payable to Lender, and Grantor hereby authorizes and directs any affected insurance company to make payment of such proceeds directly to Lender. In such event, Lender is hereby authorized and empowered by Grantor to settle, adjust, or compromise any claims for loss, damage, or destruction under any policy or policies of insurance.

(o) Except to the extent that insurance proceeds are received by Lender and applied to the indebtedness secured hereby, nothing herein contained shall be deemed to excuse Grantor from repairing or maintaining the Collateral or restoring all damage or destruction to the Collateral, regardless of whether or not there are insurance proceeds available or whether any such proceeds are sufficient, and the application or release by Lender of any insurance proceeds shall not cure or waive any default or notice of default under this Security Instrument or invalidate any act done pursuant to such notice. Lender shall not be obligated to see to the proper application of any amount paid over to Grantor and under no circumstances shall sums received by Lender bear interest or be subject to any other charge for the benefit of Grantor. Lender may, prior to the application of insurance proceeds, commingle and otherwise act with regard to said sums as it may, in its sole discretion, determine.

(p) In the event of foreclosure of this Security Instrument or other transfer of title or assignment of the Collateral in extinguishment, in whole or in part, of the debt secured hereby, all right, title and interest of Grantor in and to all policies of insurance required by this Security Instrument shall inure to the benefit of and pass to the successor in interest to Grantor or the purchaser or grantee of the Collateral. Grantor hereby appoints Lender its attorney-in-fact to endorse any checks, drafts, or other instruments representing any proceeds of such insurance, whether payable by reason of loss thereunder or otherwise.

(q) Notwithstanding any provision of this Security Instrument to the contrary, Lender's rights under this Security Instrument are subject and subordinate to the rights of the holder of the first lien trust deed that encumbers the Land.

2.10    Eminent Domain. Grantor represents and warrants that as of the date hereof, there is no proceeding pending for the total or partial condemnation of the Collateral. That should the Collateral, or any part thereof or interest therein, be taken (or threatened to be taken) or damaged by reason of any public improvement or condemnation proceeding, or in any other manner ("Condemnation"), or should Grantor receive any notice or other information regarding such proceeding, Grantor shall give prompt written notice thereof to Lender.

(a) Lender shall be entitled to all Condemnation compensation, awards, and other payments or relief, and shall be entitled at its option to commence, appear in, and prosecute in its own name any action or proceedings. Lender shall be entitled to make any compromise or settlement in connection with such taking or damage. All such compensation, awards, damages, rights of action, and proceeds awarded to Grantor (the "Proceeds") are hereby assigned to Lender and Grantor agrees to execute such further assignments of the Proceeds as Lender or Trustee may require. All Proceeds shall be applied against the Secured Indebtedness.

(b) In the event any portion of the Collateral is so taken or damaged, Lender shall have the option, in its sole and absolute discretion, to apply all such Proceeds, after deducting therefrom all costs and expenses (regardless of the particular nature thereof and whether incurred with or without suit), including attorneys' fees, incurred by it in connection with such Proceeds, upon any indebtedness secured hereby and in such order as Lender may determine, or to apply all such Proceeds, after such deductions, to the restoration of the Collateral upon such conditions as Lender may determine. Such application or release shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice.

(c) Any amounts received by Lender hereunder (after payment of any costs in connection with obtaining same) shall, if retained by Lender, be applied first to the payment of any accrued interest and other charges due under the Promissory Note and then in reduction of the then outstanding principal sum of the Promissory Note, notwithstanding that the same may not then be due and payable. Any amount so applied to principal shall be applied to the payment of installments of principal on the Promissory Note in inverse order of their due dates. Any reduction in the amount due under the Promissory Note resulting from the application by Lender of any Proceeds for such taking, alteration, injury, or decrease in value of Collateral shall be deemed to take effect only on the date of Lender's receipt of such proceeds, and then only to the extent such Proceeds shall exceed all expenses, including attorneys' fees, incurred by Lender in connection with the ascertainment and collection of such Proceeds.

(d) If, prior to the receipt by Lender of any such Proceeds, the Collateral shall have been sold on foreclosure of the lien of this Security Instrument, Lender shall have the right to receive such Proceeds to the extent of any deficiency remaining after such sale, with interest thereon at the default rate provided in the Promissory Note, whether or not a deficiency judgment on this Security Instrument shall have been sought or recovered or denied, and to the extent of attorneys' fees, costs, and disbursements incurred by Lender in connection with the ascertainment and collection of such Proceeds.

2.11    Releases and Waivers. The Grantor agrees that no release by the Lender or the Trustee of any portion of the Collateral or the Rents and Profits, no subordination of any lien, no forbearance on the part of the Lender to collect on the Secured Indebtedness, or any part thereof, no waiver of any right granted or remedy available to the Lender or the Trustee and no action taken or not taken by the Lender or the Trustee shall in any way have the effect of releasing the Grantor from full responsibility to the Lender for the complete discharge of each and every of the Grantor's obligations hereunder.

2.12    Authorizations: Restrictions. To the Grantor's knowledge, all certifications, permits, licenses, authorizations, orders, exemptions, franchises and/or approvals, including, without limitation, certificates of completion and occupancy, licenses, permits required in order to use, occupy or operate all or any portion of the Collateral for its current purpose (the "Authorizations") have been obtained and are in full force and effect. Grantor will not amend, supplement, cancel, surrender, allow to expire (other than expiration of the term thereof), terminate, release or waive any Authorization or any material provision thereof without the prior written consent of the Lender, not to be unreasonably withheld or delayed. Grantor will not initiate, join in, or consent to any change in the current use of the Collateral or in any zoning

ordinance, private restrictive covenant, assessment proceedings or other public or private restriction limiting or restricting the uses that may be made of the Collateral or any part thereof or any operations thereon, in each case, without the prior written consent of the Lender, other than customary utility easements and other licenses and easements as will not have a material adverse effect on the Collateral.

2.13    Grantor Collection of Rents and Profits.

(a)    The Grantor hereby authorizes and directs any lessees or tenants of the Collateral that, upon written notice from the Lender, all Rents and Profits and all payments required under the Leases, or in any way respecting same, shall be made directly to the Lender as they become due. The Grantor hereby relieves said lessees and tenants from any liability to the Grantor by reason of said payments being made to the Lender. Nevertheless, until the Lender notifies in writing the lessees and tenants to make such payments to the Lender, the Grantor shall be entitled to collect all such Rents and Profits and/or payments. The Lender is hereby authorized to give such notification upon the occurrence and during the continuance of any Event of Default.

(b)    Any and all Rents and Profits collected by the Lender may be applied in the manner set forth in the Promissory Note. Receipt by the Lender of such Rents and Profits shall not constitute a waiver of any right that the Lender may enjoy under this Security Instrument, the Promissory Note or under the laws of the state in which the Collateral is located, nor shall the receipt and application thereof cure any default hereunder nor affect any foreclosure proceeding or any sale authorized by this Security Instrument, the Promissory Note and the laws of the state in which the Collateral is located.

(c)    The Lender does not consent to, does not assume and shall not be liable for any obligation of the lessor under any of the Leases and all such obligations shall continue to rest upon the Grantor as though this assignment had not been made. The Lender shall not be liable for the failure or inability to collect any Rents and Profits.

2.14    Compliance with Law. The Grantor will comply with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all governmental authorities in respect of the Grantor's right, title and interest in all or any portion of the Collateral (including applicable statutes, regulations, orders and restrictions relating to environmental standards and controls).

2.15    Inspection. The Grantor will permit the Lender, or its agents, to enter and pass through or over the Collateral for the purpose of inspecting same and ensuring Grantor's compliance with the provisions of this Security Instrument.

2.16    Security Agreement. This Security Instrument shall be construed as a security agreement under the Uniform Commercial Code with respect to the security interests granted herein to the Lender as "Secured Party". The Grantor warrants that the name and address of the "Debtor" (which is the Grantor), are as set forth in the introductory paragraph of this Security

*ESM*

Instrument; and a statement indicating the types, or describing the items, of collateral is set forth hereinabove.

## ARTICLE III

### Event of Default

An event of default ("Event of Default") shall exist under the terms of this Security Instrument upon the occurrence and during the continuance of: (i) a default of Grantor's obligations under the Promissory Note; or (ii) Grantor's failure to satisfy its obligations under this Security Instrument.

## ARTICLE IV

### Acceleration; Foreclosure

4.1    Acceleration of Secured Indebtedness.    Upon the occurrence and during the continuance of an Event of Default, the entire balance of all or any portion of the Secured Indebtedness, including all accrued interest, shall, at the option of the Lender, become immediately due and payable.

4.2    Foreclosure.    Upon the occurrence and during the continuance of an Event of Default, the Lender may foreclose or cause the Trustee to foreclose the lien of this Security Instrument by judicial or nonjudicial proceeding in a manner permitted by applicable law. To the maximum extent permitted by applicable law, the Grantor hereby waives any statutory right of redemption in connection with such foreclosure proceeding.

4.3    Proceeds of Sale.    Following a foreclosure sale, the proceeds of such sale shall, subject to applicable law, be applied in accordance with the Promissory Note.

4.4    Delivery of Possession After Foreclosure.    In the event there is a foreclosure sale hereunder and at the time of such sale, the Grantor or the Grantor's heirs, devisees, representatives, successors or assigns are occupying or using the Collateral, or any part thereof, each and all immediately shall become the tenant of the purchaser at such sale, which tenancy shall be a tenancy from day to day, terminable at the will of either landlord or tenant, at a reasonable rental per day based upon the value of the property occupied, such rental to be due daily to the purchaser; and to the extent permitted by applicable law, the purchaser at such sale, notwithstanding any language herein apparently to the contrary, shall have the sole option to demand possession immediately following the sale or to permit the occupants to remain as tenants at will. In the event the tenant fails to surrender possession of said property upon demand, the purchaser shall be entitled to institute and maintain a summary action for possession of the property (such as an action for forcible detainer) in any court having jurisdiction.

30

## ARTICLE V

### Additional Rights and Remedies of Lender

5.1    <u>Rights Upon Maturity or an Event of Default</u>.    Upon the occurrence and continuation of an Event of Default, the Lender, immediately and without additional notice and without liability therefor to the Grantor and to the extent permitted by law, except for its own gross negligence or willful misconduct, may do or cause to be done any or all of the following: (a) take physical possession of the Collateral; (b) exercise its right to collect the Rents and Profits; (c) enter into contracts for the completion, repair and maintenance of the Improvements thereon; (d) expend then-outstanding loan funds and any income or Rents and Profits derived from the Collateral for payment of any taxes, insurance premiums, assessments and charges for completion, repair and maintenance of the Improvements, preservation of the lien of this Security Instrument and satisfaction and fulfillment of any liabilities or obligations of the Grantor arising out of or in any way connected with the construction of Improvements on the Collateral whether or not such liabilities and obligations in any way affect, or may affect, the lien of this Security Instrument; (e) enter into subleases demising the Collateral or any part thereof; (f) take such steps to protect and enforce the specific performance of any covenant, condition or agreement in the this Security Instrument, the Promissory Note, or the Loan Agreement, or to aid the execution of any power herein granted; (g) generally, supervise, manage, and contract with reference to the Collateral as if the Lender were equitable owner of the Collateral; (h) seek the appointment of a receiver as provided in Section 5.2 below; (i) exercise any or all of the remedies available to a secured party under the Uniform Commercial Code, including, but not limited to, selling, leasing or otherwise disposing of any fixtures and personal property which is encumbered hereby at public sale, with or without having such fixtures or personal property at the place of sale, and upon such terms and in such manner as the Lender may determine; (j) exercise any or all of the remedies of a secured party under the Uniform Commercial Code with respect to the Tangible Personalty; and (k) enforce any or all of the assignments or collateral assignments made in this Security Instrument as additional security for the Secured Indebtedness. The Grantor also agrees that any of the foregoing rights and remedies of the Lender may be exercised at any time independently of the exercise of any other such rights and remedies, and the Lender may continue to exercise any or all such rights and remedies until the Event(s) of Default are cured or waived with the consent of the Lender or until foreclosure and the conveyance of the Collateral or until the Secured Indebtedness are satisfied or paid in full (the date of any such foreclosure and conveyance, satisfaction or payment, the "Termination Date").

5.2    <u>Appointment of Receiver</u>.    If any of the Secured Indebtedness are not paid upon maturity or upon the occurrence and continuance of an Event of Default, the Lender as a matter of right shall be entitled to the appointment of a receiver or receivers for all or any part of the Collateral, to take possession of and to operate the Collateral, and to collect the rents, issues, profits, and income thereof, all expenses of which shall become Secured Indebtedness, whether such receivership be incident to a proposed sale (or sales) of such property or otherwise, and without regard to the value of the Collateral or the solvency of any person or persons liable for the payment of any Secured Indebtedness, and the Grantor does hereby irrevocably consent to the appointment of such receiver or receivers, waives any and all defenses to such appointment, and agrees not to oppose any application therefor by the Lender. Nothing herein is to be construed to

deprive the Lender of any other right, remedy or privilege it may have under the law to have a receiver appointed. Any money advanced by the Lender in connection with any such receivership shall be a demand obligation (which obligation the Grantor hereby promises to pay) owing by the Grantor to the Lender pursuant to this Security Instrument.

5.3    Waivers. No waiver of any Event of Default shall at any time thereafter be held to be a waiver of any rights of the Lender stated anywhere in this Security Instrument, the Promissory Note or the Loan Agreement, nor shall any waiver of a prior Event of Default operate to waive any subsequent Event(s) of Default. All remedies provided in this Security Instrument and the Promissory Note and in the Loan Agreement are cumulative and may, at the election of the Lender, be exercised alternatively, successively, or in any manner and are in addition to any other rights provided by law.

5.4    Marshalling. The Grantor hereby waives, in the event of foreclosure of this Security Instrument or the enforcement by the Lender of any other rights and remedies hereunder, any right otherwise available in respect to marshalling of assets which secure any Secured Indebtedness and any other indebtedness secured hereby or to require the Lender to pursue its remedies against any other such assets.

## ARTICLE VI

## General Conditions

6.1    Terms. The singular used herein shall be deemed to include the plural; the masculine deemed to include the feminine and neuter; and the named parties deemed to include their heirs, successors and assigns. The term "Lender" shall include any of the persons identified as a "Lender" herein, and any person who may become a Lender by way of assignment, together with their successors and permitted assigns. Capitalized terms used herein and not otherwise defined shall have the respective meanings ascribed to such terms in the Promissory Note.

6.2    Notices. All notices and other communications required or permitted to be given hereunder shall have been duly given in accordance with the provisions of the Promissory Note, with notices or other communications to the Trustee hereunder given to the Trustee's address provided herein in accordance with the requirements of the Promissory Note.

6.3    Severability. If any provision of this Security Instrument is determined to be illegal, invalid or unenforceable, such provision shall be fully severable and the remaining provisions shall remain in full force and effect and shall be construed without giving effect to the illegal, invalid or unenforceable provisions.

6.4    Headings. The captions and headings herein are inserted only as a matter of convenience and for reference and in no way define, limit, or describe the scope of this Security Instrument nor the intent of any provision hereof.

6.5    Conflicting Terms. In the event the terms and conditions of this Security Instrument conflict with the terms and conditions of the Promissory Note, the terms and conditions

of the Promissory Note shall control and supersede the provisions of this Security Instrument with respect to such conflicts.

6.6     Governing Law.  This Security Instrument shall be governed by and construed in accordance with the laws of the State of California.

6.7     Substitution of Trustee.  If, for any reason, with or without cause, the Lender shall elect to substitute a Trustee for the trustee herein named (or for any successor to said trustee), the Lender shall have the right to appoint successor Trustee(s), which appointment may be effected without conveyance of the Collateral and, except where required by applicable law, without the need to execute or record any instrument evidencing such appointment.  Each new Trustee shall immediately upon such appointment become successor in title to the Collateral for the uses and purposes of this Security Instrument, without conveyance of the Collateral, with all the powers, duties and obligations conferred on the Trustee in the same manner and to the same effect as though named herein as the Trustee.  If more than one Trustee has been appointed, each of such Trustees and each successor thereto shall be and hereby is empowered to act independently.

6.8     WRITTEN AGREEMENT.

(a)     THE RIGHTS AND OBLIGATIONS OF THE GRANTOR AND THE LENDER SHALL BE DETERMINED SOLELY FROM THIS WRITTEN SECURITY INSTRUMENT AND THE PROMISSORY NOTE, AND ANY PRIOR ORAL OR WRITTEN AGREEMENTS BETWEEN THE LENDER AND THE GRANTOR CONCERNING THE SUBJECT MATTER HEREOF ARE SUPERSEDED BY AND MERGED INTO THIS SECURITY INSTRUMENT AND THE PROMISSORY NOTE.

(b)     THIS SECURITY INSTRUMENT AND THE PROMISSORY NOTE MAY NOT BE VARIED BY ANY ORAL AGREEMENTS OR DISCUSSIONS THAT OCCUR BEFORE, CONTEMPORANEOUSLY WITH, OR SUBSEQUENT TO THE EXECUTION OF THIS SECURITY INSTRUMENT OR THE PROMISSORY NOTE.

(c)     THIS WRITTEN SECURITY INSTRUMENT, THE PROMISSORY NOTE AND THE LOAN AGREEMENT REPRESENT THE FINAL AGREEMENTS BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

6.9     WAIVER OF JURY TRIAL.  THE LENDER AND THE GRANTOR HEREBY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, OR RELATED TO, THE SUBJECT MATTER OF THIS SECURITY INSTRUMENT.  THIS WAIVER IS KNOWINGLY, INTENTIONALLY, AND VOLUNTARILY MADE BY THE LENDER AND THE GRANTOR, AND THE LENDER AND THE GRANTOR ACKNOWLEDGE THAT NO PERSON ACTING ON BEHALF OF ANOTHER PARTY TO THIS AGREEMENT HAS MADE ANY REPRESENTATIONS OF FACT TO INDUCE THIS WAIVER OF TRIAL BY JURY OR IN ANY WAY TO MODIFY OR NULLIFY ITS EFFECT.  THE LENDER AND THE

ESM

GRANTOR FURTHER ACKNOWLEDGE THAT THEY HAVE BEEN REPRESENTED (OR HAVE HAD THE OPPORTUNITY TO BE REPRESENTED) IN THE SIGNING OF THIS SECURITY INSTRUMENT AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL, SELECTED OF THEIR OWN FREE WILL, AND THAT THEY HAVE HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH COUNSEL.

6.10    State Specific Provisions. In the event of any inconsistencies between this Section and any of the other terms and provisions of this Security Instrument, the terms and provisions of this Section shall control and be binding.

With respect to the Collateral which are located in the State of California, notwithstanding anything contained herein to the contrary:

(a)    Foreclosure By Power of Sale. Should the Lender elect to foreclose by exercise of the power of sale herein contained, the Lender shall notify the Trustee and request that the Trustee commence such proceedings.

(i)    Upon receipt of such notice from the Lender, the Trustee shall cause to be recorded, published and delivered to the Grantor such Notice of Default and Election to Sell as shall then be required by law and by this Security Instrument. The Trustee shall, without demand on the Grantor, after lapse of such time as may then be required by law and after recordation of such Notice of Default and after Notice of Sale having been given as required by law, sell the Collateral at the time and place of sale fixed by the Trustee in said Notice of Sale, either as a whole, or in separate lots or parcels or items as the Trustee shall deem expedient, and in such order as it may determine, at public auction to the highest bidder for cash in lawful money of the United States payable at the time of sale. The Trustee shall deliver to such purchaser or purchasers thereof its good and sufficient deed or deeds conveying the Collateral so sold, but without any covenant or warranty, express or implied. The recitals in such deed of any matters or facts shall be conclusive proof of the truthfulness thereof. Any person, including, without limitation, the Grantor, the Trustee or the Lender, may purchase at such sale and the Grantor hereby covenants to warrant and defend the title of such purchaser or purchasers. In addition, the Lender may credit bid at any such sale an amount up to and including the full amount of the indebtedness under the Promissory Note and hereunder, including without limitation, accrued and unpaid interest, principal, charges, advances made hereunder and the Trustee's fees and expenses.

(ii)    After deducting all costs, fees and expenses of the Trustee and of this Security Instrument, including costs of evidence of title in connection with sale, the Trustee shall apply the proceeds of sale in accordance with the provisions of the Promissory Note.

(iii)    Subject to California Civil Code Section 2924(c) or any successor provision thereto, the Trustee may postpone sale of all or any portion of the Collateral by public announcement at such time and place of sale, and from time to time thereafter may postpone such sale by public announcement or subsequently noticed sale, and without further notice make such sale at the time fixed by the last postponement, or may, in its discretion, give a new notice of sale.

(b)    Personal Property.

*EJM*

(i)    Upon the occurrence of an Event of Default, the Lender may proceed in any sequence to exercise its rights hereunder with respect to all or any portion of the Collateral and all or any portion of the personalty in accordance with the provisions of Section 9604 of the California Commercial Code.

(ii)    Should the Lender elect to cause any of the Collateral which is subject to the California Commercial Code to be disposed of, it may dispose of any part thereof in any manner now or hereafter permitted by the California Uniform Commercial Code, or in accordance with any other remedy provided by applicable law. Any such disposition may be conducted by an employee or agent of the Lender or the Trustee. Any person, including both the Grantor and the Lender, shall be eligible to purchase any part or all of such personalty at such disposition. Any such disposition may be either public or private sale as the Lender may elect, subject to the provisions of applicable law. The Lender shall also have the rights and remedies of a secured party under the California Commercial Code, or otherwise available at law or in equity. In furtherance of the foregoing, it is agreed that the expenses of retaking, holding, preparing for sale, selling or the like shall be borne by the Grantor and shall include the Lender's and the Trustee's attorneys' fees and legal expenses. The Grantor, upon demand of the Lender, shall assemble such personalty and make it available to the Lender at the Collateral, a place which is hereby deemed to be reasonably convenient to the Lender and the Grantor. The Lender shall give the Grantor at least five (5) days' prior written notice of the time and place of any public sale or other disposition of such personalty or of the time of or after which any private sale or other intended disposition is to be made, and if such notice is sent to the Grantor, in the same manner as provided for the mailing of notices herein, it is hereby deemed that such notice shall be and is reasonable notice to the Grantor.

(iii)    This Security Instrument constitutes a financing statement filed as a fixture filing pursuant to the provisions of Division 9 of the California Commercial Code, with respect to those portions of the Collateral consisting of goods which are or are to become fixtures relating to the Collateral. The Grantor grants the Lender a security interest in all existing and future goods which are now or in the future become fixtures relating to the Collateral and proceeds thereof. The Grantor covenants and agrees that the recording of this Security Instrument in the real estate records of the county where the Collateral are located shall also operate from the date of such filing as a fixture filing in accordance with Section 9501 of the California Commercial Code. Without the prior written consent of the Lender, the Grantor shall not create or suffer to be created pursuant to the California Commercial Code any other security interest in such items, including replacements and additions thereto.

(c)    <u>Environmental Defaults and Remedies</u>. In the event that any portion of the Collateral is determined to be "environmentally impaired" (as "environmentally impaired" is defined in California Code of Civil Procedure Section 726.5(e)(3)) or to be an "affected parcel" (as "affected parcel" is defined in California Code of Civil Procedure Section 726.5(e)(1)), then, without otherwise limiting or in any way affecting Lender's or the Trustee's rights and remedies under this Security Instrument, Lender may elect to exercise its right under California Code of Civil Procedure Section 726.5(a) to (1) waive its lien on such environmentally impaired or affected parcel or portion of the Collateral; and (2) exercise (i) the rights and remedies of an unsecured

*ESM*

creditor, including reduction of its claim against Grantor to judgment, and (ii) any other rights and remedies permitted by law. For purposes of determining Lender's right to proceed as an unsecured creditor under California Code of Civil Procedure Section 726.5(a), Grantor shall be deemed to have willfully permitted or acquiesced in a release or threatened release of hazardous materials, within the meaning of California Code of Civil Procedure Section 726.5(d)(1), if the release or threatened release of hazardous materials was knowingly or negligently caused or contributed to by any lessee, occupant or user of any portion of the Collateral and Grantor knew or should have known of the activity by such lessee, occupant or user which caused or contributed to the release or threatened release. All costs and expenses, including, but not limited to, attorney's fees, incurred by Lender in connection with any action commenced under this paragraph, including any action required by California Code of Civil Procedure Section 726.5(b) to determine the degree to which the Collateral is environmentally impaired, plus interest thereon at the default rate of interest set forth in the Promissory Note until paid, shall be added to the obligations secured by this Security Instrument and shall be due and payable to Lender upon its demand made at any time following the conclusion of such action.

(d)    Request for Notice. The Grantor requests a copy of any statutory notice of default and a copy of any statutory notice of sale hereunder be mailed to Grantor at the address specified herein.

(e)    Grantor's Waivers. The Grantor waives, to the extent permitted by law, (i) the benefit of all laws now existing or that may hereafter be enacted providing for any appraisement before sale of any portion of the Collateral, and (ii) all rights of redemption, valuation, appraisement, stay of execution, notice of election to mature or declare due the whole of the secured indebtedness and marshaling in the event of foreclosure of the liens hereby created.

The Grantor does hereby, to the extent permitted by law:  (a) waive notice of any and all notices and demands of every kind which may be required to be given by any statute, rule or law; (b) waives any defense, right of set-off or other claim which the Grantor may have against the Lender; (c) waives any and all rights or benefits the Grantor may have under (i) Section 580a of the California Code of Civil Procedure purporting to limit the amount of any deficiency judgment which might be recoverable following the occurrence of a trustee's sale under a deed of trust and any right to a fair value hearing or any fair value limitation or other limitation on liability or a deficiency based upon the fair value of any collateral after a nonjudicial foreclosure of any deed of trust securing the Secured Indebtedness (including without limitation this Security Instrument), (ii) Section 580b of the California Code of Civil Procedure stating that no deficiency may be recovered on a real property purchase money obligation, (iii) Section 580d of the California Code of Civil Procedure stating that no deficiency may be recovered on a note secured by a deed of trust on real property in case such real property is sold under the power of sale contained in such deed of trust, (iv) Section 726 of the California Code of Civil Procedure stating that there may be but one form of action on an indebtedness secured by real property, (v) California Civil Code Sections 2810, 2819, 2839, 2845, 2849, 2850, 2899, and 3433, and (vi) any other anti-deficiency statute or other similar protections, if such sections, or any of them, have any application hereto or any application to the Grantor; (d) waive presentment for payment, demand for payment, notice of nonpayment or dishonor, protest and notice of protest, notice of acceptance, diligence in collection and any and all formalities which otherwise might be legally required to charge the Grantor with

*EJM*

liability; and (e) waive any defense arising as a result of the Lender's election, in any proceeding instituted under the Bankruptcy Code, of the application of Section 1111(b)(2) of the Bankruptcy Code and any defense based on any borrowing or grant of a security interest under Section 364 of the Bankruptcy Code. The Grantor acknowledges that no representations of any kind whatsoever have been made by the Lender. No modification or waiver of any of the provisions hereof shall be binding upon the Lender except as expressly set forth in a writing duly signed and delivered by the Lender.

(f)    <u>Nonforeign Entity.</u>    Section 1445 of the Internal Revenue Code of 1986, as amended (the "<u>Internal Revenue Code</u>") and Section 18805 of the California Revenue and Taxation Code provide that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. To inform the Lender that the withholding of tax will not be required in the event of the disposition of the Collateral pursuant to the terms of this Security Instrument, the Grantor hereby certifies, under penalty of perjury that Grantor is not a foreign corporation, foreign partnership, foreign trust or foreign estate, as those terms are defined in the Internal Revenue Code and the regulations promulgated thereunder.

[Signatures on following page.]

*ESM*

IN WITNESS WHEREOF, the Grantor has executed this Security Instrument as of the date specified below.

**GRANTOR:**

MONARCH BAY FOR SALE RESIDENTIAL, LLC,
a Delaware limited liability company

By: _____
Name: _____
Its: _____
Date: _____

EJM

Exhibit A to Deed of Trust
Legal Description of Land

Docusign Envelope ID: 460B5A12-0515-4DBC-8821-DB5F7A09AE79

## LEGAL DESCRIPTION

The land referred to is situated in the County of Alameda, City of San Leandro, State of California, and is described as follows:

Parcel 1 of map entitled Parcel Map No. 11312 filed for record November 30, 2022 in Book 356 of Maps at Pages 58-61 Alameda County Records.

APN's: 079A-0590-001-05 & 079A-0590-003

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California                                           )
County of _____            )


On _____, before me, _____, a Notary Public, personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.



Signature        _____

ESM

# EXHIBIT J

## ASSIGNED CONTRACTS
### Updated 7/23/2025

| Contractor | Scope & Services |
|---|---|
| BKF Engineers | Civil Engineering, VTM & Permits, Sub Project #20 |
| BKF Engineers | Civil Engineering, Public Improvements, Sub Project #25 |
| BKF Engineers | Civil Engineering, Shoreline Development, Sub Project #51 |
| Discovery Hydrovac | Pothole Data Collection & Restoration |
| Moffatt & Nichols | Stormdrain |
| Nabih Youseff & Associates | Structural Engineering |
| Bennitt Design Group | Landscape Architect |
| Engeo, Inc. | Soils Engineering |
| Hort Science - Bartlett Consulting | Arborist - Hort Science |
| Olberding Environmental Inc. | Environmental |
| Pascuzzo Golf Design, Inc | Golf Course Redesign |
| Ferma Corporation | Predevelopment Construction, Demolition & Earthwork |

*ESM*

# EXHIBIT K

## DISCRETIONARY CONTRACTS

### Updated 7/23/2025

| Contractor | Scope & Services |
|---|---|
| BKF Engineers | Civil Engineering, VTM & Permits, Sub Project #20 |
| BKF Engineers | Civil Engineering, Public Improvements, Sub Project #25 |
| BKF Engineers | Civil Engineering, Shoreline Development, Sub Project #51 |
| Discovery Hydrovac | Pothole Data Collection & Restoration |
| Moffatt & Nichols | Stormdrain |
| Nabih Yousef & Associates | Structural Engineering |
| Bennitt Design Group | Landscape Architect |
| Engeo, Inc. | Soils Engineering |
| Hort Science - Bartlett Consulting | Arborist - Hort Science |
| Olberding Environmental Inc. | Environmental |
| Pascuzzo Golf Design, Inc | Golf Course Redesign |
| Ferma Corporation | Predevelopment Construction, Demolition & Earthwork |
| Pacific Gas & Electric | Utilities relocation |
| AT&T | Utilities - Engineering Design |
| Arcadis U.S., Inc. | Sea Level Risk Assessment |
| Kittelson & Assoc | Transportation Demand Management |
| Lean Technology | FAA Obstruction Evaluation |
| Peak & Associates | Cultural Resource Studies |
| Placeworks | EIR Addendum |

ETM

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is

SHEMANOLAW
1801 Century Park East, Suite 2500
Los Angeles, CA  90067.

A true and correct copy of the foregoing document **NOTICE OF EXECUTION OF CONTRACT FOR PURCHASE AND SALE AND ESCROW INSTUCTIONS** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On August 1, 2025, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email address stated below:

- Christine M. Fitzgerald    cfitzgerald@littler.com, maria@thersfirm.com;amy@thersfirm.com;4634112420@filings.docketbird.com;ecf@theRSfirm.com
- Lane C Hilton    lane@thersfirm.com, michelle@theRSfirm.com,5030583420@filings.docketbird.com,4634112420@filings.docketbird.com,ecf@theRSfirm.com
- Paul J Leeds    Pleeds@fsl.law, ssanchez@fsl.law;jwilson@fsl.law
- Noreen A Madoyan    Noreen.Madoyan@usdoj.gov
- Maggie Elyse Schroedter    maggie@thersfirm.com, amy@theRSfirm.com,5030583420@filings.docketbird.com,ecf@theRSfirm.com,rachel@thersfirm.com;mary@theRSfirm.com;lane@thersfirm.com
- David B Shemano    dshemano@shemanolaw.com
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____,, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| August 1, 2025 | David B. Shemano | /s David B. Shemano |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                 **F 9013-3.1.PROOF.SERVICE**