MAGGIE E. SCHROEDTER, ESQ. (Bar No. 270377)
maggie@theRSfirm.com
LANE C. HILTON, ESQ. (Bar No. 314892)
lane@theRSfirm.com
ROBBERSON SCHROEDTER LLP
501 West Broadway, Suite 1260
San Diego, California 92101
(619) 353-5691

Attorneys for Creditor
THE CITY OF SAN LEANDRO

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In Re: | CASE NO. 2:24-bk-14877-DS |
| MONARCH BAY FOR SALE RESIDENTIAL, LLC, | Chapter 11 |
| Debtor. | **CREDITOR'S DISCLOSURE STATEMENT REGARDING THE FIRST AMENDED CHAPTER 11 LIQUIDATING PLAN DATED DECEMBER 5, 2025** |

## DISCLAIMER

**THIS DISCLOSURE STATEMENT PROVIDES INFORMATION REGARDING THE *FIRST AMENDED CHAPTER 11 LIQUIDATING PLAN DATED DECEMBER 5, 2025,* WHICH SECURED CREDITOR THE CITY OF SAN LEANDRO IS SEEKING TO HAVE CONFIRMED BY THE BANKRUPTCY COURT. THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES TO, AND CONFIRMATION OF, THE PLAN AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A**

**DETERMINATION OR RECOMMENDATION BY THE BANKRUPTCY COURT REGARDING THE FAIRNESS OR THE MERITS OF THE PLAN.**

**THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN DOCUMENTS RELATING TO THE PLAN. IN THE EVENT OF ANY CONFLICT, INCONSISTENCY, OR DISCREPANCY BETWEEN THE TERMS AND PROVISIONS IN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PLAN SHALL GOVERN FOR ALL PURPOSES. ALL HOLDERS OF CLAIMS SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN. THE STATEMENTS CONTAINED HEREIN HAVE BEEN MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND EQUITY INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN. ALTHOUGH THE CITY HAS MADE AN EFFORT TO DISCLOSE WHERE CHANGES IN PRESENT CIRCUMSTANCES COULD REASONABLY BE EXPECTED TO AFFECT MATERIALLY THE RECOVERIES UNDER THE PLAN, THIS DISCLOSURE STATEMENT IS QUALIFIED TO THE EXTENT CERTAIN EVENTS DO OR DO NOT OCCUR.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR ANY OTHER NONBANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY FEDERAL, STATE,**

2:24-BK-14877-DS

**LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER SUCH AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT. ALL PERSONS OR ENTITIES SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE SPECIFIC PURPOSE FOR WHICH THE DOCUMENTS WERE PREPARED.**

**THE CITY MAKES STATEMENTS IN THIS DISCLOSURE STATEMENT THAT MAY BE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER THE FEDERAL SECURITIES LAWS. STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES AND REPRESENT THE CITY'S ESTIMATES AND ASSUMPTIONS ONLY AS OF THE DATE SUCH STATEMENTS WERE MADE AND INVOLVE KNOWN AND UNKNOWN RISKS, UNCERTAINTIES, AND OTHER UNKNOWN FACTORS THAT COULD IMPACT THE CITY'S PLAN OR DISTRIBUTIONS THEREUNDER. IN ADDITION TO STATEMENTS THAT EXPLICITLY DESCRIBE SUCH RISKS AND UNCERTAINTIES, READERS ARE URGED TO CONSIDER STATEMENTS LABELED WITH THE TERMS "BELIEVES," "BELIEF," "EXPECTS," "INTENDS," "ANTICIPATES," "PLANS," OR SIMILAR TERMS TO BE UNCERTAIN AND FORWARD-LOOKING. CREDITORS AND OTHER INTERESTED PARTIES SHOULD ALSO REVIEW THE SECTION OF THIS DISCLOSURE STATEMENT ENTITLED "RISK FACTORS" FOR A DISCUSSION OF CERTAIN FACTORS THAT MAY AFFECT THE PLAN AND DISTRIBUTIONS THEREUNDER.**

# TABLE OF CONTENTS

I.     INTRODUCTION TO THE DISCLOSURE STATEMENT.........................1
       A.    Purpose of Disclosure Statement ..............................................1
       B.    The Court's Approval of the Disclosure Statement...................1
II.    SUMMARY OF THE CITY'S PLAN.................................................2
       A.    Classification of Claims and Equity Interests...........................4
             1.    Unclassified Claims ........................................................4
             2.    Classes 1 and 2 – Secured Claims ..................................4
             3.    Class 3 – General Unsecured Claims .............................5
             4.    Class 4 – Equity Interests ...............................................5
       B.    Plan Implementation ...............................................................6
       C.    Executory Contracts and Unexpired Leases .............................6
       D.    Miscellaneous Provisions........................................................7
       E.    Effect of Plan Confirmation, Jurisdiction, General Provisions ............7
III.   VOTING ON PLAN, AND OBJECTIONS .......................................8
       A.    Who May Vote ........................................................................8
       B.    Who May Vote in More Than One Class ..................................8
       C.    Voting Instructions..................................................................8
       D.    Effect of Vote .........................................................................9
       F.    Confirmation Hearing ...........................................................10
IV.    BACKGROUND OF THE DEBTOR AND ITS BANKRUPTCY
       PROCEEDING.............................................................................10
       A.    The Shoreline Project.............................................................10
       B.    The PSA ................................................................................11
       C.    The Amendments to the PSA and DDA ..................................11
       D.    The Development Agreement ..................................................12
       E.    Debtor's Acquisition of the Real Property/ Note and Deed of Trust ..12
       F.    Events Leading to Bankruptcy................................................13
       G.    The Chapter 11 Case ..............................................................13
V.     FINANCIAL INFORMATION AND ANTICIPATED FUTURE OF THE
       DEBTOR ....................................................................................13
VI.    FUNDING AND FEASIBILITY OF THE PLAN............................14
       A.    Funding of the Plan................................................................14
       B.    Funding of the Liquidating Trust............................................16
       C.    Feasibility..............................................................................16
VII.   OTHER INFORMATION ............................................................16

2:24-BK-14877-DS

| | A. | Liquidation Analysis | 16 |
| | B. | Tax Consequences | 17 |
| | | 1. To Creditors and Equity Security Holders | 17 |
| | | 2. Certain U.S. Federal Income Tax Consequences of the Liquidating Trust | 18 |
| | C. | Amendments to DDA, DA, the Debtor PSA and Shoreline PSA | 19 |
| | D. | Discharges, Injunctions, Releases and Exculpation | 20 |
| | | 1. Discharge of the Debtor | 20 |
| | 2. | Injunction | 20 |
| | 3. | Exculpation and Releases | 21 |
| | E. | Risk Analysis and Alternatives to the Plan | 22 |
| | | 1. Plan Implementation | 22 |
| | | 2. Risks Regarding the Property | 23 |
| | F. | Litigation | 24 |
| | G. | Special Procedures | 25 |
| VIII. | | CONFIRMATION OF THE PLAN | 25 |
| | A. | The Confirmation Hearing | 25 |
| | B. | Plan Confirmation Requirements | 26 |
| IX. | | RECOMMENDATION | 27 |

2:24-BK-14877-DS

# TABLE OF AUTHORITIES

**Page(s)**

**Statutes**

11 U.S.C. § 101, *et seq.* ........................................................................... 1

11 U.S.C. § 365 ....................................................................................... 7

11 U.S.C. § 1111(b) ................................................................................. 7

11 U.S.C. § 1125 ...................................................................................... 1

11 U.S.C. § 1125(b) ................................................................................. 2

11 U.S.C. § 1128(a) ............................................................................... 25

11 U.S.C. § 1129 ................................................................................... 26

28 U.S.C. § 1930 ................................................................................... 27

Government Code Section 65864 ............................................................ 12

**Other Authorities**

Federal Rules of Bankruptcy Procedure 2004 .......................................... 13

Federal Rules of Bankruptcy Procedure 3018 ............................................ 9

Federal Rules of Bankruptcy Procedure 3017(d)(1) ................................. 25

Federal Rules of Bankruptcy Procedure 3017(e) ...................................... 25

Federal Rules of Bankruptcy Procedure 3018(a) ........................................ 8

Federal Rules of Bankruptcy Procedure  9006(c) ..................................... 25

IRS Revenue Procedure 94-45 ................................................................ 18

IRS Revenue Procedure 94-45, 1994-28 .................................................. 18

## I.    INTRODUCTION TO THE DISCLOSURE STATEMENT

### A.    Purpose of Disclosure Statement

Monarch Bay For Sale Residential, LLC (the "Debtor") is the Debtor in this Chapter 11 Bankruptcy case. On June 20, 2024 (the "Petition Date"), the Debtor commenced a bankruptcy case by filing a voluntary petition under Chapter 11 of the United States Bankruptcy Code (the "Code"), 11 U.S.C. § 101, *et seq*. in the United States Bankruptcy Court for the Central District of California (the "Court").

This Disclosure Statement (the "Disclosure Statement") is submitted by the City of San Leandro (the "City"), the holder of a secured claim against the Estate, with respect to the Chapter 11 bankruptcy case of the Debtor pursuant to 11 U.S.C. § 1125.[1] The purpose of this Disclosure Statement is to provide the holders of claims against the Debtor with adequate information about the Debtor and the City's First Amended Liquidating Plan (the "Plan") to make an informed judgment about the merits of approving the Plan. A copy of the Plan is attached hereto as **Exhibit A.** The Plan proposes to liquidate the assets of the Debtor. You may be entitled to vote on the Plan.

As a Creditor entitled to vote on the Plan, your acceptance of the Plan is important. Acceptance of the Plan by a Class of Creditors requires a vote by at least two-thirds in claim amount and more than fifty percent in number of the allowed claims in the class which actually cast votes. Failure to vote on the Plan does not count as either an acceptance or a rejection of the Plan.

The voting rules are explained below, along with a summary of the Plan and other relevant information. This Disclosure Statement is explanatory only. The Plan will be the binding document, if it is confirmed by the court.

### B.    The Court's Approval of the Disclosure Statement

---

[1] Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Plan.

2:24-BK-14877-DS

This Disclosure Statement has not yet been approved under Bankruptcy Code Section 1125(b) for use in the solicitation of acceptances or rejections of the Plan. On January 20, 2026 at 1:00 p.m. , the Bankruptcy Court will hear and consider the City's request for approval of this Disclosure Statement. The information contained herein should not be relied upon for any purpose other than determining that the Disclosure Statement contains adequate information within the meaning of Bankruptcy Code Section 1125(b).

The source of information regarding the Debtor was information known by the City, and based upon pleadings filed by the Debtor with the Bankruptcy Court. An accountant has not reviewed the information contained in the Disclosure Statement, such information is unaudited, and the City cannot warrant or represent that it is without error. To the best of the City's knowledge and belief, the information contained herein is accurate.

By Order dated _____, the Bankruptcy Court approved this Disclosure Statement as containing "adequate information" concerning the Plan, meaning that it contains sufficient information to enable any Holder of Claims and Equity Interest entitled to vote to make an informed judgment in exercising their rights to vote to accept or reject the Plan. The Bankruptcy Court's approval of this Disclosure Statement or any other disclosure statement for a plan for the Debtor does not mean that the Bankruptcy Court recommends either acceptance or rejection of a plan. No solicitation of votes may be made except pursuant to an approved Disclosure Statement.

## II.    SUMMARY OF THE CITY'S PLAN

The City's Plan accompanies this Disclosure Statement as Exhibit A. The reader is urged to review the Plan carefully in conjunction with this Disclosure Statement. If there is/are any conflict(s) between the provisions of this Disclosure Statement and those of the Plan, the provisions of the Plan shall control.

The Debtor owns the real property located in the City of San Leandro, County

2

2:24-BK-14877-DS

of Alameda, State of California, and as described in the Deed of Trust as follows: Parcel 1 of map entitled Parcel Map No. 11312 filed for record November 30, 2022 in Book 356 of Maps at Pages 58-61 Alameda County Records. APN's: 079A-0590-001-05 & 079A-0590-003 (the "Property"). The Property is one component of the Shoreline Project, which provides for the development of the Property and certain City-owned real property consisting of approximately seventy-five acres located within the City limits in the Shoreline-Marina area. The Shoreline Project includes reconstruction of the nine-hole executive golf course (the "Golf Course Element") and construction of single-family residential units (the "Residential Element"), townhomes, multifamily residential units, a hotel, a restaurant, a market, and associated infrastructure improvements.

The Property owned by the Debtor is commonly referred to as the "Eastside", which development will be comprised of the Residential Element and the Golf Course Element. The Westside" is owned by the City, and is a development designed to include a hotel, multifamily residential units, a restaurant, a market, and associated infrastructure improvements (the "Westside Elements"). The Westside development also contemplates the construction of the "Monarch Bay Drive Element" and the "Infrastructure Element". The Debtor's parent company, Cal Coast Companies, LLC ("Cal Coast"), and its affiliate LLCs, are currently responsible for the development of the Westside Elements, the Monarch Bay Drive Element and the Infrastructure Element, pursuant to four ground leases and the DDA. Cal Coast and/or its affiliates are presently in default under the DDA and the ground leases.

The Plan creates a liquidating trust, appoints a liquidating trustee, and effects a sale of the Debtor's Property to a buyer-developer for the purpose of making Distributions to the Holders of Allowed Claims and Interests, and otherwise satisfying the outstanding obligations of the bankruptcy Estate in accordance with the Plan.

///

3

2:24-BK-14877-DS

### A.    Classification of Claims and Equity Interests

**Articles II and III of the Plan** divides creditors and interest holders into the following groups. The table below summarizes the classification and treatment of Claims and Equity Interests under the Plan. For a complete description of the classification and treatment of Claims and Equity Interest, reference should be made to the Plan.

| CLASS | CLASS DESCRIPTION | STATUS | VOTING RIGHTS | PROJECTED RECOVERY |
|-------|-------------------|--------|---------------|--------------------|
| Class 1 | The Secured Claim of the City of San Leandro | Impaired | Yes | 100% |
| Class 2 | Secured Claim of Tax Collector Alameda County | Impaired | Yes | 100% |
| Class 3 | Unsecured Claims | Impaired | Yes | 100% |
| Class 4 | Equity Interests | Unimpaired | No | 100% |

### 1.    Unclassified Claims

Unclassified claims include United States Trustee Fees, allowed professional fees, priority tax claims, and other administrative expense claims that include costs of administering this bankruptcy case. Unclassified claims are generally entitled to be paid in full on the Plan's Effective Date, which is defined in the Plan and should be a short time after the Plan is confirmed. Administrative Expense Claimants are not entitled to vote on confirmation of the Plan.

Counsel for the Debtor have not filed interim fee applications, however the City anticipates that the proceeds from the sale of the Property will be sufficient to pay professional fees to be paid at closing from escrow.

### 2.    Classes 1 and 2 – Secured Claims

Secured claims consist of claims secured by collateral, which generally are entitled to be paid in full, over time, with interest.

4

2:24-BK-14877-DS

Class 1 consists of the Secured Claim of the City arising from a promissory note and secured by a second priority lien on the real property that is the primary asset of the Debtor, and evidenced by a deed of trust. The City's secured claim will be paid in full (including interest and reasonable fees and costs) from escrow at the sale of the Property. Class 1 is impaired and is entitled to vote on confirmation of the Plan.

Class 2 consists of the secured claim of Henry C. Levy Tax Collector Alameda County. On September 23, 2024, the Tax Collector filed Proof of Claim No. 4 in the amount of $614,615.08 for unpaid taxes for fiscal years 2023 and 2024. The Class 2 claimant shall be paid in full from the sale of the Property. Class 2 is impaired and is entitled to vote on confirmation of the Plan.

### 3.    Class 3 – General Unsecured Claims

General unsecured claims are claims that are not entitled to "priority" under the Bankruptcy Code and are not secured by collateral, which generally will receive over time, an estimated percentage of their claims. Class 3 consists of the general unsecured claims of the Debtor not entitled to priority and that do not have recourse against collateral. All Class 3 claims will receive the following estimated percentage of their claims: 100%, to be paid after the Adequate Assurance Reserve (defined in the Plan) has been funded and Classes 1 and 2 have been paid in full. Class 3 is impaired and is entitled to vote on confirmation of the Plan.

### 4.    Class 4 – Equity Interests

Class 4 consists of all membership interests in the Debtor. The Debtor's Statement of Financial Affairs states that Edward J. Miller owns a 63% interest in the Debtor, which is inconsistent with the Debtor's LLC Operating Agreement. The LLC Operating Agreement states that 100% of the Debtor is owned by Cal Coast. The Debtor's 2023 tax return, however, provides that it is a multi-member LLC reporting as a partnership. The Debtor's operating reports identify additional equity interests in the Debtor.

To the extent all Class 1-3 Claims are paid in full, the holder of a Class 4 Claim shall retain its full equity interest in the Debtor. Class 4 is not impaired and is not entitled to vote on confirmation of the Plan.

### B.    Plan Implementation

**Article IV** of the Plan explains how the Plan will be implemented. The Plan shall be funded through the sale of the Property to The New Home Company, LLC (the "Buyer") or another Qualified Developer for the Purchase Price set forth in the Shoreline PSA. Upon the Effective Date, the Property shall vest in the Liquidating Trust created on the Effective Date pursuant to the Trust Agreement in substantially the same form as the agreement attached to the Plan as **Exhibit B**.

The City anticipates that the proceeds from the sale will be sufficient to pay all Allowed Claims against the Debtor in full provided by the Plan, as set forth in **Exhibit A** to this Disclosure Statement. The Plan proposes to create a segregated account deemed the Adequate Assurance Reserve, which will be held and disbursed exclusively to facilitate compliance with the contractual requirements for completing the Monarch Bay Drive Element and the Infrastructure Element. Specifically, the Liquidating Trustee shall deposit $9,300,000.00 of the proceeds from the sale of the Property into the Adequate Assurance Reserve. Disbursement of funds from the Adequate Assurance Reserve shall be governed by the terms of the Trust Agreement.

### C.    Executory Contracts and Unexpired Leases

**Article V** of the Plan governs executory contracts and unexpired leases. An executory contract is a contract wherein both the Debtor and another party to the contract have not yet fully performed their obligations, and the underperformed obligations of both parties are significant enough that either party's breach would excuse the other performing. The Debtor has not expressed any intention to assume any executory contracts or leases at this time.

The Plan lists the executory contracts and leases which will be deemed assumed upon Plan confirmation and assigned to the Liquidating Trust pursuant to

6

2:24-BK-14877-DS

section 365 of the Bankruptcy Code, and are listed on **Exhibit D**. The executory contracts are amended consistent with the Shoreline PSA.

### D.    Miscellaneous Provisions

**Article VI** of the Plan includes Miscellaneous Provisions, including objections to claims, disputed claims reserve, 11 U.S.C. § 1111(b) elections, resolution of disputes, settlement, allowed amounts, unclaimed, funds, and modification/amendment of the Plan.

### E.    Effect of Plan Confirmation, Jurisdiction, General Provisions

**Article VII** of the Plan explains the effect of Plan confirmation. It provides that Debtor will not be discharged from existing debts as provided in § 1141(d)(3). Article VII of the Plan also specifies certain effects of confirmation, including that all property of the Estate shall vest in the Liquidating Trust for administration by the Liquidating Trustee, the power of the Liquidating Trustee to pursue claims for avoidance and recovery of avoidable transfers and/or preferences, the temporary injunction, including that creditors are prevented from attempting to collect preconfirmation obligations except in specific circumstances or in accordance with the terms of the Plan, and the exculpation of the City, the Buyer (or other Qualified Developer), and the releases of Cal Coast and the City.

**Article VIII** of the Plan governs post-confirmation jurisdiction.

**Article IX** of the Plan includes General Provisions, such as governing law, and successors and assigns.

**THE CITY BELIEVES THAT THE PLAN IS FAIR AND EQUITABLE, WILL MAXIMIZE RECOVERIES TO INVESTORS AND OTHER CREDITORS, AND IS IN THE BEST INTERESTS OF THE DEBTOR AND ITS STAKEHOLDERS. THE PLAN ALSO IS THE PRODUCT OF THE CITY'S EXTENSIVE NEGOTIATIONS AND EFFORTS. FOR THESE REASONS, THE CITY URGES HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE TO TIMELY RETURN THEIR BALLOTS AND TO**

7

**VOTE TO ACCEPT THE PLAN.**

## III.    VOTING ON PLAN, AND OBJECTIONS

### A.    Who May Vote

You are entitled to vote on the Plan <u>unless</u>: (1) your claim or interest is Disputed (as defined in the Plan); (2) your class is to receive no distribution (presumed to reject the Plan); (3) your class is "unimpaired" (presumed to accept the Plan – see <u>Article II and III</u> of the Plan for the proponent's designation of which classes are "impaired") (§ 1124); or (4) your claim is unclassified (and thus is required by law to be paid in full) (§§ 1123(a)(1) & 1129(a)(9)(A) & (C)). If your claim or interest is Disputed then you must file a motion to have it allowed for voting purposes. (You must do that soon, so that your motion can be heard before votes are counted.) (Rule 3018(a).)

### B.    Who May Vote in More Than One Class

If your claim has been allowed in part as a secured claim and in part as an unsecured claim, or if you otherwise hold claims or interests in more than one class, you are entitled to accept or reject the Plan in each capacity and you should return a separate ballot for each claim or interest.

### C.    Voting Instructions

A ballot accompanies this Disclosure Statements for Creditors to use in voting on the Plan as **Exhibit E**. Creditors and equity interest holders entitled to vote to accept or reject the Plan may vote by completing, dating, signing, and returning via mail, or electronic mail, the accompanying ballot to:

Robberson Schroedter LLP
501 West Broadway, Suite 1260
San Diego, California, 92101

Electronic mail:
<u>maggie@theRSfirm.com, lane@theRSfirm.com, and amy@thersfirm.com</u>

2:24-BK-14877-DS

The deadline to vote on the Plan is _____ at 5:00 P.M. (Pacific Time). In order for your vote to be counted, your Ballot must be properly completed in accordance with the Voting Instructions on the Ballot and actually received no later than the Voting Deadline. The risk of non-receipt or late receipt of ballots whether due to Post Office error or any other reason, is entirely on the voting Creditor. The failure of a Creditor to vote on the Plan may have serious consequences that will affect substantive and procedural rights. A ballot can only be changed or withdrawn after submission for cause shown after notice and a hearing before the Court. Please see Federal Rules of Bankruptcy Procedure Rule 3018.

**ALL BALLOTS ARE ACCOMPANIED BY VOTING INSTRUCTIONS. IT IS IMPORTANT THAT THE HOLDER OF A CLAIM ENTITLED TO VOTE FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED WITH EACH BALLOT.**

### D.    Effect of Vote

The Plan will be confirmed only if (1) it is accepted by each impaired class, or (2) it is accepted by at least one impaired class (without counting the votes of "insiders," as defined in § 101(31)) and the court determines that the Plan is "fair and equitable" (as defined by § 1129(b)) to all rejecting classes of creditors, and (3) it meets all of the other legal requirements for confirmation. A class of creditors accepts the Plan if a majority in number and at least two-thirds in dollar amount of the claims in that class are timely voted in favor of the Plan (§ 1126(c)). A class of interests accepts the Plan if at least two-thirds of those interests are timely voted in favor of the Plan (§ 1126(d)).

### E.    Solicitation of Votes

Nobody is permitted to solicit your vote to accept or reject any plan during the bankruptcy case unless, at or before the time of the solicitation, you have been provided with the plan or a summary of the plan and a written disclosure statement

9

2:24-BK-14877-DS

that has been approved by the court as containing adequate information for you to make an informed judgment about the plan.  Then any person may solicit your vote for or against the Plan

### F.    Confirmation Hearing

The Court will hold a hearing with respect to confirmation of the Plan to determine whether the Plan has been accepted by the requisite number of Creditors and whether the other requirements for confirmation of the Plan have been satisfied. The issues to be determined through the confirmation hearing include (without limitation) issues relating to notice, value of property, and feasibility of the Plan. The City must also prove, among other things, that the Plan does not discriminate unfairly against, and is fair and equitable to, any nonaccepting Class(es).

You may obtain details regarding the time, place and date of the hearing on Plan Confirmation through the Court's website using PACER service (www.cacb.uscourts.gov).

### IV.    BACKGROUND OF THE DEBTOR AND ITS BANKRUPTCY PROCEEDING

### A.    The Shoreline Project

The City owned real property consisting of seventy-five acres located within the City of San Leandro in the Shoreline-Marina area. The City selected Cal Coast as the developer to develop the Shoreline area with a multi-component development that includes the construction of single and multi-family residential units, the reconstruction of a nine-hole executive golf course, a hotel, a restaurant, a market, and associated infrastructure improvements (the "Shoreline Project").

On July 22, 2020, the City and Cal Coast entered into a Disposition and Development Agreement regarding development of approximately 75 acres within the City in the Shoreline-Marina area ("DDA") The DDA requires the Developer, defined as Cal Coast and any permitted assignee or successor-in-interest, to develop the Shoreline Project. The Shoreline Project includes the construction of 200-215

10

single family homes and townhomes ("Residential Element"). The DDA provides for the City to convey fee title and leasehold interests to Cal Coast as follows: (1) the sale of the land to Cal Coast pursuant to a purchase and sale agreement (defined below); and (2) ground leases for land for the construction of the hotel, the multi-family element, the restaurant element, and the market element.

**B.    The PSA**

In connection with the DDA, on July 22, 2020, the City and Cal Coast entered into a Purchase and Sale Agreement ("PSA" or "Debtor PSA") for the development of the Residential Element and pursuant to which the City conveyed the east side parcel of the Shoreline Area (the "Property") to Cal Coast in exchange for a purchase price of not less than $29,345,092. The PSA incorporates the development obligations of the DDA, and obligates the buyer to design and construct the Residential Element as well as to redesign and reconstruct the Golf Course Element.

**C.    The Amendments to the PSA and DDA**

On March 17, 2021, the City and Cal Coast entered into the First Amendment to Purchase and Sale Agreement and Disposition and Development Agreement. The First Amendment revised the PSA and the DDA Schedules of Performance, among other things.

On July 22, 2022, the City and Cal Coast entered into the Second Amendment to Purchase and Sale Agreement and Disposition and Development Agreement to provide for certain conditions to be satisfied prior to the close of escrow for the conveyance of the Property to Cal Coast and commencement of the ground leases. The Second Amendment revised the PSA Scope of Development, which sets forth the dates by which Cal Coast shall construct and develop the Residential Element of the Shoreline Project.

On December 19, 2022, the City and Cal Coast entered into the Third Amendment to Purchase and Sale Agreement and Disposition and Development Agreement. Cal Coast requested that the City provide short-term seller takeback

11

financing for a portion of the purchase price of the Property, and the Third Amendment was entered into to provide for the City to make a short-term seller takeback loan to Cal Coast evidenced by a promissory note.

### D.    The Development Agreement

On December 22, 2022, the City and Cal Coast entered into the Development Agreement ("DA"), which was recorded with the Alameda County Recorder on December 30, 2022. The DA runs with the Property.

The DA was entered into pursuant to Government Code section 65864, which authorizes the City to enter into a development agreement for real property with any person having a legal or equitable interest in such property in order to establish certain development rights in the property.

### E.    Debtor's Acquisition of the Real Property/ Note and Deed of Trust

Cal Coast created the Debtor to hold the Property and develop the Residential Element of the Shoreline Project.

On December 20, 2022, pursuant to Paragraph 12 of the PSA, the Debtor and Cal Coast entered into an Assignment and Assumption of Contract and Escrow Instructions, pursuant to which Cal Coast assigned all of its rights, title, interest, and delegated all of its duties under the PSA to Debtor.  These rights and duties include the right and duty to develop the Residential Element and the Golf Course Element, as set forth in the PSA.

On or about December 22, 2022, the City loaned Debtor $24,882,958 for payment of a portion of the purchase price of the Property. In order to memorialize the loan, on December 22, 2022, the Debtor signed a Promissory Note (the "Note") for the amount as the loan, which is secured by a recorded Deed of Trust in favor of the City. The Note obligates the Debtor to pay the principal amount plus interest at a rate of 7.5%, which rate adjusted to the then-current prime rate of interest if the term of the Note was extended.

///

12

F.    **Events Leading to Bankruptcy**

The Debtor defaulted on the Note by failing to pay the City upon expiration of the term of the Note. The City exercised its remedies under the Note and Deed of Trust by commencing the non-judicial foreclosure of the property. A Notice of Default was recorded on February 20, 2024. The City filed a notice of sale on May 20, 2024.

G.    **The Chapter 11 Case**

On June 20, 2024, the Debtor filed a voluntary Chapter 11 petition. The Debtor self-designated as a Single Asset Real Estate ("SARE") entity. Since the Petition Date, the Debtor has continued to operate its business as a debtor-in-possession. The Debtor obtained approval from the Bankruptcy Court to employ: (1) Mayer Brown LLP as Special Land Use Counsel, and (2) Shemano Law as Bankruptcy Counsel.

On July 31, 2024, the Debtor filed a Notice of Bar Date for Filing Proofs of Claim in a Chapter 11 Case pursuant to LBR 3003-1 providing notice that the claims bar date is September 30, 2024 [ECF No. 26]. To date, nine claims have been filed.

The City obtained an order from the Bankruptcy Court to examine the Debtor under Federal Rules of Bankruptcy Procedure 2004.

The City filed a motion to appoint a Chapter 11 trustee for the Debtor [ECF Nos. 54-57]. The Debtor opposed, and the Bankruptcy Court denied the Motion [ECF No. 70].

The Debtor has not filed or sought to confirm a Chapter 11 plan or taken any significant actions in the bankruptcy proceeding.

V.    **FINANCIAL INFORMATION AND ANTICIPATED FUTURE OF THE DEBTOR**

A.    **Present Condition of the Debtor**

On July 19, 2024, the Debtor filed Statements and Schedules. [ECF No. 20-21.] This is a single-asset real estate case. [ECF No. 1.] The Debtor owns the real

13

property as defined in the Plan as the "Property," and valued it at $67,000,000 in its Schedule A/B based upon an unsigned letter of intent. [ECF No. 20.] The Debtor's only other asset is a Bank of America checking account (account ending 9453). [ECF No. 20.] Debtor's cash balance as of September 30, 2025 was $30,144. [ECF No. 80.]

The Debtor does not operate a business or generate income. The September 2025 Monthly Operating Report provides that the Debtor received $31,075 in cash receipts from its parent company, Cal Coast, and had an ending cash balance of $30,144. [Doc. No. 80.] The Debtor asserts it is current on postpetition tax return filings, postpetition estimated tax payments, U.S. Trustee fees, and the Debtor asserts there has been no postpetition borrowing, other than transfusions of cash from its parent company, Cal Coast.

As of the date of filing this Disclosure Statement, Debtor has filed Monthly Operating Reports through September 2025.

### B. Future of the Debtor

The Debtor represented in its initial and only Chapter 11 status report that it intends to liquidate the Property through a Chapter 11 liquidating plan, but has not filed a plan or sought Bankruptcy Court approval to enter into any contracts regarding the development or sale of the Property.

The Debtor was formed for the sole purpose of holding and developing the Property, utilizing cash infusions from its parent company, Cal Coast. Once the property of the estate is liquidated and distributed to creditors holding Allowed Claims, presumably the Debtor will cease to operate.

## VI. FUNDING AND FEASIBILITY OF THE PLAN

### A. Funding of the Plan

The Plan will be funded through the sale of the Property to the Buyer or another Qualified Developer within the time period set forth in Paragraph 4.4 of the Plan. The City anticipates that the proceeds from the sale of the Property will be sufficient

to pay all Allowed Claims against the Debtor in full pursuant to the provisions of the Plan.

On July 30, 2025, the Debtor and the Buyer entered into a Contract for Purchase and Sale and Escrow Instructions, which is attached to the Plan as Exhibit A (the "Shoreline PSA"), and which is subject to the approval of the Bankruptcy Court. Pursuant to the Shoreline PSA, the Debtor obtained approval of the Vested Tentative Map No. 8643, which includes 144 Single Family Lots and 62 Townhome Units within the boundaries of the Property. The DDA requires the redevelopment of an existing golf course adjacent to the Residential Element, the development of infrastructure within the project and the development of improvements within Monarch Bay Drive.

Pursuant to the Shoreline PSA, the Debtor agreed to sell and the Buyer agreed to purchase the Property for the purchase price of $68,259,000.00. The Buyer agreed to pay an initial earnest money deposit of $100,000.00 within five business days after the effective date of the Shoreline PSA ("Initial Earnest Money"), and an additional earnest money deposit of $10,100,000.00 ("Additional Earnest Money"), for a total of $10,200,000.00 (together, the "Earnest Money"). According to the Debtor, the Debtor has extended the Inspection Period (as defined in the Shoreline PSA) and the deadline for the Buyer to make the Additional Earnest Money Deposit.

The City's Plan proposes the same treatment. The Debtor's assets, including the Property, will be transferred to the Liquidating Trust. Leslie T. Gladstone dba Financial Fiduciaries shall be named as the Liquidating Trustee. The Liquidating Trustee will carry out the purpose and intent of the Plan, including selling the Property to the Buyer pursuant to the Shoreline PSA, or in a form substantially similar to the Shoreline PSA, subject to the business judgment of the Liquidating Trustee and with approval of the City. The proceeds from the sale of the Property shall be held in the Liquidating Trust and distributed in accordance with the Plan. Should the sale to the Buyer fail to close, the Liquidating Trustee shall market and

sell the Property to a Qualified Developer on terms substantially similar to the Shoreline PSA, amended as necessary to carry out the terms of this Plan in the business judgment of the Liquidating Trustee, with the consent of the City and the Agreement of the Qualified Developer, and distribute the proceeds and any other assets to creditors in accordance with the terms of the Plan.

To the extent the proceeds of the sale of the Property are insufficient to pay in full the balance of all Allowed Claims, the Liquidating Trustee shall liquidate other Estate Property to the extent necessary to pay all Allowed Claims in full in accordance with the Plan. Any amount in excess of the amount required to be paid on account of Allowed Claims shall be distributed to the Debtor.

### B.    Funding of the Liquidating Trust

The City shall fund the Liquidating Trust with an initial deposit of $500,000.00 on the Effective Date, plus bimonthly deposits up to a maximum of $1,500,000.00. The City's funds used to fund the Liquidating Trust shall be added to the City's Class 1 secured claim and paid in accordance with the Plan.

### C.    Feasibility

The Plan cannot be confirmed unless the court finds it feasible. A Plan is feasible if confirmation of the Plan is not likely to be followed by Debtor's liquidation or need for further financial reorganization, unless such liquidation or reorganization is proposed in the Plan (§ 1129(a)(11)). The Plan is feasible because it contemplates a sale of the Debtor's primary asset for the highest potential value (as demonstrated by the Shoreline PSA, the City's prior marketing and estimate of value) which the City anticipates will be sufficient to pay all Allowed Claims in full.

## VII.   OTHER INFORMATION

### A.    Liquidation Analysis

The Plan cannot be confirmed unless the Bankruptcy Court finds that, for each impaired class of claims or interests that has not accepted the Plan, the class will receive or retain no less than if Debtor's estate were liquidated under Chapter 7 of

16

the Bankruptcy Code.

A liquidation analysis is attached hereto as **Exhibit C**. Creditors should note that on a liquidation basis, full market value for assets cannot be obtained. Further, there are costs associated with a liquidation of assets that must be paid out of any sale proceeds. The liquidation analysis does not contain an estimation of any tax liability which could be associated with liquidation. This analysis is provided for informational purposes only and to establish that the Plan provides a greater return than a Chapter 7 liquidation.

**B.     Tax Consequences**

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. ALL CREDITORS AND EQUITY INTEREST HOLDERS SHOULD CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE SALE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FEDERAL TAX LAWS.

IN NO EVENT WILL THE CITY OR ITS PROFESSIONAL ADVISORS BE LIABLE FOR ANY TAX CONSEQUENCES OF THE PLAN. CREDITORS AND EQUITY SECURITY HOLDERS MUST LOOK SOLELY TO AND RELY SOLELY UPON THEIR OWN ADVISORS AS TO THE TAX CONSEQUENCES OF THIS PLAN.

**1.     To Creditors and Equity Security Holders**

The City has not obtained a tax opinion and does not express any opinion as to the tax consequences to the creditors or equity security holders. The Tax Code embodies many complicated rules which make it difficult to state completely and accurately all the tax implications in any action. Interested parties are encouraged to obtain their own professional counsel to determine the tax consequences of the Plan. For example, creditors may realize taxable income upon the Effective Date funding of the Liquidating Trust, or creditors may realize taxable income when their claim is

17

paid unless they already reported that accrued income as an accrual basis taxpayer.

### 2. Certain U.S. Federal Income Tax Consequences of the Liquidating Trust

This discussion is provided for information purposes only, and is based on provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), Treasury Regulations, judicial authorities, and current administrative rulings and practice, all in effect on the date hereof. The tax consequences described in this Disclosure Statement are subject to significant uncertainties.

The Debtor is an LLC that has filed tax returns as a pass-through entity for income tax reporting purposes. Other than California annual minimum tax and LLC California tax fees based upon income, the Debtor is not anticipated to incur any income taxes as a result of the proposed transactions pursuant to the Plan.

The Liquidating Trust is intended to qualify as a liquidation trust for U.S. federal income tax purposes. In general, a liquidation trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor" trust (i.e., a pass-through entity). The IRS, in Revenue Procedure 94-45, 1994-28 I.R.B. 124, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidation trust under a chapter 11 plan. The Liquidating Trust has been structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45. All parties (including the Debtor, the Liquidating Trustee and the beneficiaries of the Liquidating Trust (the "Liquidating Trust Beneficiaries")) are required to treat for U.S. federal income tax purposes, the Liquidating Trust as a grantor trust of which the Liquidating Trust Beneficiaries are the owners and grantors.

Under the terms of the Plan, the property of the Estate will be transferred to the Liquidating Trust in a taxable disposition. The tax consequences of the Plan, however, are subject to many uncertainties due to the complexity of the Plan and the lack of interpretative authority regarding certain changes in the tax law. Uncertainties

with regard to the U.S. Federal income tax consequences of the Plan also arise due to the inherent nature of estimates of value that will impact the determination of the amount of income or gain from the transfer of property of the Estate to the Liquidating Trust.

As of the Effective Date, the Liquidating Trust shall be established for the benefit of all Liquidating Trust Beneficiaries. The Liquidating Trustee will make a good-faith valuation of the assets transferred to the Liquidating Trust (the "Liquidating Trust Assets"). All parties (including, without limitation, the Debtor, the Liquidating Trustee and the Liquidating Trust Beneficiaries) must consistently use such valuation for all U.S. Federal income. The Debtor should report the disposition to the Liquidating Trust at the same value as the Liquidating Trust and the Liquidating Trust Beneficiaries use for tax purposes.

The Liquidating Trust and the Liquidating Trust Beneficiaries may be subject to Federal and State income tax withholding requirements. The Liquidating Trustee is required to file tax reports with information relating to the Liquidating Trust Beneficiaries. Liquidating Trust Beneficiaries are required to provide the Liquidating Trustee with an executed Form W-9 as a condition of being eligible to receive Liquidating Trust distributions under the Plan. The Liquidating Trustee may use the W-9 information for tax withholding and tax reporting purposes.

## C.    Amendments to DDA, DA, the Debtor PSA and Shoreline PSA

The Plan provides that the DDA, the DA and the Debtor PSA will be amended consistent with the purpose and intent of the Shoreline PSA, including that the Buyer shall retain all responsibility for the Residential Element and the Golf Course Element, and the Buyer shall assume the requirements for completion of the Monarch Bay Drive Element and the portions of the Infrastructure Element needed to support the Residential and Golf Course Elements. The Liquidating Trustee, with the consent of the City and the agreement of the Buyer, may amend other terms of the Shoreline PSA, DDA, DA and the Debtor PSA in her business judgment.

19

### D.   Discharges, Injunctions, Releases and Exculpation

#### 1.   Discharge of the Debtor

The Plan provides that the rights afforded in the Plan shall be in exchange for a discharge of the Debtor, the Debtor-In-Possession and the Liquidating Trust. Section 7.1 of the Plan provides:

> **Except as otherwise provided in this Plan, the rights afforded in the Plan shall be in exchange for and in complete satisfaction, discharge, and release of all Claims of any nature or kind whatsoever, including any interest accrued thereon, from and after the Confirmation Date, against the Debtor, the Debtor-In-Possession, or the Liquidating Trust, and any of its assets or properties whether or not (i) a proof of claim based on such debt is filed or deemed filed under Bankruptcy Code Section 501, (ii) such Claim is allowed under Bankruptcy Code Section 502, or (iii) the holder of such Claim has accepted the Plan. The discharge and release granted herein is intended to be as broad as permissible by the Bankruptcy Code and will forever bar any Claim, suit, demand, or action by any person on account of a Claim which arose prior to confirmation of the Plan. The discharge granted pursuant to confirmation of the Plan will affect all Claims held by third parties as of the Confirmation Date. It will not affect or modify the rights granted to Creditors pursuant to the Plan itself.**

#### 2.   Injunction

Section 7.4 of the Plan contains an injunction provision relating to the Debtor's discharge and release which provides:

> **Except as otherwise provided in this Plan, the discharge and release granted to the Debtor will operate as an injunction against the commencement or continuation of an action, employment of process, or an act to collect, recover, or offset any debt or Claim otherwise discharged and paid under the Plan as a liability of the Debtor, whether or not the discharge of such debt is waived.**
>
> **Except as otherwise provided in the Plan, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all**

20

2:24-BK-14877-DS

Persons who have held, hold or may hold Claims against the Debtor or the Estate will be, with respect to any such Claims, permanently enjoined from and after the Confirmation Date from: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor or the Liquidating Trust or any of its property or any direct or indirect successor in interest to the Debtor or the Liquidating Trust or any property of any such successor; (b) enforcing, levying, attaching (including, without limitation, any pre judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Debtor or the Liquidating Trust or any of its property or any direct or in direct successor in interest to the Debtor or the Liquidating Trust or any property of any such successor; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtor or the Liquidating Trust or any of its property or any direct or indirect successor in interest to the Debtor or the Liquidating Trust or any property of any such successor. The injunction set forth in the Plan enjoins, to the fullest extent permitted by applicable law, all Persons from acting or proceeding in any manner, in any place whatsoever, that does not conform or comply with the provisions of the Plan.

### 3.    Exculpation and Releases

The Plan contains exculpation and releases in favor of the City, the Buyer (or other Qualified Developer) and the Debtor. Section 7.5.1 of the Plan provides:

Effective upon the entry of the Plan Confirmation Order, to the maximum extent permitted by law and except to the extent arising from fraud, willful misconduct, or gross negligence, neither the City, nor the Buyer (or other Qualified Developer), nor the Debtor nor any of their respective officers, directors, shareholders, or professionals retained in connection with this Case, shall have or incur any liability to any person or entity, including any Creditor of Debtor, for any act taken or omission made from the Petition Date to the Effective Date of the Plan in

**connection with or related to the negotiation, formulation, or preparation of the Plan and the Disclosure Statement, the approval of the Disclosure Statement, the confirmation of the Plan, the consummation of the Plan, or the administration of the Plan, the Case, or the property to be distributed under the Plan, except that Debtor will be liable for performance of the obligations assumed by it or imposed upon it under or by the Plan.**

Section 7.5.2 of the Plan provides a release for the City from the Debtor's parent company, Cal Coast, as follows:

**Cal Coast and its affiliates shall waive all remaining rights, claims and demands arising under the DDA, DA, Debtor PSA, and Shoreline PSA, including but not limited to leases of real or personal property, license agreements, or other rights or agreements related to the Shoreline Project, and release the City from all obligations thereunder.**

Section 7.5.3 of the Plan provides a release for Cal Coast from the City, as follows:

**The City shall waive all remaining rights against Cal Coast under the DDA, DA, and Debtor PSA, and release Cal Coast from all obligations thereunder.**

## E.    Risk Analysis and Alternatives to the Plan

Before voting on the Plan, each Holder of a Claim entitled to vote should carefully consider the risk factors described below, as well as all other information contained in this Disclosure Statement, including the schedules and exhibits hereto. These risk factors should not be regarded as the only risks involved in connection with the Plan and its implementation.

### 1.    Plan Implementation

The Debtor has stated that its exit strategy in Chapter 11 is to sell the Property to a developer through a Chapter 11 plan. Postpetition, the Debtor entered into the Shoreline PSA with the Buyer. The Debtor does not operate or earn revenue, and

22

2:24-BK-14877-DS

therefore the Plan does not depend on any operations of the Debtor or its ability to generate sufficient revenue over time to fund the Plan. The Debtor has not proposed a Chapter 11 plan. As a result, the only alternative to the City's Plan is a Chapter 7 liquidation, which would decrease the return to holders of claims and interests.

Prior to proposing the Plan, the City conducted market and economic analysis regarding the fair market value of the Property, including: (1) the strength of the market for real property which is contractually obligated to be developed into a residential element of a larger-scale multi-use development; (2) the ability to locate qualified prospective developers to purchase the property; and (3) the relationship of the Property to the connected parcel, also subject to the DA. Given its past ownership of the Property, and as it is a party to the DA and the DDA, the City believes that a sale in Chapter 11 will generate a higher value than a Chapter 7 liquidation or outside of the Bankruptcy Court.

The Plan also promotes the public interest by selling the Property to a Qualified Developer to construct a development for the benefit of the citizens of the City of San Leandro. The City commenced the Shoreline Project in or about October 2008, with a vision for the development that will (i) provide complementary amenities to the citizens of the City of San Leandro; (ii) connect the amenities with current shoreline users; (iii) recognizes the development value of this desirable regional location, and how commercial development can fund public amenities and services; (iv) addresses logical phasing of development; (v) requires little or no City investment; and (vi) results in a Shoreline which is self-supporting. The City believes that the Plan is the most cost-effective and efficient solution to construct the Residential Element of the Shoreline Project.

## 2.    Risks Regarding the Property

The Plan relies on the sale of the Property to produce cash for distribution to Claimants and Equity Interests. If the sale is delayed, or the Liquidating Trust incurs costs that exceed estimates, or sale proceeds are below the Purchase Price in the

2:24-BK-14877-DS

Shoreline PSA, payments may be correspondingly delayed or decreased. The various risks associated with the Property and the real-estate industry include economic conditions; the supply and demand for properties; changes in interest rates; changes in environmental laws or regulations, planning laws and other governmental roles and fiscal and monetary policies; changes in real-property tax rates and related tax deductions; negative developments in the economy that depress travel and retail activity; uninsured casualties; force majeure acts; terrorist events; under-insured or uninsurable losses; and other factors that are beyond the reasonable control of the Liquidating Trust. In addition, real-estate assets are subject to long-term cyclical trends that can give rise to significant volatility in values.

Under the Plan, if the Liquidating Trustee is unable, after utilization of reasonable marketing and solicitation efforts, to sell the Property within the time specified in Section 4.4 of the Plan, then, at the option of the City: (1) the Property will revert to the City, free and clear of any Claim or Interest of the Debtor, the Liquidating Trust, or any other party, except for reasonable costs associated with the administration of the Liquidating Trust; or (2) the City may exercise its rights under the Note and Deed of Trust.

## F.    Litigation

The Plan provides that all claims for avoidance and the recovery of avoidable transfers and/or preferences shall be transferred to the Liquidating Trust. As such, the Liquidating Trustee might sue you if, for example, you received a transfer of funds or any other property from the Debtor that is avoidable under the Bankruptcy Code.  Other types of claims also may be made, and the Plan proponent has not completed investigations, but the anticipated and pending legal proceedings by the Liquidating Trustee are claims against Cal Coast for the transfers made to Cal Coast within the one-year period prior to the Petition Date.

The City anticipates that the value of avoidable transfers is at least $588,479.83.

24

2:24-BK-14877-DS

### G.    Special Procedures

This Disclosure Statement and the accompanying Plan, with exhibits, are the principal documents for the proposed Liquidating Plan, but the court may authorize more lengthy documents to be filed separately (a Plan supplement), or may authorize shorter documents to be served on some classes. Streamlined procedures are encouraged, both to save costs and because that may provide creditors and other parties in interest with more meaningful disclosure. For example, the court may consider: (1) whether, instead of receiving the full Plan and Disclosure Statement, some classes should receive a "court-approved summary" such as a brief table showing the proposed treatment of each class, with prominent instructions on how to request a copy of the full documents and/or review them online (*see* § 1125(b) & (c) and Rule 3017(d)(1)); (2) whether to establish special procedures for transmitting documents and information "to beneficial holders of stock, bonds, debentures, notes, and other securities" (*see* Rule 3017(e)), (3) whether to adjust any deadlines (*see* Rule 9006(c)), and (4) whether to adopt any other special procedures.

## VIII.  CONFIRMATION OF THE PLAN

### A.    The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Court, after notice, to hold a hearing regarding confirmation of the Plan. Section 1128(b) provides that any party in interest may object to Plan confirmation.

The Court has scheduled the Confirmation Hearing to commence on **_____, at __:00 _.m. (Pacific Time)**, before the Honorable _____, United States Bankruptcy Judge, in the United States Bankruptcy Court for the Central District of California. The Confirmation Hearing Notice sets forth the time and date of the Confirmation Hearing. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof. Objections to Confirmation of the Plan must be filed and served so that they are

2:24-BK-14877-DS

actually received by no later than _____, **at 11:59 p.m. (Pacific Time). Unless objections to Confirmation of the Plan are timely served and filed in compliance, they may not be considered by the Bankruptcy Court**.

### B.    Plan Confirmation Requirements

Confirmation of the Plan requires, among other things, that the Plan (i) is accepted by all impaired Classes or, if rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such impaired Class; (ii) is feasible; and (iii) is in the "best interests" of holders of Claims. At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The City believes that: (i) the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11 of the Bankruptcy Code, (ii) the City has complied or will have complied with all of the necessary requirements of chapter 11 of the Bankruptcy Code, and (iii) the Plan has been proposed in good faith.

More specifically, the City believes that the Plan satisfies the following Confirmation requirements of section 1129 of the Bankruptcy Code: (i) the Plan complies with the applicable provisions of the Bankruptcy Code; (ii) the City has complied with the applicable provisions of the Bankruptcy Code; (iii) the Plan has been proposed in good faith and not by any means forbidden by law; (iv) either each holder of a Claim in an impaired Class has accepted the Plan, or each such Holder will receive or retain under the Plan on account of such Claim property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive or retain if the Debtor was liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code; (v) the Classes of Claims that are entitled to vote on the Plan will have accepted the Plan, or at least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class, and the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Class of

26

Claims that is impaired under, and has not accepted, the Plan; (vi) except to the extent a different treatment is agreed to, the Plan provides that all Allowed Administrative Claims and Allowed Priority Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable; and (vii) all accrued and unpaid fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid through the Effective Date.

## IX.    RECOMMENDATION

The City believes that confirmation of the Plan will result in the maximization of value of the Estate and the payment in full of all Allowed Claims and urges all impaired Creditors to vote in favor of and support confirmation of the Plan.

DATED:  December 5, 2025

ROBBERSON SCHROEDTER LLP

By: */s/ Maggie E. Schroedter*
MAGGIE E. SCHROEDTER, ESQ.
LANE C. HILTON, ESQ.
Attorneys for Secured Creditor
THE CITY OF SAN LEANDRO

| Exhibits to Plan | Description | Exhibits to Disclosure Statement | Description |
|---|---|---|---|
| A | Shoreline PSA | A | First Amended Chapter 11 Liquidating Plan |
| B | Liquidating Trust Agreement | B | Projected Revenue and Expenses |
| | | C | Liquidation Analysis |
| | | D | List of Executory Contracts to Be Assumed |
| | | E | Ballot |
| | | F | Order or Notice Regarding Deadlines and Procedures |

1

## <u>EXHIBIT A</u>

**First Amended Chapter 11 Liquidating Plan**

**[Filed Separately]**

# EXHIBIT B

## Projected Revenue and Expenses

| Income | |
|---|---|
| Purchase Price of Property | $68,259,000.00 |
| Preferences | $588,479.83 |
| **Total Income** | **$68,847,479.83** |
| | |
| **Expenses** | |
| Liquidating Trustee Value Fee 2% | $1,365,180.00 |
| Adequate Assurance Reserve | $9,300,000.00 |
| Professional Fees (Debtor)(est.) | $150,000.00 |
| Priority Tax Claims | $2,941.15 |
| Alameda County Tax Secured Claim | $1,064,024.00 |
| City Secured Claim (includes trust funding) | $31,093,704.57 |
| Unsecured Claims | $459,179.82 |
| **Total Expenses** | **$43,435,029.54** |
| | |
| **Net Income** | **$25,412,450.29** |

2:24-BK-14877-DS

## EXHIBIT C

## Liquidation Analysis

| Description | FMV | Liquidation Value | Secured Claims | Net Proceeds |
|---|---|---|---|---|
| Cash (est.) | $30,000.00 | $30,000.00 | $0.00 | $30,000.00 |
| Property* | $31,875,000.00 | $29,962,500.00 | $32,157,728.57 | $0.00 |
| Preferences | $588,479.83 | $588,479.83 | $0.00 | $588,479.83 |
| **TOTAL** | | | | **$618,479.83** |
| | | | | |
| Net Proceeds | | | $618,479.83 | |
| Chapter 7 Trustee Fees | | | -$34,173.99 | |
| Trustee's Professionals | | | -$25,000.00 | |
| Chapter 7 Liabilities | | | $0.00 | |
| Chapter 11 Liabilities | | | -$150,000.00 | |
| | | | | |
| NET FUNDS AVAILABLE FOR UNSECURED CREDITORS | | | $409,305.84 | |

| Hypothetical Chapter 7 Trustee Fees | | |
|---|---|---|
| $618,479.83 | Total disbursements | |
| $0.00 | Minus exemptions | |
| $0.00 | Minus adjustments* | |
| $618,479.83 | = Net disbursements | |
| § 326 calculations | | |
| $5,000.00 | X 25%= | $1,250.00 |
| $45,000.00 | X 10%= | $4,500.00 |
| $568,479.83 | X 5%= | $28,423.99 |
| $0.00 | X 3%= | $0.00 |
| $618,479.83 | Totals | $34,173.99 |
| Adjustment (if any) | | $0.00 |
| Trustee Fee | | $34,173.99 |
| *Property value assumes 85% of City estimated FMV, and 6% cost of sale. | | |

2:24-BK-14877-DS

## **EXHIBIT D**

### **List of Executory Contracts to be Assumed**

1.      Disposition and Development Agreement, dated July 22, 2020, and as amended on March 17, 2021, on June 21, 2022, and on December 19, 2022.

2.      Development Agreement, dated December 22, 2022, and as recorded with the Alameda County Recorder on December 30, 2022.

3.      The Purchase and Sale Agreement between the Debtor and the City, dated July 22, 2020, and as amended on March 17, 2021 and June 21, 2022.

4.      The License Agreement, dated December 22, 2022.

1

## EXHIBIT E

2

**Ballot**

3

**[Filed Separately]**

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2:24-BK-14877-DS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT F

**Order or Notice Regarding Deadlines and Procedures**

**[Filed Separately]**

2:24-BK-14877-DS